IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALINA BOYDEN and
SHANNON ANDREWS,

                Plaintiffs,                             Case No. 17-cv-264

       v.

STATE OF WISCONSIN DEPARTMENT
OF EMPLOYEE TRUST FUNDS, et al.,

                Defendants.

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO
STATE DEFENDANTS' MOTION TO DISMISS**

---

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL AND STATUTORY BACKGROUND ......................................................... 3

LEGAL STANDARDS ................................................................................................... 6

ARGUMENT .................................................................................................................. 8

I.   Plaintiffs' Claims Satisfy Article III's Standing Requirements. ............................. 8

    A.   Plaintiffs' Injuries Are Traceable to the State Defendants. ................................ 8

    B.   Injunctive Relief and Damages Awards Directed to State Defendants Will Redress Plaintiffs' Injuries. ............................................................................................ 11

II.   Defendants Conlin, Cross, Blank and Golden Are Proper Defendants Under 42 U.S.C. § 1983. .................................................................................................................. 14

    A.   The Named State Officials Are Sufficiently "Personally Involved" in the Violation of Plaintiffs' Equal Protection Rights to Be Held Liable For Damages in their Personal Capacities. ................................................................................................... 15

    B.   The Eleventh Amendment Does Not Bar Plaintiffs' *Ex Parte Young* Claims For Injunctive Relief Against Named State Officials in their Official Capacities. ............ 18

III.   Plaintiffs State Title VII Claims Against the State Defendants. ......................... 20

    A.   The Board of Regents and ETF are Liable for Employment Discrimination against Plaintiffs. ............................................................................................................ 20

    B.   Defendants' Policy of Excluding Insurance Coverage for Transition-Related Care is Discriminatory on Its Face, so Plaintiffs are Not Required to Separately Allege or Prove that Defendants Intended to Discriminate. ......................................................... 24

    C.   Defendants ETF and GIB Exerted Control Over Plaintiffs' Employment Benefits and Significantly Affected Access to Plaintiffs' Employment Benefits, So They are Liable Under Title VII. .................................................................................................. 26

IV.   Plaintiffs Have Adequately Plead ACA Claims Against GIB; Their Claims Against ETF and GIB Should Not Be Stayed. ......................................................................... 32

    A.   Plaintiffs' Allegations Show That GIB is a "Covered Entity" Subject to the ACA. ......... 32

    B.   Plaintiffs' ACA Claims Should Not Be Stayed. ............................................... 35

CONCLUSION ................................................................................................................. 38

Plaintiffs Alina Boyden and Shannon Andrews ("Plaintiffs"), through their undersigned attorneys, submit this brief in opposition to the State Defendants'[1] Motion to Dismiss or Stay (Dkt. 28).

## INTRODUCTION

Plaintiffs are two women who are transgender, which means the gender assigned to them at birth does not match their core understanding of their gender, or gender identity. Alina Boyden works at the University of Wisconsin as a graduate teaching assistant, and Shannon Andrews works at the School of Medicine and Public Health as a researcher in the Carbone Cancer Center. Their Amended Complaint (the "Complaint") (Dkt. 27) alleges that Defendants have violated their rights to Equal Protection, to equal terms and conditions of employment under Title VII of the Civil Rights Act of 1964, and to equal treatment in health coverage under section 1557 of the Affordable Care Act ("ACA"), by adopting and enforcing a categorical exclusion of coverage of "procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment" in all state employee health insurance plans.

In their motion to dismiss, State Defendants do not dispute that Plaintiffs have been injured by the enforcement of the State's policy excluding coverage of transition-related care. They do not dispute that the exclusion substantively violates Plaintiffs'

---

[1] The "State Defendants" are: the State of Wisconsin Department of Employee Trust Funds ("ETF"); the Wisconsin Group Insurance Board ("GIB"); Robert J. Conlin, the Secretary of ETF ("Conlin" or "the Secretary"); the Board of Regents of the University of Wisconsin System (the "Regents"); Raymond W. Cross, the President of the University of Wisconsin System ("Cross" or "the President"); Rebecca M. Blank, Chancellor of the University of Wisconsin Madison ("Blank" or "the Chancellor"); the University of Wisconsin School of Medicine and Public Health ("SMPH"); and Robert N. Golden, Dean of SMPH ("Golden" or "the Dean").

constitutional rights to equal protection of the laws, or their statutory rights to equal terms and conditions of employment under Title VII and to equal treatment in health coverage under section 1557 of the Affordable Care Act. (Defs.' Br. (Dkt. 29)[2] at 1 ("leaving aside these claims' merits . . .")).[3]

Instead, Defendants misconstrue standing and sovereign immunity doctrines and the coverage provisions of Title VII and the Affordable Care Act to argue in essence that *no one* can be held liable for such violations. (*Id.* (". . . plaintiffs' complaint pleads the wrong claims against the wrong state entities and officials . . .")). However, as explained below, because each of the State Defendants either adopted or enforces and administers the unlawful employee health insurance policy at issue in this case, they are proper defendants under 42 U.S.C. § 1983, Title VII and the ACA. ETF and GIB created the discriminatory exclusion in state employee health insurance contracts. The employer defendants—the Regents, the SMPH and their administrators—only offered the Plaintiffs policies that included the discriminatory exclusion. And ETF and Secretary Conlin administer the health insurance policies and enforced the discriminatory exclusion against the Plaintiffs.

---

[2] All page citations to the State Defendants' brief refer to the numbers at the bottom of the page, not to the page numbers assigned by the ECF system.

[3] Such an argument would be exceedingly difficult in light of the Seventh Circuit's decision in *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), which held that discrimination against a transgender student was sex discrimination in violation of Title IX and the Equal Protection Clause.

## FACTUAL AND STATUTORY BACKGROUND

The Plaintiffs are state employees eligible for state-provided health insurance. (Compl. ¶¶ 7, 43, 64.) Their health care providers have concluded that they have gender dysphoria that should be treated with hormone therapy and gender confirmation surgery. (Compl. ¶¶ 42, 47, 63, 67-70.) Their employee health insurance policies contain an exclusion that discriminates against them based on their sex and transgender status by denying them coverage for these medically necessary treatments. (Compl. ¶¶ 8, 9, 85, 91, 98-102, 109.) State Defendants each have, and at all relevant times had, a statutory role in the adoption and/or enforcement of the discriminatory health insurance exclusion Plaintiffs challenge in this case. (Compl. ¶¶ 20-27, 36-41, 48-56, 72-79.)

Defendant ETF is the executive branch agency, created by state statute (Wis. Stat. § 15.16), charged with providing retirement, health insurance and other benefit programs to state and local government employees. (Compl. ¶ 20; *see* Wis. Stat. § 40.01(1) (among the statutory purposes of the ETF is providing "aid [to] public employees in protecting themselves . . . against the financial hardships of . . . illness and accident . . . by establishing equitable benefit standards throughout public employment.").) ETF manages state employee health insurance, defined as "contractual arrangements which may include, but are not limited to, indemnity or service benefits, or prepaid comprehensive health care plans, which will provide full or partial payment of the financial expense incurred by employees and dependents as the result of injury, illness or preventive medical procedures." Wis. Stat. § 40.02(37).

Defendant GIB is one of five boards within ETF. Wis. Stat. § 15.165(2) ("There is created in the department of employee trust funds a group insurance board."). GIB sets policy for group insurance benefit programs (Compl. ¶ 21; *see* Wis. Stat. § 40.03(6)), while the ETF Board provides oversight for the entire department. *See* Wis. Stat. § 40.03(1). The ETF Board appoints the Secretary of the Department[4] to administer the public employee trust funds as defined in Wis. Stat. § 40.01. The GIB sets the guidelines for eligibility and specifies the contractual terms for group health insurance plans for state employees. Wis. Stat. § 40.52(1) ("The group insurance board shall establish by contract a standard health insurance plan in which all insured employees shall participate . . ."). ETF hears appeals from denials of coverage by health insurance administrators, such as Defendant Dean Health Plan (the administrator of Plaintiff Boyden's plan) and WPS Insurance (the administrator of Plaintiff Andrews' plan). Wis. Adm. Code Ch. ETF 11.[5] Andrews filed an appeal to ETF under these procedures after WPS denied coverage of her surgery. (Compl. ¶ 79.)

Defendant Conlin, as Secretary of the Department, is "in charge of the administration of the department and exercise[s], as head of the department, all powers

---

[4] Wis. Stat. § 40.03(1)(c) (the ETF board "[s]hall appoint the secretary of the department and may employ or select any medical, legal and other independent contractors as are required for the administration of the fund").

[5] *See also*, "ETF Insurance Complaint Information" (April 21, 2016) (available at http://etf.wi.gov/publications/et2405.pdf (last visited August 11, 2017)). When deciding motions to dismiss for failure to state a claim, "[c]ourts may take judicial notice of . . . matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parunago v. Community Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017). Courts routinely take judicial notice of documents posted on government websites. *See, e.g.*, *Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003).

and duties" exercised by other department secretaries. (Compl. ¶ 22; Wis. Stat. §

40.03(2)(a).) These powers and duties include the power to "plan, direct, coordinate and

execute the functions vested in the department." Wis. Stat. § 15.04(1)(a).[6] Specifically,

the Secretary "[s]hall promulgate, with the approval of the group insurance board, all

rules required for the administration of the group health . . . insurance plans." Wis. Stat.

§ 40.03(2)(ig). In addition, the Secretary is tasked with "determin[ing] whether there is

any arbitrary discrimination" and, if he finds such discrimination, taking "remedial

action." Wis. Stat. § 15.04(1)(g).

The State Employer Defendants (the Board of Regents and the Medical School,

along with their chief executive officers) offer only health insurance plans containing

the discriminatory coverage exclusion to their employees, including the Plaintiffs. Wis.

Stat. § 40.52(1) ("all insured employees shall participate" in standard employee health

plans devised by GIB and ETF).[7] Under Wis. Stat. § 36.155(7), the Regents or the

Chancellor of U.W. Madison must "establish and maintain consistent employment

---

[6] *See also*, Wis. Dep't of Employee Trust Funds, *The Role of the Secretary* 1 (April 2012) (available at http://etf.wi.gov/boards/gov_manual_retirement/11_secretary_role.pdf (last visited August 11, 2017)), which provides that the "Secretary will provide executive leadership for the policy development and administration of a broad array of pension and other public employee benefits . . ." by, *inter alia*, "[d]eveloping and recommending policy . . . to the . . . Group Insurance . . . Board[] relating to: 1) changes in the design of existing employee benefit plans; and 2) the creation of new benefit plans for public employees at all levels of government in the State of Wisconsin . . ." and "[e]nsuring the effective implementation of the policies adopted . . . by the Boards through selecting, training, motivating, and providing overall direction to Department staff . . . ."

[7] The term "employer" is defined in the Employee Trust Funds Chapter of the Statutes to include "the state, including each state agency . . . ." Wis. Stat. 40.02(28). Under Wis. Stat. § 40.02(25)(b), employees of the University of Wisconsin are "eligible employees" for purposes of group health insurance.

5

relations policies and practices for all system employees . . . ." More specifically, Wis. Stat. § 40.51(6) requires state employers, like the University of Wisconsin and the Medical School, to "offer to all of its employees at least 2 insured or uninsured health coverage plans . . ." established and administered by ETF and GIB.

ETF employee health insurance plans excluded coverage of transition-related care until mid-July 2016, when GIB, at ETF staff's recommendation, amended its policy to permit coverage beginning in January 2017. (Compl. ¶¶ 36-37.) However, in December 2016, GIB reversed course, directing that, upon the satisfaction of four criteria, the ban on coverage of transition-related care would be reinstated; in January 2017, GIB and ETF Secretary Conlin[8] approved reinstatement of the ban, effective February 1, 2017. (Compl. ¶¶ 38-40.)

## LEGAL STANDARDS

When considering whether to dismiss for lack of standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) ("In ruling on a motion to dismiss for want of standing, the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor.").

---

[8] Secretary Conlin issued a memorandum on January 30, 2017, in which he concluded, in consultation with the GIB chair, that the criteria for reinstating the ban on coverage of transition-related care had been met and stated that "ETF issued a 2017 health plan contract amendment to all participating health plans to reinstate the benefit exclusion, effective February 1, 2017." (Memo available at http://etf.wi.gov/boards/agenda-items-2017/gib0208/item4.pdf (last visited August 11, 2017)).

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court construes the complaint in the light most favorable to plaintiffs, accepting well-pleaded facts as true and drawing all reasonable inferences in plaintiffs' favor. *See Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 504 (7th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In order to survive such a motion, Plaintiffs are only required to plead "allegations plausibly suggesting" an entitlement to relief. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). "[S]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). As the Seventh Circuit has explained, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Erickson* and *Iqbal*, do not "cast any doubt on the validity of Rule 8 of the Federal Rules of Civil Procedure," which requires that a pleading contain "a short and plain statement of the claim . . . ." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403-04 (7th Cir. 2010). Rather, these decisions simply require "more careful attention to" whether a complaint "give[s] the opposing party 'fair notice'; how much detail realistically can be given, and should be given, about the nature and basis or grounds of the claim; and in what way is the pleader expected to signal the type of litigation" before the court. *Id.* at 404. In "many straightforward cases, it will not be any more difficult today for a plaintiff to meet [the pleading standard under *Twombly* and *Iqbal*] than it was before the Court's recent decisions." *Id.* In fact, a discrimination complaint generally need only "identif[y] the type of discrimination . . ., by whom . . ., and when . . . ." *Id.* at 405.

7

## ARGUMENT

### I.   Plaintiffs' Claims Satisfy Article III's Standing Requirements.

Defendants fundamentally misconstrue the requirements of Article III in arguing that Plaintiffs' injuries are not "fairly traceable" to any of the State Defendants and that such injuries cannot be redressed by injunctive relief or damages remedies directed to these Defendants. Contrary to Defendants' assertions, a defendant need not be the sole or primary decision-maker or actor for an injury to be traceable to that defendant. An administrative official's enforcement of the policy decision of another body more than suffices to make the injury caused by that policy traceable to the agency or administrative official. Also contrary to Defendants' assertions, an order does not need to be addressed to a defendant who has the authority to amend a challenged policy. An order to an official or entity responsible for administering or enforcing an unlawful policy to cease its enforcement or to pay the plaintiff damages for injury caused by enforcement of the policy redresses the plaintiff's harm, even if the unlawful policy remains on the books.

### A.   Plaintiffs' Injuries Are Traceable to the State Defendants.

Article III's "case or controversy" provision requires that "there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant . . . ." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). While a plaintiff must allege that a defendant's actions were in the chain of causation resulting in the plaintiff's injury, the showing required to satisfy the traceability requirement "is relatively modest," particularly at the pleadings stage. *Id.* at

171. The Seventh Circuit has indicated that an allegation that a defendant's action or inaction is a "but for" cause of the plaintiff's injury will suffice, even if multiple other actors were involved in the deprivation. *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 500-01 (7th Cir. 2005) ("The Secretary's silent approval caused that potential to become a reality because, *but for* her approval, the compact would have no effect.") (emphasis added).

Thus, a more demanding showing of "[p]roximate causation is *not* a requirement of Article III standing, which requires *only* that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (emphasis added). Similarly, a defendant's actions need not be "the very last step in the chain of causation" to satisfy the minimal traceability requirement. *Bennett*, 520 U.S. at 168-69. So long as the defendant has some involvement in the administration or enforcement of an unlawful policy that causes harm to a plaintiff, the traceability standard is satisfied.

As Plaintiffs alleged and as explained above, Defendants ETF and Secretary Conlin, administer the health insurance policies for state employees. Wis. Stat. §§ 40.01(1), 40.02(37), 40.03(2)(a), 15.04(1)(a), 40.03(2)(ig). The Employer Defendants (the Board of Regents and the Medical School, along with their chief executive officers) offer only health insurance plans containing the discriminatory coverage exclusion to their employees, including the Plaintiffs. Wis. Stat. §§ 40.51(6), 40.52(1).

Defendants fixate on the fact that the GIB, rather than the named defendants, "actually decided" to exclude coverage of transition related care from the health

9

insurance contracts created and enforced by Conlin and ETF and offered to plaintiffs by their employers, the UW system and its officials. (Defs.' Br. at 7-8.)

The fact that GIB made the "decision" to adopt the policy is irrelevant for standing purposes. As an initial matter, GIB is *part of* ETF. Wis. Stat. § 15.165(2) (creating GIB "in the department of employee trust funds"). It is difficult to see why the state department created to provide health insurance to state employees (ETF) should escape liability for the decisions of a constituent board established to set ETF group health insurance policies. In addition, Secretary Conlin issued a memorandum on January 30, 2017, in which he concluded, in consultation with the GIB chair, that the criteria for reinstating the ban on coverage of transition-related care had been met and stated that "ETF issued a 2017 health plan contract amendment to all participating health plans to reinstate the benefit exclusion, effective February 1, 2017." (Memo available at http://etf.wi.gov/boards/agenda-items-2017/gib0208/item4.pdf (last visited August 11, 2017)).

Moreover, in civil rights litigation, it is often the state legislature that "actually decides" to adopt an unlawful or unconstitutional statute, but the proper defendant in such cases is not the legislature (which has sovereign immunity) or individual legislators (who have legislative immunity), but the state official who administers or enforces that statute. "[W]hen a plaintiff challenges . . . a rule of law, it is the state official designated to enforce that rule who is the proper defendant . . . ." *ACLU v. Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993). In such cases, as here, "a controversy exists not because the state official is himself a source of injury, but because the official

represents the state whose statute is being challenged as the source of the injury." *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987). The same is true for the state agency tasked with administering or enforcing an unlawful policy. For example, numerous cases find that a state agency is liable under Title VII for discriminatory policies or practices, even if they were not the "source" of those polices. *See, e.g., Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1089 (1983) (finding that state employer and agency that administer employment benefits are liable under Title VII, even though it was the private companies with whom the employer contracted who set the terms of the policies); *see also* additional cases cited in Section III., *infra.*, finding that employers and agencies that enforce and administer discriminatory employment policies may be subject to liability. If such entities are *liable* under Title VII, they must, *a fortiori*, be proper defendants under Title VII for standing purposes. And there can be no serious doubt that ETF is liable for the agency's actions – including those of GIB – under the ACA, and therefore is a proper defendant under that statute.

## B. Injunctive Relief and Damages Awards Directed to State Defendants Will Redress Plaintiffs' Injuries.

Article III also requires a plaintiff to show a likelihood that her "injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A "favorable decision" by this Court granting an injunction requiring any of the State Defendants to provide insurance coverage or otherwise pay for Plaintiff Alina Boyden's transition-related care would redress her

injury, regardless of whether GIB formally changes the terms and conditions of its employee health insurance. Similarly, a "favorable decision" awarding damages to Plaintiff Shannon Andrews would redress her injury by compensating her for the costs of gender confirmation surgery that Defendants refused to pay pursuant to their discriminatory coverage exclusion.

State Defendants argue that because only GIB has the authority under state statutes to set the terms and conditions of health insurance contracts "none of [the other] defendants can redress Plaintiffs' injuries." (Defs.' Br. at 9.) It may or may not be true that only GIB can *voluntarily* "redress" the Plaintiffs' injuries by changing the illegal terms and conditions excluding coverage of transition-related care. But the question is not whether the named defendant has the authority to change the illegal policy under state law, but whether a "favorable decision" by this Court will remedy Plaintiffs' injury. The fact that these injunctive and monetary remedies running against the State Defendants (other than the GIB) will provide the Plaintiffs with relief is sufficient to satisfy the redressability requirement as to those defendants.

In *Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010), plaintiffs challenged a provision of the Arizona Code of Judicial Conduct. There, as here, defendants argued that "because they [had] no authority to change the Code," an authority reserved for the Arizona Supreme Court, they could not redress the plaintiff's injury. *Id.* at 1056. The court of appeals rejected the defendants' argument, observing that a plaintiff "need not obtain a Code revision . . . in order to obtain a measure of relief." *Id.* The court found the redressability requirement of Article III standing satisfied, because "[e]njoining the

defendants from enforcing the challenged canons will redress [the plaintiff's] injury." *Id.* at 1057. The same is true here of an injunction against enforcing the discriminatory coverage exclusion or ordering the defendants to pay damages.

The two cases cited by Defendants are not to the contrary. In *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), plaintiffs sued state officials to challenge a statute that could be enforced only by private parties bringing civil actions. Because the defendant state officials had no role in enforcement of the statute, no injunctive relief entered against them could redress the plaintiffs' anticipated harm from private lawsuits. *Id.* at 426-27. Here, in contrast, the State Defendants are all directly involved in some way in the administration or enforcement of the exclusion of transition-related care from state employee benefits plans. Secretary Conlin and ETF administer the employee health insurance plans, including implementation of coverage decisions made by the GIB. The State Employer Defendants offer those plans—and only those plans—to their employees and have done nothing to compensate their employees for their discriminatory treatment under those plans. In *Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007), the court found that plaintiffs lacked Article III standing to pursue their challenge to the constitutionality of Utah's criminal prohibition of polygamy against a county clerk, because the clerk did not have power to initiate a criminal prosecution, and the clerk's issuance of a marriage license would not prevent a criminal

13

prosecution,[9] the risk of which was the injury claimed by plaintiffs. *Id.* at 1111. The court found a lack of redressability because "[e]njoining [the clerk] from enforcing § 76-7-101 would be a meaningless gesture. It would not protect plaintiffs from any threat of future criminal prosecution for polygamous behavior; such prosecutions are the province of governmental actors other than [the clerk]." *Id.* at 1112. Here, in contrast, ordering the State Defendants to provide coverage or pay for the medical care that has been denied will make the Plaintiffs whole.

## II.   Defendants Conlin, Cross, Blank and Golden Are Proper Defendants Under 42 U.S.C. § 1983.

In actions alleging constitutional violations under 42 U.S.C. § 1983, the Eleventh Amendment and principles of sovereign immunity preclude suits against a State or its agencies. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). However, under the doctrine of *Ex parte Young*, plaintiffs may sue state officials in their official capacities for injunctive relief from enforcement of unconstitutional policies. Further, plaintiffs may sue state officials in their individual capacities for damages caused by those officials' participation in administration or enforcement of an unconstitutional policy.

------

[9] To the extent *Bronson* could be read more broadly to preclude standing in a case seeking from a county clerk the issuance of a license the clerk would have ministerial authority to issue but for an unconstitutional state law preventing its issuance, it is contrary to the weight of authority. *See, e.g.*, *Bostic v. Schaefer*, 760 F.3d 352, 370-72 & n.3 (4th Cir. 2014) (same-sex couple had standing to sue clerk who refused to issue marriage license and state registrar who administered challenged provisions of state law); *Harris v. McDonnell*, 988 F. Supp. 2d 603, 614 (W.D. Va. 2013) (finding standing to sue clerk who refused to issue marriage license to same-sex couple "[i]t is this enforcement authority that makes the injury traceable to him, regardless of any discretion he does or does not possess.").

A. **The Named State Officials Are Sufficiently "Personally Involved" in the Violation of Plaintiffs' Equal Protection Rights to Be Held Liable For Damages in their Personal Capacities.**

To make out a prima facie case for damages under 42 U.S.C. § 1983 a plaintiff need only demonstrate that (1) "the conduct complained of was committed by a person acting under color of state law," and (2) "this conduct deprived a person of rights, privileges, or immunities secured by the constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Defendants do not dispute that they acted under color of state law. Nor do they dispute, at this stage of the litigation, that excluding transition-related care from coverage under state employee health insurance programs deprives Plaintiffs of their constitutional right to equal protection. (Defs.' Br. at 11 ("The Court need not reach the merits of Plaintiffs' equal protection claims . . . .").) Instead, Defendants argue that they were not "personally involved" in the alleged constitutional deprivations. (*Id.*)

The personal involvement test requires "some causal connection" or "affirmative link" between the action complained about and the official sued to obtain damages under § 1983. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). However, the test does not, as Defendants suggest, require that plaintiffs plead "specific actions regarding health insurance coverage" taken by the Defendants. (Defs.' Br. at 11.) Even after *Iqbal*, the pleading rules "do[] not require detailed factual allegations" in a complaint. 556 U.S. at 678. A complaint need only make a plausible claim that Defendants were "involved in" the constitutional violation — here the discriminatory denial of coverage of Plaintiffs' necessary medical care. The defendants' involvement

15

need not be direct. *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). If the conduct causing the constitutional deprivation occurs at a defendant's direction or with her knowledge or consent, that is sufficient. *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).

The statutes that spell out Defendants' role in providing and administering health insurance coverage for state employees—along with the common sense inference that Defendants perform their statutory duties—more than satisfy that standard. *See Engel v. Buchan*, 710 F.3d 698, 709 (7th Cir. 2013) (complaint must make "allegations [that] permit the court to draw a reasonable inference that the defendant is liable"); *id.* ("draw[ing] on its judicial experience and common sense.") (quoting *Twombly*, 550 U.S. at 679). As explained above, state statutes put Defendant Conlin "in charge of the administration" of the Department of Employee Trust Funds, Wis. Stat. § 40.03(2)(a), whose purposes include providing health insurance coverage to state employees like the Plaintiffs. Wis. Stat. § 40.01(1). He does so by, among other things, "promulgat[ing], with the approval of the group insurance board, all rules required for the administration of the group health . . . insurance plans." Wis. Stat. § 40.03(2)(ig). His agency takes appeals from denials of coverage, Wis. Adm. Code § Ch. 11, such as the appeal filed by Plaintiff Andrews. (Compl. ¶ 79.) Defendants Cross, Blank and Golden, as the top administrators of the UW system, the University of Wisconsin and the University of Wisconsin Medical School, are ultimately responsible for providing health insurance to their employees, including Plaintiffs, under Wis. Stat. § 40.51(6). The insurance they provided to their employees discriminatorily denies coverage for transition-related medical care.

16

Defendants characterize Plaintiffs' complaint as setting forth only "general administrative authority" and "conclusory 'the-defendant-harmed-me'" allegations. (Defs.' Br. at 12.) Plaintiffs allege much more than general authority and conclusions that these defendants harmed them when they assert that defendants have discriminated through the acts of the agencies they lead (Compl. ¶¶ 20, 21, 28, 37-41) and in doing so violated Plaintiffs rights to Equal Protection. (Compl. ¶¶ 85, 90.) Moreover, while Plaintiffs could have cited additional statutory provisions to show Defendant Conlin's role in administering and enforcing the discriminatory insurance policies or the State Employer Defendants' role in offering those policies to their employees, there was no requirement that they do so. "A complaint must narrate a plausible grievance; it need not set out a legal theory or cite authority." *Frank v. Walker*, 819 F.3d 384, 387-88 (7th Cir. 2016) (citing *Johnson v. Shelby*, 135 S. Ct. 346 (2014); *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073 (7th Cir. 1992)); *see also McGee v. Schmidt*, 411 F. Supp. 43, 44 (W.D. Wis. 1976) (in deciding motion to dismiss, taking "judicial notice of the Wisconsin statutes which form the essential ingredients" of case).[10]

Ultimately, the purpose of a complaint is to put the defendants on notice of the nature of the claim against them so they can mount a defense. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[T]he complaint merely needs to give the defendant

---

[10] To the extent the Court believes additional allegations would make the Defendants' role clearer, Plaintiffs should be granted leave to amend. Fed. R. Civ. P. 15(a)(2).

sufficient notice to enable him to begin to investigate and prepare a defense.").

Defendants cannot seriously contend that the Complaint in this case fails to do so.

### B. The Eleventh Amendment Does Not Bar Plaintiffs' *Ex Parte Young* Claims For Injunctive Relief Against Named State Officials in their Official Capacities.

Defendants concede that, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff

may obtain prospective injunctive relief from unconstitutional state action against a

state officer in his or her official capacity, the state's sovereign immunity under the

Eleventh Amendment notwithstanding. (Defs.' Br. at 13.) Defendants also acknowledge

that a court considering a claim under *Ex parte Young* "need only conduct a

'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of

federal law and seeks relief properly characterized as prospective." (Defs.' Br. at 13

(quoting *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Serv. Admin.*, 603 F.3d 365, 371

(7th Cir. 2010).) Defendants admit that "Plaintiffs seek prospective injunctive relief." *Id.*

Defendants nonetheless insist that, because the named individual defendants

"did not *decide* to exclude coverage" for transition-related care and "ha[ve] no power to

*create* the coverage exclusions" (Defs.' Br. at 14 (emphasis added)), they cannot be

proper defendants in an *Ex parte Young* action. Defendants are wrong. Regardless of

who "decides" or "creates" an unlawful policy or statute, the proper defendant in an *Ex

parte Young* action is the official who *enforces* or *administers* the challenged law, as *Ex

parte Young* itself made clear. All that is required is "that the state officer by virtue of his

office has *some connection* with the enforcement of the act . . . ." 209 U.S. at 157 (emphasis

added); *see also Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644-45 (7th Cir.2006).

18

The "some connection" test is not particularly demanding. An official need not be personally involved in the deprivation to be a proper defendant, so long as the official has a role in ensuring implementation of relief. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (holding current warden of prison proper defendant for injunctive relief to remedy inadequate medical treatment provided by medical staff, because warden would be responsible for ensuring compliance with injunction). Conlin would have a role in ensuring compliance with an injunction barring enforcement of the ban on coverage of transition-related care by directing that it is no longer included in insurance contracts and that it is not applied to deprive employees of coverage. The heads of the state employers would have a role in ensuring compliance by offering insurance plans to their employees that do not contain the exclusion or otherwise making available to them the transition-related care they are currently denied. And even where statutes do not expressly confer enforcement authority on a particular state official, the official may be a proper defendant in an *Ex parte Young* action if he or she *indirectly* enforces the statute. *Intn'l Assoc. of Machinists Dist. 10 v. Wisconsin*, 194 F. Supp.3d 856, 863 (W.D. Wis. 2016).

*David B. v. McDonald*, 156 F.3d 780 (1998), cited by Defendants, is not to the contrary. In *David B.*, the court confronted a request by the Illinois Department of Children and Family Services to be relieved of its obligations under a 20-year-old consent decree, because intervening statutory changes created obligations for the department that were potentially inconsistent with the decree's requirements. *Id.* at 782. The court noted that, when the suit was commenced, the named agency heads "were

appropriate to the theory of the case," because federal law required "these defendants' agencies" to provide equal services to plaintiffs, *id.* at 783, just as the Equal Protection Clause requires ETF and Plaintiffs' employers to treat Plaintiffs equally in this case. It was only because the theory of the case changed over the life of the *David B.* decree that the agency, and therefore the head of the agency, was no longer a proper defendant, because the agency had no federal law obligations under that theory. *Id.* That is not true here: ETF and the Plaintiffs' employers remain obligated under the Equal Protection Clause to treat them equally, so the heads of those entities remain appropriate defendants.

The statutes manifestly confer on Secretary Conlin the authority to administer and enforce GIB's health insurance policy decisions, including the exclusion of coverage for transition-related care. Similarly, Cross, Blank and Golden, as Plaintiffs' employers, have "some connection" to the exclusion, because it is contained in all of the policies they offered their employees. This is more than sufficient to satisfy the "some connection" standard.

## III.   Plaintiffs State Title VII Claims Against the State Defendants.[11]

### A.   The Board of Regents and ETF are Liable for Employment Discrimination against Plaintiffs.

Defendants insist that neither the Board of Regents nor ETF can be liable for the discriminatory health insurance benefits because they did not intentionally choose the

---

[11] Plaintiffs agree that, because state law provides that the Regents may be sued for the actions of the University of Wisconsin and its constituent entities, including SMPH (Defs.' Br. at 16-17), SMPH may be dismissed as a defendant. Plaintiffs also agree that the punitive damages claims under Title VII against the State Defendants (Defs.' Br. at 22) may be dismissed.

discriminatory exclusion at issue. (Defs.' Br. at 16.) However, *Norris*, 463 U.S. 1073, addressed similar circumstances to those in the present case and found the State of Arizona and the state agency liable under Title VII for administering employee benefit plans that discriminated on the basis of sex. *Id.* at 1074, 1078. The state agency in that case "invit[ed] private companies to submit bids outlining the investment opportunities that they were willing to offer State employees" and then "selected several companies to participate in its deferred compensation plan." *Id.* at 1076. Although the state was responsible for diverting the correct amount from the employees' paychecks to the designated company each month, the state "[did] not contribute any moneys to supplement the employees' deferred wages." *Id.* at 1077. All of the insurance companies offered by the state used sex-based mortality tables to calculate monthly retirement benefits, which result in larger monthly payouts to men because women live longer. *Id.*

After concluding that the program violated Title VII, the Court held that the state and the state agency could be held liable even though "it is the companies chosen by [the state and state agency] to participate in the plan that calculate and pay the retirement benefits." *Id.* at 1086. In reaching this conclusion, the Court focused on the fact that the state entities played an extensive and significant role in establishing the discriminatory benefits plan. They "did not simply set aside retirement contributions and let employees purchase annuities on the open market." *Id.* at 1088. The employer "entered into contracts with them governing the terms on which benefits were to be provided to employees," who "could obtain retirement benefits only from one of those companies, and no employee could be contacted by a company except as permitted by

the State." *Id.* at 1089. Further, "it is well established that both parties to a discriminatory contract are liable for any discriminatory provisions." *Id.* at 1090. Thus, the employer and state agency were legally responsible for the discriminatory terms on which annuities were offered by the companies chosen to participate. *Id.*

Given the state and the state agency's extensive role in establishing the discriminatory benefits plan, the Court ultimately concluded that:

> Under these circumstances there can be no serious question that [the state and state agency] are legally responsible for the discriminatory terms on which annuities are offered by the companies chosen to participate in the plan. Having created a plan whereby employees can obtain the advantages of using deferred compensation to purchase an annuity only if they invest in one of the companies specifically selected by the State, the State cannot disclaim responsibility for the discriminatory features of the insurers' options. Since employers are ultimately responsible for the 'compensation, terms, [and] privileges of employment' provided to employees, [and] an employer that adopts a fringe-benefit scheme that discriminates among its employees on the basis of…sex violates Title VII regardless of whether third parties are also involved in the discrimination.

*Id.* at 1089.

The *Norris* Court's rationale applies here with equal force: the "employers are ultimately responsible for the 'compensation, terms, conditions, and privileges of employment.'" *Id*. In *Norris*, the State defendants claimed, as the Board of Regents and ETF do here, that they were not responsible for choosing the discriminatory benefits. *Id.* at 1087 ("[P]etitioners contend that they have not violated Title VII because the life annuities offered by the companies participating in the Arizona plan reflect what is available in the open market."); (Defs.' Br. at 18 ("GIB controls the content of state employees' health insurance plan, not ETF or the Board of Regents.").) The Supreme

Court rejected that argument in *Norris*, and this Court should reject it here. An

"employer who confronts such a situation must either supply the fringe benefit himself,

without the assistance of any third party, or not provide it at all." *Id.* at 1091. It would

be "inconsistent with the broad remedial purposes of Title VII to hold that an employer

who adopts a discriminatory fringe-benefit plan can avoid liability on the ground that

he could not find a third party willing to treat his employees on a nondiscriminatory

basis." *Id.* at 1090-91; *see also Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 116

(6th Cir. 1987) ("An employer . . . may not avoid Title VII liability by delegating its

discriminatory programs to third parties."), *abrogated on other grounds, Price Waterhouse

v. Hopkins*, 490 U.S. 228 (1989); *Moscowitz v. City of Chicago*, 1993 WL 478938, *4 (N.D. Ill.

Nov. 15, 1993) ("[U]nder either Title VII or the ADEA, an employer cannot simply

delegate portions of its hiring or promotion procedure to a third party and escape

liability if the third party develops discrimination problems."). Moreover, as explained

in Section III.B., *infra.*, it is the administration of a discriminatory policy that makes ETF

and the Board of Regents liable for violating Title VII, rather than any independent

intent to discriminate.

What is more, the EEOC Compliance Manual directs employers to "ensure that

the terms of [their] health benefits are non-discriminatory." EEOC Compliance Manual

Chapter 3: Employee Benefits (Oct. 3, 2000). The Supreme Court considers these

guidelines an "administrative interpretation of the Act by the enforcing agency" that

"constitute a body of experience and informed judgment to which courts and litigants

may properly resort for guidance." *Miller v. Vesta, Inc.*, 946 F. Supp. 697, 703 (E.D. Wis.

1996) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). So, although the

EEOC Compliance Manual is not binding authority, it is entitled to *Skidmore* deference.

*See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14-15 (2011); *Vance v. Ball

State University*, 133 S. Ct. 2434, 2443 n.4 (2013); *id.* at 2461 (Ginsburg, J., dissenting).

Such deference requires a court to give weight to the EEOC's "persuasive articulation of

views within [its] area of expertise," *Kasten*, 563 U.S. at 15 (citing *Skidmore v. Swift & Co.*,

323 U.S. 134, 140 (1944)), which should include an employer's responsibilities under

Title VII with respect to health benefits.

The bottom line is an employer cannot dodge the obligations of Title VII simply

because it depends on another entity to design or administer employment benefits.

Thus, the Board of Regents, as employer, is liable for discrimination against Plaintiffs in

the terms, conditions and privileges of their employment.

### B. Defendants' Policy of Excluding Insurance Coverage for Transition-Related Care is Discriminatory on Its Face, so Plaintiffs are Not Required to Separately Allege or Prove that Defendants Intended to Discriminate.

Plaintiffs allege that the categorical exclusion of coverage for transition-related

care is a facially discriminatory employment policy. (Compl. ¶ 41, 85, 90, 109.) When a

challenged employment policy is facially discriminatory, no further proof of intent is

necessary, since "[w]hether an employment practice involves disparate treatment

through explicit facial discrimination does not depend on why the employer

discriminates but rather on the explicit terms of the discrimination." *Int'l Union v.

Johnson Controls*, 499 U.S. 187, 199 (1991). The motives or intention of the employer are

irrelevant, since they cannot "alter the intentionally discriminatory character of the policy." *Id.*

In *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978), all that was required was to show "a practice" that involved "treatment of a person in a manner which but for that person's sex would be different." *Id*. at 711 (citation omitted). And in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, (1971) (per curiam), an employment policy of refusing to hire women with preschool-age children constituted discrimination even though "no question of bias against women as such was presented." *Id.* at 543; *see also Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 119 (3d Cir. 1983) ("[W]here an employer's policy or practice is discriminatory on its face, it is unnecessary for the plaintiff to make a separate showing of intent to discriminate."); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("[A] facially discriminatory employment policy . . . is direct evidence of discriminatory intent.") (internal citations omitted).

Accordingly, the cases cited by Defendants (Defs.' Br. at 18) are inapposite, since facially discriminatory employment policy claims "should be distinguished from the more typical disparate treatment case," where the *McDonnell Douglas* method of proof "is appropriate." *Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1340-41 (7th Cir. 1992). "The *McDonnell Douglas* procedure is inapt in a situation involving a facially discriminatory

policy." *Id.*; *see also Healey v. Southwood Psych. Hosp.*, 78 F.3d 128, 131-32 (3d Cir. 1996) (same).[12]

Here, Defendants violated Title VII by offering a policy that discriminated against Plaintiffs in the "compensation, terms, conditions, or privileges of employment" based on their sex. *See Whitaker*, 858 F.3d at 1049-50 ("School District's policy [that] subjects . . . transgender student, to different rules, sanctions, and treatment than non-transgender students [discriminates on the basis of sex] in violation of Title IX.").

### C. Defendants ETF and GIB Exerted Control Over Plaintiffs' Employment Benefits and Significantly Affected Access to Plaintiffs' Employment Benefits, So They are Liable Under Title VII.

Plaintiffs' Title VII claims against ETF and GIB should proceed because both entities are agents of Plaintiffs' employer that exercise control over a significant aspect of their employment and significantly impact their ability to access employment benefits. *See* 42 U.S.C. § 2000e(b) (Defining "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.").

―――――――――――

[12] Defendants argue that "[t]o state a claim under Title VII, Plaintiffs must allege that intentional discrimination by ETF and the Board of Regents played a part in an employment outcome." (Defs.' Br. at 18.) That is untrue, both because Plaintiffs' case involves a challenge to a facially discriminatory policy, but also because Title VII provides for "disparate impact" claims that do not require any showing of intent. *See Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 669-70 (7th Cir. 1996) ("A plaintiff may demonstrate a violation of Title VII under the disparate impact theory without proving discriminatory intent."); *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) (explaining the two provisions of Title VII as "disparate treatment" requiring intentional discrimination, and "disparate impact.").

"Title VII plaintiffs may maintain a suit directly against an entity acting as the agent of an employer," *Alam v. Miller Brewing Co.*, 709 F.3d 662, 669 (7th Cir. 2013), where "'the agent exercise[s] control over an important aspect of [the plaintiff's] employment.'" *Id.* (quoting *Carparts Distrib. Ctr., Inc. v. Automobile Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17 (1st Cir. 1994) (alterations in original)). In addition, an employer's agent can be sued if "the agent 'significantly affects access of any individual to employment opportunities.'" *Alam*, 709 F.3d at 669 (quoting *Spirt v. Teachers Ins. & Annuity Ass'n.*, 691 F.2d 1054 1063 (2d Cir. 1982), *cert. granted*, *judgment vacated sub nom. Long Island Univ. v. Spirt*, 463 U.S. 1223 (1983)). Finally, an employer's agent can be sued if "'an employer delegates sufficient control of some traditional rights over employees to a third party.'" *Alam*, 709 F.3d at 669 (quoting *Nealey v. Univ. Health Servs., Inc.*, 114 F. Supp. 2d 1358, 1367 (S.D. Ga. 2000)).

*Alam* is not the only time the Seventh Circuit has concluded that an employee could sue an agent of his employer for employment discrimination. In *DeVito v. Chicago Park Dist.*, 83 F.3d 878 (7th Cir. 1996), for example, the Seventh Circuit concluded that an employee could sue his employer (the Chicago Park District) *and* the entity that adjudicates employment disputes on behalf of the Park District (the Personnel Board) under the ADA, since the Personnel Board was the Park District's agent and otherwise met the statutory definition of "employer." *Id.* at 881-82[13]; *see also E.E.O.C. v. Benicorp*

---

[13] *Little v. Illinois Dep't of Rev.*, 369 F.3d 1007 (7th Cir. 2004), cited by Defendants to support their argument that an employee "may not sue an entity which does not employ her" (Defs.' Br. at 19), was decided almost a decade before *Alam*'s holding that agents of employers may be sued

27

*Ins. Co.*, No. IP 00-014-MISC, 2000 WL 724004, at *4 (S.D. Ind. May 17, 2000) (insurance provider "could be considered an agent of [the charging party's] employer" since "an employer's agent who otherwise meets the statutory definition of an employer can be held liable under the ADA.").[14]

In the present case, ETF and GIB exercise control over an important aspect of Plaintiffs' employment—their access to healthcare benefits—and have significantly affected access to Plaintiffs' employment opportunities by discriminatorily denying them access to healthcare coverage. As such, under the reasoning of *Alam*, Plaintiffs may sue ETF and GIB under Title VII as agents of their employer.

Both *Carparts* and *Spirt*, cited favorably by the Seventh Circuit in *Alam*, provide additional support for Plaintiffs' Title VII claims against ETF and GIB.[15] In *Spirt*, the

---

and failed to account for earlier decisions such as *DeVito*. Defendants cite *Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003), for the same proposition – that "[i]t is only the employee's employer who may be held liable under Title VII" (Defs.' Br. at 20), but *Robinson* is easily distinguished. It involved the well-established principal that *individuals*, such as an employee's supervisor, may not be held personally liable under Title VII for sexual harassment. Plaintiffs here are not seeking to hold individuals personally liable as agents of their employer, but the state entities that administered their employment benefits.

[14] Other district courts in the Seventh Circuit have concluded that agents of employers are subject to liability for employment discrimination. *See, e.g.*, *Holmes v. City of Aurora*, No. 93 C 0835, 1995 WL 21606, at *4 (N.D. Ill. Jan. 18, 1995) (entity that controls and manages city's pension fund, including determining who qualifies for admission into the pension plan is an "employer" under the ADA); *United States v. State of Ill.*, No. 93 C 7741, 1994 WL 562180, at *4 (N.D. Ill. Sept. 12, 1994) (the "administration of pension benefits has been delegated to the Fund" so "the Fund may be held liable under the ADA either because it is an employer under the ADA or an agent of the employer"); *E.E.O.C. v. Elrod*, No. 86 C 3509, 1987 WL 6872, *6 (N.D. Ill. Feb. 13, 1987) (trustees of retirement board were agents of "an employer"—the State of Illinois—and were thus "amenable to suit under the ADEA").

[15] The Supreme Court's decision in *Norris*, discussed in Section III.A., *supra.*, is consistent with the decisions in *Alam*, *Spirt*, and *Carparts*, since the Court there found not only the State, as employer of the plaintiff class, but also the state agency that administered voluntary retirement benefit plans, liable under Title VII.

Second Circuit held that, for purposes of Title VII, the term "employer" was broad enough to encompass administrators of retirement benefits, even though the administrators were not technically the "employer" of the plaintiff. 691 F.2d at 1058. Indeed, the court noted that "the language of the Supreme Court in *Manhart* would seem to compel a finding that delegation of responsibility for employee benefits cannot insulate a discriminatory plan from attack under Title VII." *Id.* at 1063 (citing *Manhart*, 435 U.S. at 718 n.33). The court recognized that "exempting plans not actually administered by an employer would seriously impair the effectiveness of Title VII." *Id.* at 1063.

In *Carparts*, the First Circuit held that two independent insurance entities—including the trust that administered the employer's health benefit plan—could be sued under the Americans with Disabilities Act (ADA) for discriminatory healthcare coverage, relying in part on *Spirt*. 37 F.3d at 16-18.[16] The entities could qualify as an "employer" if "they functioned as [plaintiff's] 'employer' with respect to his employee health care coverage, that is, if they exercised control over an important aspect of his employment" or they "act[ed] on behalf of the entity in the matter of providing and administering employee health benefits," *id.* at 17, even if they "did not have authority

---

[16] Although the *Spirt* decision addressed the definition of an "employer" under Title VII, and not the ADA, the First Circuit noted that "[t]here is no significant difference between the definition of the term 'employer' in the two statutes." *Carparts*, 37 F.3d at 16. The Seventh Circuit similarly recognizes that "Title VII, the ADA, and the Age Discrimination in Employment Act ('ADEA') use virtually the same definition of 'employer,' and . . . '[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably.'" *Williams v. Banning*, 72 F.3d 552, 553-54 (7th Cir. 1995) (quoting *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d at 1279-80 (7th Cir. 1995)).

to determine the level of benefits, and even if [the employer] retained the right to control the manner in which the Plan administered these benefits." *Id.* More recently, in *Brown v. Bank of Am., N.A.*, 5 F. Supp. 3d 121, 132 (D. Me. 2014), a district court held that an insurance company that administered an employee benefits plan could be held liable as the employer's "agent" under the ADA. *Id.* at 130-35 (citing *Carparts*, 37 F.3d at 17). The court found that notwithstanding more recent First Circuit precedent narrowing the scope of *Carparts*, an insurance company could be liable under the ADA where it "was 'intertwined' with [the employer] with respect to [plaintiff's] employee benefits, and that those benefits were a significant enough aspect of her employment, to meet the first *Carparts* test." 5 F. Supp. 3d at 134.

State Defendants cite *Klassy v. Physicians Plus Ins. Co.*, 276. F. Supp. 2d 952 (W.D. Wis. 2003), *aff'd*, 371 F.3d 952 (7th Cir. 2004) (Title VII liability question was not appealed), to support its argument that ETF and GIB are not subject to suit under Title VII. However, the reasoning and holding of *Klassy* have been superseded by the Seventh Circuit's decision in *Alam*. Specifically, the *Klassy* court's conclusion that *Spirt* may no longer be good law was implicitly rejected by the Seventh Circuit's reliance on *Spirt* in *Alam* and by subsequent Second Circuit decisions, such as *Gulino v. New York State Educ. Dep't*, 460 F.3d 361 (2d Cir. 2006), that reaffirmed *Spirt*'s core holding that "where an employer has delegated one of its core duties to a third party . . . that party can incur liability under Title VII." *Id.* at 377; *see also Jansson v. Stamford Health, Inc.*, No. 3:16-CV-260 (CSH), 2017 WL 1289824, at *19 (D. Conn. Apr. 5, 2017) (noting that "the Second Circuit has recognized a narrowly limited 'interference' theory under Title VII"

under which a third party can incur liability if it has been delegated a core employer duty) (quoting *Gulino*, 460 F.3d at 377). In addition, the *Klassy* court's conclusion that an employee must show that the employer's agent was actually providing the allegedly discriminatory benefits conflicts with the holding of *Alam* as well as the Supreme Court's holding in *Norris* that the state agency responsible for administering a voluntary benefits plan was subject to Title VII, even though the state "[did] not contribute any monies to supplement the employees' deferred wages." 463 U.S. at 1077. Finally, the *Klassy* court's conclusion that an agent's "exist[ence] solely for the purpose of enabling . . . [an] employer . . . to delegate its responsibility to provide health benefits for its employees" and the requirement "that plaintiffs . . . participate in the . . . plan, [were] features that were critical to the [*Spirt* court's] holding," *Klassy*, 276 F. Supp. 2d 952, 959-60 (W.D. Wis. 2003), is inconsistent with *Alam*'s finding that it is sufficient for purposes of liability under Title VII to show that an entity that exercises control over an important aspect of a plaintiff's employment or significantly affects access to plaintiff's employment opportunities.[17]

ETF and GIB are agents of Plaintiffs' employer, exercise significant control over a primary benefit of state employees—their health insurance—and significantly impact their ability to obtain those important benefits. Accordingly, the State Defendants' motion to dismiss Plaintiffs' Title VII claims against them should be denied.

---

[17] In addition, there are a number of significant differences between the facts in *Klassy* and those in the present case. The ETF and GIB are state entities created for the sole purpose of setting the terms of all Wisconsin State and municipal employees' health insurance plans and overseeing their administration and thus are more closely intertwined with state employers than the private insurance company was with the private employer in *Klassy*. *Id.* at 960.

**IV.    Plaintiffs Have Adequately Plead ACA Claims Against GIB; Their Claims Against ETF and GIB Should Not Be Stayed.**

 **A. Plaintiffs' Allegations Show That GIB is a "Covered Entity" Subject to the ACA.**

State Defendants argue that Plaintiffs' ACA claim against GIB must be dismissed, since Plaintiffs do not allege that GIB receives federal financial assistance. The problem with that argument is that GIB is part of ETF—*see* Wis. Stat. § 15.165 ("There is created in the department of employee trust funds a group insurance board.")[18]; (Compl. ¶ 21 ("Defendant, State of Wisconsin Group Insurance Board ('GIB'), sets ETF policy and, with the Secretary, oversees the administration of the group health insurance plans for state employees.")) —and ETF receives federal funds. (Compl. ¶ 107, n.3 (ETF staff issued a memorandum concluding that "ETF was a 'covered entity'" because it administers "health insurance coverage" and receives "federal financial assistance").) Section 1557 of the ACA prohibits sex discrimination by "any health program or activity, *any part of which is receiving Federal financial assistance*, including credits, subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116(a) (2010) (emphasis added). Accordingly, ETF's receipt of federal funds is sufficient to make GIB a covered entity under the ACA.

ETF is a covered entity because it receives federal funds. (Compl. ¶ 107, n.3 (alleging that "ETF accepts Medicare Part D subsidies").) State Defendants do not challenge Plaintiffs' allegation that ETF is a covered entity, which it plainly is. ETF's

_____

[18] The Wisconsin Supreme Court has noted that the GIB is "attached to the Department of Employee Trust Funds." *Gebin v. Wis. Group Ins. Bd.*, 2005 WI 16, ¶ 23 n. 39, 278 Wis. 2d 111.

receipt of Medicare funds renders both ETF and GIB subject to the ACA. *Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *13 (D. Minn. Mar. 16, 2015); *see also U.S. v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1042 (5th Cir. 1984) (Medicaid and Medicare funding are financial assistance for purposes of Rehabilitation Act claim); *Ruffin v. Rockford Mem'l Hosp.*, 181 Fed. Appx. 582, 584-85 (7th Cir. 2006) (plaintiff could have pursued a Rehabilitation Act claim because hospital received Medicaid and Medicare funds).

Since GIB is part of ETF, it is also a covered entity. "[A]s long as part of an organization or entity receives federal funding or subsidies of some sort, the entire organization is subject to the anti-discrimination requirements of Section 1557." *Rumble*, 2015 WL 1197415, at *12 ("A potential plaintiff need not seek medical care specifically from the part of the organization that receives federal funding."). The ACA rules issued by the U.S. Department of Health and Human Services define a "health program or activity" as "the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage," 45 C.F.R. § 92.4, and provide that "[f]or an entity principally engaged in providing or administering . . . health insurance coverage or other health coverage, *all of its operations are considered part of the health program or activity*, except as specifically set forth

otherwise in this part." *Id.* (emphasis added). "Such entities include a . . . group health plan, health insurance issuer, . . . or other similar entity." *Id.*[19]

Other courts have reached the same conclusion in interpreting "program or activity" in analogous civil rights statutes. *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir. 1995), for example, shows that ETF's receipt of federal funds is sufficient to render the entire department subject to the ACA. There, the plaintiff alleged a Rehabilitation Act claim against the City of Omaha for discrimination while employed by the Fire Division. The Rehabilitation Act makes it unlawful for any "program or activity" receiving federal financial assistance to discriminate on the basis of a disability. The City argued that "the defining unit for purposes of the Rehabilitation Act is the Fire Division," and that the claim must be dismissed "[b]ecause no part of the Fire Division receives federal assistance." *Id.* at 789. The Eighth Circuit rejected this argument because "the Fire Division comprised part of the Public Safety Department," which received federal funds through other divisions. *Id.*; *see also White v. Engler*, 188 F. Supp. 2d 730, 746 (E.D. Mich. 2001) (finding that federal funding to state department which administered allegedly discriminatory Merit Award Program was sufficient to make it a "program or activity" under Title VI, even though the Program itself received no federal funds).

--------

[19] The Department's regulations should be given deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984), since the ACA fails to define "health program or activity," and the Department's interpretation of this language is reasonable. *Id.* at 843-44.

Similarly, in *Schroeder v. City of Chicago*, 927 F.2d 957 (7th Cir. 1991), the Seventh Circuit concluded in examining whether a Rehabilitation Act claim could go forward against the City of Chicago that "[i]f the office of a mayor receives federal financial assistance and distributes it to local departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies which actually get the aid." *Id.* at 962 (quoting S. Rep. No. 64, 100th Cong., 2d Sess. 16 (1988), U.S. Code Cong. & Admin. News 1988, 3, 18).[20] Even though *Schroeder*, *Thomlison*, and *White* were interpreting "program and activity" under different civil rights statutes, courts presume that when Congress adopts identical language in statutes with similar purposes, the language carries the same meaning. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005). In addition, section 1557 of the ACA expressly references and incorporates four civil rights statutes, including the Rehabilitation Act and Title IX.

## B.   Plaintiffs' ACA Claims Should Not Be Stayed.

The State Defendants argue in the alternative that Plaintiffs' ACA claims should be stayed until there is a final order in *Franciscan Alliance, Inc. v. Price*, Case No. 7:16-cv-00108-O (N.D. Tex.), because that case concerns "the same . . . regulations that Plaintiffs rely on here." (Defs.' Br. at 26.) The Court should reject Defendants' request for a stay, since Defendants have failed to meet their "burden of establishing its necessity." *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-CV-168-WMC, 2010 WL 2079866, at *1 (W.D. Wis. May

---

[20] The court rejected the plaintiffs' claim against the City based on alleged discrimination at the hands of two divisions of the fire department, reasoning that "program or activity" could not be read so broadly as "to sweep in the whole state or local government, so that if two little crannies (the personnel and medical departments) of one city agency (the fire department) discriminate, the entire city government is in jeopardy of losing its federal financial assistance." *Id.* at 962.

19, 2010) (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997)), by showing that the balance of "competing interests" favors the State Defendants as compared to the Plaintiffs and other transgender state employees who have an interest in securing medically necessary health care or compensation for that care. *Landis v. N. Am. Co.*, 299 U.S. 248, 255, (1936). Defendants have failed to "make out a clear case of hardship or inequity in being required to go forward." *Id.*

Consideration of the four factors applicable to deciding whether to grant a stay — "1) whether the litigation is at an early stage; (2) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (3) whether a stay will simplify the issues in question and streamline the trial; and (4) whether a stay will reduce the burden of litigation on the parties and on the court," *Hy Cite Corp.*, 2010 WL 2079866, at *1 — shows that a stay should be denied in this case as it was in *Hy Cite.* While this case, like *Hy Cite*, is at an early stage, granting a stay would prejudice Plaintiffs, and will not necessarily "simplify the issues in question [or] streamline the trial," nor "reduce the burden of litigation on the parties and on the court," because, as in *Hy Cite*, any decision in the *Franciscan Alliance* case regarding the ACA or its regulations "would be merely persuasive, as opposed to a binding precedent," *id.*, on this Court.

The State Defendants argue, however, that the *Franciscan Alliance* court's grant of a preliminary injunction "precludes Plaintiffs here from relying on [the ACA] regulations, since 'when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed.'" (Defs.' Br. at 27 (quoting *National Mining Ass'n*

*v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) (inner citation omitted)).

First, Plaintiffs are not simply relying on the ACA regulations, but on the statute itself.

Second, in *National Mining Ass'n*, the court entered a final ruling that a regulation was

facially invalid and entered a permanent injunction against its enforcement. *Id.* at 1409.

The court had "reached the conclusion that the rule was indeed illegal (i.e., not merely

that the plaintiffs had a reasonable probability of success on the merits, as would be

necessary for a preliminary injunction)." *Id.*

*Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct.

4, 2007), and *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 977 (S.D. Ill. 1999),

*aff'd*, 230 F.3d 947 (7th Cir. 2000), also cited by Defendants, similarly involve final

judgments granting permanent injunctive relief. In contrast, the *Franciscan Alliance*

ruling cited by Defendants is a grant of a preliminary injunction, such that the question

of the regulation's validity remains "pending final review on the merits." *Franciscan*

*Alliance*, 227 F. Supp. 3d at 694.[21]

The *Rumble* court's grant of a stay, *see Rumble v. Fairview Health Servs.*, No. 14-CV-

2037 (SRN/FLN), 2017 WL 401940, at *1 (D. Minn. Jan. 30, 2017), was based in part of

the Supreme Court's grant of a stay in *Gloucester Cnty. Sch. Bd. v. G.G.*, 137 S. Ct. 369

(2016), since "the fundamental question of whether Title IX's prohibition against sex-

based discrimination embraces gender identity is squarely before the highest court in

---

[21] State Defendants' speculation that the ACA regulations "will soon disappear through either a
final order by the *Franciscan Alliance* court or administrative action by HHS itself," (Defs.' Br. at
28), is plainly insufficient to overcome the Plaintiffs' compelling need for medical care.

the land." *Rumble*, 2017 WL 401940, at \*4. The Supreme Court's decision to vacate and remand the Fourth Circuit's decision in *G.G.*, 137 S. Ct. 1239 (2017), means that the pendency of the case no longer provides a basis for granting a stay. The *Rumble* court also relied on the grant of an injunction in *Franciscan Alliance*, but it did so by erroneously relying on *National Mining Ass'n*, even though the *Franciscan Alliance* decision is a preliminary one, rather than a final ruling on the validity of the ACA regulations. For all these reasons, this Court should decline to follow the district court's decision in *Rumble* and should deny the State Defendants request for a stay.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.[22]

Dated this 11th day of August, 2017.

> **AMERICAN CIVIL LIBERTIES UNION OF WISCONSIN FOUNDATION**
> *Counsel for Plaintiffs,*
>
> By: */s/ Laurence J. Dupuis*
> Laurence J. Dupuis, State Bar No. 1029261
> Email: ldupuis@aclu-wi.org
> ACLU of Wisconsin Foundation
> 207 East Buffalo Street, Suite 325
> Milwaukee, Wisconsin 53202
> Telephone: (414) 272-4032
>
> **AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
> *Counsel for Plaintiffs,*

---

[22] Plaintiffs' Title VII claims against SMPH and the demand for punitive damages from the State Employee Defendants may be dismissed.

By: */s/ John A. Knight*
John A. Knight
Email: jaknight@aclu.org
ACLU Foundation
Lesbian Gay Bisexual Transgender Project
150 North Michigan Avenue, Suite 600
Chicago, Illinois 60601
Telephone: (312) 201-9740

**HAWKS QUINDEL, S.C.**
*Counsel for Plaintiffs,*

By: */s/ Nicholas E. Fairweather*
Nicholas E. Fairweather, State Bar No. 1036681
Email: nfairweather@hq-law.com
Michael R. Godbe, State Bar No. 1104823
Email: mgodbe@hq-law.com
409 East Main Street
Post Office Box 2155
Madison, Wisconsin 53701-2155
Telephone: (608) 257-0040
Facsimile: (608) 256-0236