IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALINA BOYDEN and
SHANNON ANDREWS,

      Plaintiffs,

    v.                          Case No. 17-CV-264

STATE OF WISCONSIN DEPARTMENT
OF EMPLOYEE TRUST FUNDS, et al.,

      Defendants.

---

## REPLY BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs' Opposition Brief (Dkt. 39, "Pls.' Br.") underlines the fatal flaw in their claims against the State Defendants. Under Plaintiffs' theory, they could sue every single state agency and employee with any connection to Plaintiffs' health insurance plans, however tangential. To Plaintiffs, it does not matter whether an official presides over a state entity that employs them but has no authority over health insurance terms, like Defendants Golden (Dean of the University of Wisconsin School of Medicine and Public Health (the "UWSchool of Medicine")), Cross (President of the University of Wisconsin System), and Blank (Chancellor of the University of Wisconsin–Madison). It does not matter whether the state entity that employs Plaintiffs

has no authority over employees' health insurance terms, like the Board of Regents. And it does not matter whether the state entity promulgates rules for administering state health insurance plans, but has no further authority over the plans' terms, like the Department of Employee Trust Funds (ETF) and Conlin, its Secretary. Any and all can be sued for a decision they did not—and could not—make.

This is not the right result under well-established standing principles, Title VII, or 42 U.S.C. § 1983. Plaintiffs have sued the wrong defendants.

As for the Group Insurance Board (GIB), the state entity which actually made the challenged health insurance coverage decision, Plaintiffs fail to show that either Title VII or the Affordable Care Act (ACA) subjects this unique entity to liability. GIB's role in setting terms for state employees' health insurance plans does not render it an employer or agent under Title VII, and GIB does not receive federal financial assistance such that the ACA applies to it. Again, Plaintiffs' claims simply do not fit the defendant.

Plaintiffs' claims against the State Defendants must be dismissed.

2

I.    **Plaintiffs do not establish Article III standing for their claims against the non-GIB State Defendants.**

   A.    **The non-GIB State Defendants' negligible involvement in Plaintiffs' health insurance plans does not show that Plaintiffs' alleged injuries are traceable to them.**

Plaintiffs understate Article III standing's traceability requirement. In Plaintiffs' view, each State Defendant merely needs "some involvement in the administration or enforcement of an unlawful policy" to adequately trace an alleged injury to it. (Pls.' Br. 9.[1]) To establish that connection, Plaintiffs rely solely on Wisconsin statutes which place with State Defendants (other than GIB) certain authority over state employees' health insurance. (Pls.' Br. 9 (citing Wis. Stat. §§ 40.01(1), 40.02(37), 40.03(2)(a), 15.04(1)(a), 40.03(2)(ig), 40.51(6), 40.52(1)).) Plaintiffs still do not identify any specific alleged acts or omissions by the non-GIB State Defendants that caused the challenged coverage denial.

This threadbare connection does not suffice. Limited involvement by government officials and agencies without power to craft a challenged policy does not show that an injury is traceable to them. For example, in *Parker v. Stranburg*, No. 14-CIV-24010, 2015 WL 3863804 (S.D. Fla. June 22, 2015),

---

[1] Citations to Plaintiffs' brief reference the page numbering at the bottom of the page, not the ECF-assigned page number.

the Florida Department of Revenue was compelled by statute to collect revenue derived from unlawful traffic fines. *Id.* at *2. But other entities, including local municipalities, were responsible for issuing the unlawful tickets themselves. The court held that the plaintiffs' injury was traceable to the fining entities, but not to the Florida Department of Revenue, who simply "compl[ied] with the directives of the Florida legislature" in collecting the fines. *Id.*

Likewise, in *Bloch v. Exec. Office of the President*, 164 F. Supp. 3d 841 (E.D. Va. 2016), the head of the United States Office of Special Counsel (OSC) sued OSC, OSC officials, the Office of Personnel Management, and the Executive Office of the President for allegedly removing him from office without due process. But the court held that the plaintiff's injury was traceable only to the President, since that official "was the only person with the [statutory] power to remove plaintiff." *Id.* at 848–49. The other agencies and officials may have participated in the plaintiff's removal, but that did not mean his injury was traceable to those defendants. *Id.*

These principles show that Plaintiffs' alleged injuries cannot be traced to the non-GIB State Defendants. Like in *Parker* and *Bloch*, the so-called "Employer Defendants" (the Board of Regents, the UW School of Medicine, Cross, Blank, and Golden) (Pls.' Br. 9) executed their statutory duties to offer GIB-approved health insurance plans to their employees. *See* Wis. Stat.

4

§§ 40.51(6), 40.52(1). Plaintiffs argue that the Employer Defendants "offer only health insurance plans containing the discriminatory coverage exclusion," but Wisconsin law *requires* that result, given GIB's decision. (Pls.' Br. 9.) The Employer Defendants had no power to adopt the coverage exclusion at issue, just as the Florida Department of Revenue had no power to issue the unlawful tickets in *Parker* and the federal officials aside from the President had no power to remove the OSC head in *Bloch*. Nor do Plaintiffs identify any statutes allowing these Employer Defendants to "administer" the health insurance plans, at least in any relevant way. (Pls.' Br. 9.)

As for ETF and Secretary Conlin, none of the statutes Plaintiffs cite give ETF or Secretary Conlin the power to set benefits terms or decide benefits claims. (Pls.' Br. 9.) The most relevant cited statute, Wis. Stat. § 40.03(2)(ig), only allows Secretary Conlin to promulgate those "rules required for the administration" of GIB-approved health insurance plans, not the plans' terms. (Plaintiffs do not allege that any such rules contributed to their alleged injury.) Wisconsin Stat. § 40.01(1) simply outlines ETF's broad purposes. Wisconsin Stat. § 40.02(37) defines "health insurance." And Wis. Stat. §§ 15.04(1)(a) and 40.03(2)(a) put Secretary Conlin in charge of ETF's administration and gives him general supervisory powers.

To bolster ETF's role, Plaintiffs try to impute GIB's powers to ETF. But GIB is not "part" of ETF in any relevant sense, contrary to Plaintiffs'

assertion. (Pls.' Br. 10.) While GIB is nominally placed "in the department of employee trust funds," Wis. Stat. § 15.165 classifies it as an "attached board". This means that GIB is "attached" to ETF only for "limited purposes," namely "budgeting, program coordination and related management functions." Wis. Stat. § 15.03. Otherwise—like when setting the health insurance terms at issue—GIB acts as a "distinct unit" that "exercise[s] its powers, duties and functions prescribed by law . . . independently of the head of the department." *Id.* The Wisconsin Supreme Court has confirmed that "attached" entities under Wis. Stat. § 15.03 (like GIB) "exercise[] [their] powers, duties, and functions independently of the head of the department to which [they are] connected." *Racine Harley-Davidson, Inc. v. State, Div. of Hearings & Appeals*, 2006 WI 86, ¶ 32, 292 Wis. 2d 549, 717 N.W.2d 184; *see also State v. Delaney*, 2006 WI App 37, ¶ 17, 289 Wis. 2d 714, 712 N.W.2d 368 (such entities are "not subject to the control of the . . . secretary" of their attached department), *abrogated on other grounds*, *State v. Harbor*, 2011 WI 28, 333 Wis. 2d 53, 797 N.W.2d 828.

This statutory division of power and duties between GIB and ETF further shows that Plaintiffs' injury is not traceable to ETF. Secretary Conlin's January 30, 2017, memorandum that Plaintiffs cite does not change that conclusion. (Pls.' Br. 10.) Rather than show that Secretary Conlin made or approved the coverage decision at issue, the memorandum instead states

6

that "*the [Group Insurance] Board approved* reinstating the exclusion of health benefits and services based on gender identity . . . ." (Memo available at http://etf.wi.gov/boards/agenda-items-2017/gib0208/item4.pdf (emphasis added) (last visited August 25, 2017)). ETF and Secretary Conlin merely carried out their statutory duty to execute GIB's decision—they had no power to do otherwise.

Plaintiffs also inaptly analogize to legislative acts. (Pls.' Br. 10–11.) Given legislative immunity principles, the proper defendant in such cases may be the state official who enforces a challenged statute. But this case differs in a key respect: it does not concern a statute, and so the relevant policy-maker—GIB—does not enjoy absolute immunity against challenges to its decisions, unlike legislatures and their members. This distinguishes *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987), which addressed a challenge to a state statute. As for *ACLU v. Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993), Plaintiffs do not explain how, like in *Florida Bar*, the non-GIB State Defendants are "designated to enforce" the challenged policy. *Id.* at 1490. Plaintiffs just assert it, without identifying any relevant statutes or facts. (Pls.' Br. 10.) The same is true for *Arizona Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1089 (1983). Plaintiffs make no effort to show how any of the non-GIB State Defendants are analogous to the state benefits

7

administrator in *Norris*, who freely selected and then administered the discriminatory aspects of the benefits plans at issue. 463 U.S. at 1075–76, 1088–89. The non-GIB State Defendants took no such actions here.

In sum, Plaintiffs fail to show with facts or law that the non-GIB State Defendants enforced or administered Plaintiffs' health insurance plans, such that Plaintiffs' alleged injuries are traceable to these defendants. Article III standing is thus absent for all of Plaintiffs' claims against these defendants.

**B.     The non-GIB State Defendants do not have the power to redress Plaintiffs' alleged injuries.**

Plaintiffs do not dispute that only GIB has the power to alter the coverage exclusion they challenge. (Pls.' Br. 12; *see also* Dkt. 29:9, "State Defs.' Br.") They also concede that, under Wis. Stat. § 40.52(1), the non-GIB State Defendants can only provide GIB-approved health insurance plans. (Pls.' Br. 4–5.) This should end the redressability analysis, since the non-GIB State Defendants cannot, by law, provide the insurance coverage that Plaintiffs seek.

Plaintiffs respond, however, that their injuries can be redressed by the non-GIB State Defendants through other forms of monetary and injunctive relief. (Pls.' Br. 11–12.) First, they suggest that non-GIB State Defendants can be "requir[ed] . . . to provide insurance coverage" for the treatment sought. (Pls.' Br. 11.) But, since Wisconsin law only allows state entities to

provide GIB-approved plans, such an injunction would violate the principle that "a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place." *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001).[2]

Next, Plaintiffs assert that non-GIB State Defendants can be directed to "otherwise pay" for Plaintiff Boyden's care and compensate Plaintiff Andrews for the costs she has already incurred. (Pls.' Br. 11–12.) But this remedy is really no different from requiring these defendants to provide insurance coverage, something they cannot do except through GIB-approved plans. Moreover, such a remedy would upend the statutory health insurance scheme Wisconsin has created for state employees, effectively transforming it from a fully-insured to a self-insured model. Wisconsin state entities now provide healthcare by collecting contributions from their employees and paying premiums to a third-party insurance carrier, which in turn pays

---

[2] Plaintiffs draw a false distinction with *Okpalobi*, arguing that the non-GIB State Defendants' limited role in administering Plaintiffs' health insurance distinguishes this case from *Okpalobi*, where the defendants could not enforce the statute at issue. (Pls.' Br. 13.) But the defendants in both cases are similarly situated, in that no defendants had the statutory authority to act in the way the plaintiffs desired. The same goes for *Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007), where redressability was absent because the defendants had no power to prevent the plaintiffs' alleged injury—just like the non-GIB State Defendants have no power to set the terms of Plaintiffs' health insurance plans.

employees' claims for health services. *See, e.g.*, Wis. Stat. §§ 40.03(6)(a)1., 40.51(2). Plaintiffs effectively ask this Court to impose a self-insurance model—at least for transgender health services—whereby Wisconsin state entities must bear the cost of those services out of their own budgets, rather than transferring them to a third-party insurance provider.[3]

Plaintiffs cite no cases allowing such an intrusive remedy ordered by a federal court. Instead, they cite only *Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010), but that case enjoined officials from enforcing a challenged judicial disciplinary code provision. Plaintiffs here seek the opposite type of remedy—one compelling state entities to undermine Wisconsin's fully-insured health insurance model by directly paying claims for health services.

Because Plaintiffs fail to show that their alleged injuries can be redressed by the non-GIB State Defendants, they lack Article III standing for all their claims against those defendants.

---

[3] While GIB *may* adopt self-insured plans (Wis. Stat. § 40.03(6)(a)2.), the Wisconsin Legislature's Joint Committee on Finance recently rejected such a proposal. *See* Associated Press, *Walker's self-insurance plan rejected by budget committee*, Jun. 15, 2017, *available at* https://www.apnews.com/1dfd7a49d4a24fd9af0a396b90be2bf6 (last visited August 25, 2017).

II.    **Plaintiffs fail to show that they can sue the individual State Defendants under 42 U.S.C. § 1983.**

   A.    **Plaintiffs still identify no allegations that the individual State Defendants were personally involved in any constitutional violation.**

Plaintiffs concede that any claim against individual officials for damages under 42 U.S.C. § 1983 "requires that a defendant be *personally involved* in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) (emphasis added). *See also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible."). (Pls.' Br. 15–16.) Yet their allegations against the individual State Defendants—Conlin (ETF's Secretary), Blank (University of Wisconsin–Madison's Chancellor), Cross (President of the University of Wisconsin System), and Golden (UW School of Medicine's Dean)—fall far short of this standard.

Plaintiffs vaguely assert only that the individual State Defendants were somehow "involved in" the challenged coverage denial. (Pls.' Br. 15.) Plaintiffs further contend that sufficient personal involvement occurs "at a defendant's direction or with her knowledge or consent." (Pls.' Br. 16.) But Plaintiffs identify no factual allegations that Conlin, Blank, Cross, or Golden directed any subordinates to deny coverage, consented to the denial of coverage, or even knew about Plaintiffs' requests for coverage. Plaintiffs cite

paragraphs 20, 21, 28, and 37–41 of their amended complaint (Dkt. 27, "Am. Compl."), claiming that these allegations show that the individual defendants discriminated "through the acts of the agencies they lead." (Pls.' Br. 17.) Setting aside supervisory liability, none of these cited paragraphs mention *any* personal involvement by Conlin, Blank, Cross, or Golden. Indeed, their names are not even referenced in these paragraphs.

This omission is fatal to Plaintiffs' section 1983 individual capacity claims against these defendants, since it effectively argues for respondeat superior liability. But "under § 1983, a plaintiff may not rely on the doctrine of respondeat superior to hold supervisory officials liable for the misconduct of their subordinates." *Doyle v. Camelot Care Ctrs.*, 305 F.3d 603, 614 (7th Cir. 2002); *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (alteration in original) ("[I]ndividual-capacity claims cannot rest on a *respondeat superior* theory."). For a supervisor to be individually liable, he or she "must have condoned or acquiesced in a subordinate's unconstitutional treatment" of plaintiffs. *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010). Not only is there no mention in Plaintiffs' amended complaint of what Conlin, Blank, Cross, or Golden did, there is no mention of what their subordinates did either.

Rather than allege any specific facts, Plaintiffs instead rely solely on Wisconsin statutes that detail the powers and duties of the offices that

Conlin, Blank, Cross, and Golden hold. (Pls.' Br. 16.) But they cite no authority to support this novel pleading tactic. While referencing statutes may suffice for *official* capacity claims (though Plaintiffs' claims fail in this regard, too), statutes alone cannot show what any state official actually did in their *individual* capacity.

In any event, Plaintiffs do not even identify statutes that give the individual State Defendants decision-making power over health insurance terms or administrative authority over individual claims decisions. The closest Plaintiffs come is citing appeals from coverage denials (Pls.' Br. 16.), but that role is assigned to GIB, not ETF or Secretary Conlin. *See* Wis. Stat. § 40.03(6)(i); Wis. Admin. Code § ETF 11.01(3). So, even the "common sense inference that Defendants perform their statutory duties" that Plaintiffs offer (Pls.' Br. 16) does not suggest that these individual defendants actually directed, condoned, or acquiesced in any alleged constitutional violation.

Plaintiffs fall back on an argument that their pleading merely needs to put the individual State Defendants on notice of the nature of the constitutional claims against them. (Pls.' Br. 17.) But any "notice" is quite hollow here. Given the total lack of allegations about what Conlin, Blank, Cross, or Golden did (or did not) do to Plaintiffs, it is difficult to understand how to defend against a claim resting on personal involvement.

Given the lack of any factual allegations regarding the individual State Defendants' personal involvement, Plaintiffs' section 1983 individual capacity claims against Conlin, Blank, Cross, and Golden must be dismissed.

**B.      Plaintiffs fail to show that the *Ex parte Young* exception applies to their official capacity claims.**

Plaintiffs argue that the individual State Defendants, in their official capacities, meet the *Ex Parte Young* exception to Eleventh Amendment immunity because these defendants vaguely have "some connection" to the enforcement of "the challenged law." (Pls.' Br. 18.) They also argue that *Ex Parte Young* applies to officials who "enforce[] or administer[]" the challenged law. (Pls.' Br. 18.) This argument fails because, as explained above in Sections I.A. and II.A., Plaintiffs never explain how these officials have any relevant role in enforcing or "administer[ing]" health insurance. (Pls.' Br. 18.) Moreover, this case does not challenge a state statute, where state officers may be sued in their official capacities because the statute empowers them to enforce it. Plaintiffs cite *Int'l Assoc. of Machinists, Dist. 10 v. Wisconsin*, 194 F. Supp. 3d 856, 863–64 (W.D. Wis. 2016), but that case involved an agency with indirect power to enforce a statute. Plaintiffs identify no comparable way that the State Defendant officials here can enforce GIB's decision.

14

Plaintiffs respond that the individual State Defendants are proper defendants because they may have roles in ensuring the implementation of relief. Plaintiffs' amended complaint requests "[i]njunctive relief ordering Defendants to provide health insurance coverage for Plaintiffs' transition-related care, including gender confirmation surgery." (Am. Compl. ¶ 25.) Conlin could purportedly "have a role in ensuring compliance with an injunction" by directing that the challenged coverage exclusion "is no longer included in insurance contracts and that it is not applied to deprive employees of coverage." (Pls.' Br. 19.) And Blank, Cross, and Golden supposedly "would have a role in ensuring compliance by offering insurance plans to their employees that do not contain the exclusion or otherwise making available to them the transition-related care they are currently denied." (Pls.' Br. 19.)

But the theory fails because "'a claim for injunctive relief can stand only against someone who has the authority to grant it.' In other words, plaintiffs must identify some relief that a particular defendant can give them to justify his or her inclusion in the lawsuit." *Wolf v. Walker*, No. 14-CV-64-BBC, 2014 WL 1729098, at *4 (W.D. Wis. Apr. 30, 2014) (quoting *Williams v. Doyle*, 494 F. Supp. 2d 1019, 1024 (W.D. Wis. 2007)). Put another way, a plaintiff cannot "seek an injunction from anyone he wishes." *Ajala v. West*, No. 13-CV-545-BBC, 2014 WL 7338782, at *3 (W.D. Wis. Dec. 22, 2014).

15

But Plaintiffs never explain how the ETF Secretary (Conlin), the University of Wisconsin Madison Chancellor (Blank), the University of Wisconsin System President (Cross), or the UW School of Medicine Dean (Golden) has any statutory authority to determine coverage exclusions in Plaintiffs' health insurance plans. Indeed, as explained in State Defendants' opening brief (State Defs.' Br. 9) and above, that power rests exclusively with GIB. *See* Wis. Stat. § 40.03(6)(d)5. Moreover, Plaintiffs even alleged that GIB alone decided to exclude coverage for transgender medical services. (Am. Compl. ¶¶ 40–41.) Like the warden in *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (Pls.' Br. 19)—who was the only official that could direct the requested injunctive relief, that a prison's staff provide the plaintiff with surgery—here, only GIB can ensure an order to provide health insurance coverage is carried out. Such an order directed at the named defendants would be meaningless.

Because Plaintiffs' claims do not fall within the *Ex parte Young* exception, the Eleventh Amendment bars their constitutional claims against Conlin, Blank, Cross, and Golden in their official capacities. These claims must be dismissed.

16

III.  **Plaintiffs cannot sue the Board of Regents, ETF, or GIB under Title VII.[4]**

A.  **Plaintiffs still do not identify any intentional discrimination by the Board of Regents or ETF.**

Plaintiffs do not dispute that neither the Board of Regents nor ETF had authority to create the challenged coverage exclusion, but argue that those State Defendants can still face Title VII liability under *Norris*, 463 U.S. 1073. (Pls.' Br. 20–23.) There, the State of Arizona and a state benefits entity violated Title VII by administering deferred compensation plans that discriminated on the basis of sex.

But *Norris* differs in a key respect—the benefits entity's role in selecting the benefits plan was nothing like the Board of Regents' and ETF's role here. In *Norris*, the Arizona benefits entity solicited bids from private companies to manage deferred compensation funds, and the benefits entity then selected which companies' plans would be offered to state employees. 483 U.S. at 1076, 1088–89. And Arizona expressly requested that bidders include the discriminatory terms in their proposed deferred compensation plans. *Id.* at 1089–90, n.19, 24. Here, however, the Board of Regents and ETF had no such authority over the relevant provisions in Plaintiffs' health

---

[4] Plaintiffs agree that Title VII claims against UW School of Medicine must be dismissed, as well as their request for punitive damages under Title VII. (Pls.' Br. 20 n.11.)

insurance plans. No allegation exists that either the Board of Regents or ETF solicited bids from third-party health insurers, requested that the bids contain an exclusion for transgender services, or selected the plans ultimately offered to Plaintiffs.

The Board of Regents' and ETF's inability to control the contents of Plaintiffs' health insurance plan shows why this case differs from the other cited Title VII cases, too. (Pls.' Br. 23.) In *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111 (6th Cir. 1987), the defendant delegated some of its own authority over hiring decisions to a third-party, and the third-party discriminated against the plaintiff on the basis of sex. Because the third-party acted as the defendant's hiring agent, the court held that the defendant could be liable under Title VII for the third-party's actions. *Id.* at 116–17. Likewise, *Moscowitz v. City of Chicago*, No. 93-C-1335, 1993 WL 478938 (N.D. Ill. Nov. 15, 1993), involved a defendant who delegated certain hiring authority to a third-party who then discriminated against an applicant on the basis of sex. By contrast, neither the Board of Regents nor ETF delegated any authority over setting the terms of Plaintiffs' health insurance plans. Wisconsin law never gave them any such authority, and so it was not theirs to delegate.

The cited Equal Employment Opportunity Commission (EEOC) guidance is inapposite for the same reason, even if it is given some deference.

(Pls.' Br. 23–24.) Although it provides that employers must "ensure that the terms of [their] health benefits are non-discriminatory," this can only apply when the employer has some authority over the terms of its health insurance plans. Since neither the Board of Regents nor ETF had any such authority here, the EEOC guidance does not apply. And Plaintiffs cite no cases applying the EEOC guidance to entities without authority over benefits terms.

Plaintiffs also argue that they need not allege any intentional discrimination by the Board of Regents or ETF, supposedly because the challenged coverage exclusion is facially discriminatory. (Pls.' Br. 24–26.)[5] But even if a facially discriminatory policy *sometimes* evidences intentional discrimination, that is not true here. Plaintiffs first cite *Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991). But in that case, the defendant-employer itself chose to forbid women from working in certain positions, and so the policy alone created an inference of intentional discrimination by the

---

[5] State Defendants wrote that "[t]o state a claim under Title VII, Plaintiffs must allege that intentional discrimination by ETF and the Board of Regents played a part in an employment outcome." (State Defs.' Br. 18.) Plaintiffs claim this is untrue because other ways exist to prove Title VII liability: a facially discriminatory policy and disparate impact. (Pls.' Br. 26 n.12.) But Plaintiffs' amended complaint does not allege a disparate impact claim. And, contrary to Plaintiffs' assertion, a facially discriminatory policy is merely *evidence* of disparate treatment; it is not a third theory under which to prove liability under Title VII. The decisions Plaintiffs cite in their brief confirm this. *See, e.g., Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1340 (7th Cir. 1992) (discussing two Title VII theories of liability: disparate treatment and disparate impact).

employer. *Id.* at 191–92. Likewise, in *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978), the defendant-employer itself chose to require larger pension contributions from women. The same inference of intentional discrimination arose in that and all the other cases Plaintiffs cite since, in each of them, the employer itself voluntarily implemented the discriminatory policy. (Pls.' Br. 25.)

But unlike in those Title VII cases, neither ETF nor the Board of Regents had any role in creating the policy Plaintiffs challenge. Again, Wisconsin law *required* these defendants to offer plans with terms approved by GIB. *See* Wis. Stat. §§ 40.51(6), 40.52(1). Even assuming the plan is facially discriminatory, it does not create an inference of discriminatory intent on the part of either ETF or the Board of Regents.

In sum, Plaintiffs cite no cases in which a government entity faced Title VII liability for a benefits decision it had no power to make—this case should not be the first. Plaintiffs' Title VII claims against the Board of Regents and ETF should be dismissed.

**B.      Plaintiffs fail to show the necessary employment relationship with either ETF or GIB under Title VII.**

Plaintiffs contend that ETF and GIB—entities that Plaintiffs concede did not employ them—can nevertheless be held liable under Title VII as agents of Plaintiffs' employers. (Pls.' Br. 26.) They rely heavily on *Alam v. Miller Brewing Co.*, 709 F.3d 662, 669 (7th Cir. 2013), which supposedly shows that ETF's and GIB's "control over an important aspect of Plaintiffs' employment" (Pls.' Br. 28)—health insurance—exposes those entities to Title VII liability. But, as explained above, ETF is not the entity that determines the health insurance benefits that employees receive, and so it has no control over this aspect of Plaintiffs' employment. *See supra* Section I.A. It cannot be considered an agent for purposes of Title VII, even under the *Alam* approach.

As for GIB, neither *Alam* nor the cases on which it relied held that a government entity that sets terms for health insurance plans—but neither administers nor otherwise runs those plans—exposes that entity to sweeping employment-based Title VII liability.

Instead, *Alam* outlined general Title VII agency principles and found no agency relationship between the plaintiff's former employer and a company

21

that considered hiring him as an independent contractor.[6] 709 F.3d 667–69. Likewise, *Spirt v. Teachers Ins. & Annuity Ass'n.*, 691 F.2d 1054, 1063 (2d Cir. 1982), addressed a pension fund manager defendant that contracted directly with university employees to provide the discriminatory benefit. The same goes for *Carparts Distrib. Ctr., Inc. v. Automobile Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 14, 17 (1st Cir. 1994) and *Brown v. Bank of Am., N.A.*, 5 F. Supp. 3d 121, 125–26, 132 (D. Me. 2014), cases which involved insurance company defendants that administered employee benefits claims and denied the plaintiffs' claims.

None of these cases involved a unique government entity like GIB, which does not play the role of a typical claims administrator or insurance provider. GIB does not provide benefits directly to employees, unlike the pension manager in *Spirt* and the insurance providers in *Carparts* and *Brown*. Instead, GIB sets the terms of permissible State health insurance plans, and then independent, third-party insurance providers like defendant Dean Health Plan provide those plans to State employees. Those third-party insurers administer claims and are more analogous than GIB to the insurer entities in Plaintiffs' cited agency cases.

---

[6] Plaintiffs also cite *DeVito v. Chicago Park Dist.*, 83 F.3d 878 (7th Cir. 1996), but that case simply held that Title VII agency liability can exist *only if* the agent otherwise meets the statutory definition of "employer." It provided no other criteria relevant to this case.

This Court should instead follow *Klassy v. Physicians Plus Ins. Co.*, 276 F. Supp. 2d 952 (W.D. Wis. 2003), *aff'd*, 371 F.3d 952 (7th Cir. 2004), which found no Title VII agency liability for an employer's third-party health insurance carrier. The same concern the *Klassy* court expressed applies here:

> [I]f plaintiffs' theory is correct, for purposes of Title VII, defendant Physicians Plus "employs" every employee of every company that contracts with Physicians Plus to provide health care coverage for its workers. In the absence of some clear indication in the statute, I am reluctant to infer that Congress intended to impose such potentially wide-ranging liability on insurers.

*Id.* at 960. Here too, if Plaintiffs' theory is correct, ETF and GIB would be "employers" of every single state government employee in Wisconsin—"wide-ranging liability" that should be avoided "[i]n the absence of some clear indication" that Title VII meant to impose it. *Id.* at 960. And ETF and GIB are even farther removed from traditional employers than the insurers in *Klassy*, since neither ETF nor GIB are insurers that provide health care coverage to employees.

Plaintiffs fail to distinguish *Klassy*. (Pls.' Br. 30–31.) They argue that *Alam* supersedes *Klassy*, but it does not. First, even though *Klassy* criticized *Spirt*, a case on which *Alam* partly relied, *Klassy*'s holding expressly

23

"assum[ed] that *Spirt* remain[ed] good law." 276 F. Supp. 2d at 959.[7] Moreover, *Klassy* analyzed factors that remain relevant under *Alam*, contrary to Plaintiffs' suggestion. (Pls.' Br. 31.) *Klassy* considered whether the defendant "'exist[ed] solely for the purposes of enabling'" the plaintiff's employer "to delegate its responsibility to provide health benefits for its employees," and whether the plaintiffs were "required to participate" in the defendant's insurance plan. *Id.* at 959–960 (alteration in original) (quoting *Spirt*, 691 F.2d at 1063). Both factors were relevant under *Spirt*, a case *Alam* approvingly cited. Nor is *Klassy* inconsistent with *Norris*; *Norris* addressed a benefits administrator, while *Klassy* involved a third-party insurer.

At bottom, Plaintiffs assert that *Alam* subjects GIB to Title VII liability as an "employer," even though GIB does not administer Plaintiffs' health insurance plans, employ Plaintiffs, remunerate them, or exercise any control over their hiring, firing, and day-to-day work. To Plaintiffs, the sole relevant fact is that GIB set the terms of Plaintiffs' health insurance. No cases Plaintiffs cite have held such a government entity liable—an unsurprising result, since such an entity is a poor fit for liability under Title VII. The

---

[7] In any event, *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 377 (2d Cir. 2006) emphasized that *Spirt* contains a "narrow rule" that has been limited by subsequent Supreme Court decisions. The *Gulino* court focused on traditional common law agency principles, including whether the employee received remuneration from the alleged employer. There is no allegation here that Plaintiffs received any remuneration from ETF or GIB.

statute targets employers, not policy-making government entities with no insurance administration duties or employment relationship with government employees.

Plaintiffs' Title VII claims against ETF and GIB should be dismissed.

## IV.   Plaintiffs' ACA claims should be dismissed or stayed.

### A.   Plaintiffs cannot allege that GIB receives federal financial assistance simply because ETF does.

To paper over their lack of allegations that GIB itself receives federal financial assistance—a requirement for ACA liability—Plaintiffs reiterate their argument that GIB is "part of" ETF. (Pls.' Br. 32.) As explained above in Section I.A, this misunderstands the relationship between ETF and GIB. While it is true that GIB is created "in" ETF under Wis. Stat. § 15.165, it is "attached" to ETF only for "limited purposes" under Wis. Stat. § 15.03. GIB is a "distinct unit" that operates independently of ETF, and is attached to ETF only for limited administrative purposes. Wis. Stat. § 15.03. This means that 45 C.F.R. § 92.4, which opines that "all of [an qualifying entity's] operations" can face ACA liability, does not apply here. (Pls.' Br. 33.) Since GIB operates independently from ETF, federal aid to ETF does not expose GIB to ACA liability.

And Plaintiffs do not show that their cited cases provide helpful analogies to GIB. (Pls.' Br. 34–35.) First, *Schroeder v. City of Chicago*, 927 F.2d 957 (7th Cir. 1991), expressly *refused* to hold that if "two little crannies (the personnel and medical departments) of one city agency (the fire department) discriminate, the entire city government is in jeopardy of losing its federal financial assistance." *Id.* at 962. The same principle applies here— federal aid to one unit of state government (like ETF) does not necessarily expose others to liability (like GIB). Moreover, no allegation exists that ETF distributes any of its federal financial assistance to GIB, a key fact from *Schroeder* that can sometimes establish the necessary relationship between two state entities. *Id.* As for *Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir. 1995), federal aid to a city department sufficed to apply the Rehabilitation Act to a division in that department. But no indication exists in *Thomlison* that the division operated independently from the department, like GIB does from ETF. *Id.* at 789. Likewise, in *White v. Engler*, 188 F. Supp. 2d 730, 746 (E.D. Mich. 2001), federal funding to a state department sufficed because the department itself ran an allegedly discriminatory scholarship program. Again, GIB operates independently from ETF, which distinguishes this case from *White*.

26

Since Plaintiffs fail to show a sufficient relationship between ETF and GIB, federal aid to ETF does not subject GIB to ACA liability. Plaintiffs' ACA claim against GIB must be dismissed.[8]

### B. Plaintiffs' ACA claims should be stayed to clarify whether the claims will rely on the statute itself, or regulations which are currently subject to a preliminary injunction.

Plaintiffs mischaracterize State Defendants' request for a stay, both in terms of its potential impact on this case and on Plaintiffs, themselves. To be clear, State Defendants do not request that the Court stay this entire case. Instead, they request only that Plaintiffs' ACA claim be stayed, since ongoing litigation in the Northern District of Texas (and ongoing rulemaking proceedings) may fundamentally recast these claims. *See Franciscan Alliance, Inc. v. Price*, No. 7:16-cv-00108-O (N.D. Tex.).

Plaintiffs' interest in pursuing the ACA claim is not as strong as they insist. If any of Plaintiffs' Title VII or section 1983 claims survive dismissal, staying the ACA claim would not compromise Plaintiffs' "interest in securing medically necessary health care or compensation for that care." (Pls.' Br. 36.) Should Plaintiffs ultimately prevail on their other claims, they could obtain

---

[8] Even if GIB is "part" of ETF such that GIB receives federal financial assistance for purposes of ACA liability, the relationship goes no farther. Specifically, if true, this would not mean that ETF obtains GIB's statutory powers such that Plaintiffs have Article III standing to sue ETF, as discussed in Section I.A above.

an order from this Court guaranteeing them the medical care and compensation they seek. The ACA claim is not necessary to secure that relief.

And staying the ACA claim would simplify this case. Though it is true that "Plaintiffs are not simply relying on the ACA regulations, but on the statute itself" (Pls.' Br. 37), their ACA claim is pleaded based on those regulations. (*See* Am. Compl. ¶¶ 105–07.) Whether Plaintiffs may rely on those regulations or whether they can rely only on the ACA's statutory language will materially affect how that claim is litigated. Under the former approach, issues of *Chevron* deference to agency regulations must be litigated, whereas under the latter approach, only a question of statutory interpretation arises. The *Franciscan Alliance* court has already enjoined the relevant ACA regulations, and allowing that litigation to resolve will clarify which approach the parties must litigate here.

Plaintiffs respond that this Court can ignore the Northern District of Texas decision because it is merely "persuasive" and involves only a preliminary injunction. (Pls.' Br. 36–37.) But they effectively concede that litigants may not rely on enjoined regulations, no matter which federal court issues the injunction. And Plaintiffs offer no good reason why it matters whether that injunction is preliminary or permanent. The court in *Rumble v. Fairview Health Services*, No. 14-cv-2037-SRN/FLN, 2017 WL 401940 (D. Minn. Jan. 30, 2017), implicitly held that this distinction lacks a

28

difference, as the court there stayed a similar ACA claim based on the *Franciscan Alliance* injunction.

In any event, the *Franciscan Alliance* injunction is effectively permanent, pending the resolution of ongoing rulemaking proceedings. The court has stayed the case, noting that "a draft of a proposed rule is going through the clearance process within the Executive Branch." *Franciscan Alliance,* Dkt. 105, 108. The State Defendants are not merely speculating about this process (Pls.' Br. 37 n.21); the federal government has represented to the court that rulemaking proceedings are ongoing. *Franciscan Alliance*, Dkt. 106.[9] It makes sense to let those proceedings resolve themselves so that the proper analytical framework for Plaintiffs' ACA claim can be determined.

---

[9] While it is true that the United States Supreme Court has vacated and remanded the Fourth Circuit's decision in *G.G.*, 137 S. Ct. 1239 (2017), the other considerations discussed in this section justify staying Plaintiffs' ACA claim.

## CONCLUSION

This Court should dismiss Plaintiffs' claims under 42 U.S.C. § 1983, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 18116 with respect to all State Defendants. As for Plaintiffs' claims against ETF and GIB under 42 U.S.C. § 18116, if those claims are not dismissed, this Court should stay them until a final order issues in the pending *Franciscan Alliance* case.

Dated this 28th day of August, 2017.

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

/s/Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
(608) 266-1792
(608) 267-2223 (Fax)
rothct@doj.state.wi.us
kilpatricksc@doj.state.wi.us