IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALINA BOYDEN and SHANNON
ANDREWS,

Plaintiffs,                                          OPINION AND ORDER

v.                                                         17-cv-264-wmc

ROBERT J. CONLIN, BOARD OF REGENTS
OF THE UNIVERSITY OF WISCONSIN
SYSTEM, RAYMOND W. CROSS, REBECCA
M. BLANK, UNIVERSITY OF WISCONSIN
SCHOOL OF MEDICINE AND PUBLIC HEALTH,
ROBERT N. GOLDEN, STATE OF WISCONSIN
DEPARTMENT OF EMPLOYEE TRUST FUNDS, and
STATE OF WISCONSIN GROUP INSURANCE BOARD,

Defendants.

Plaintiffs Alina Boyden and Shannon Andrews are both employees of the State of

Wisconsin and transgender women, who assert claims against various state officials and

entities for excluding gender transition care from coverage under group health insurance

plans for state employees.  Before the court is state defendants' motion to dismiss.  (Dkt.

#28.)  For the reasons explained below, the court will grant that motion in part and deny

it in part.  Specifically, the court will grant the motion based on plaintiffs' lack of legal

standing to pursue claims against the Board of Regents of the University of Wisconsin

System, Raymond W. Cross and Rebecca M. Blank.  The court will also grant the motion

to dismiss plaintiffs' claim under the Patient Protection and Affordable Care Act against

the Wisconsin Group Insurance Board for failing to allege that it is a recipient of federal

funding.[1]  In all other respects, the motion is denied.

---

[1] Plaintiffs also agreed in their opposition brief to dismiss:  (1) the University of Wisconsin School

Plaintiffs Alina Boyden and Shannon Andrews are transgender women. Each were assigned male identities at birth, but self-identify as female and have done so throughout their lives. Both have received diagnoses of gender dysphoria, a widely recognized medical diagnosis marked by "feeling[s] of incongruence between one's gender identity and one's sex assigned at birth, and the resulting stress from that incongruence." (Am. Compl. (dkt. #27) ¶ 31.)

As employees of the State of Wisconsin, plaintiffs receive state-provided health insurance. Boyden is a graduate student and teaching assistant in the Department of Anthropology at the University of Wisconsin-Madison. Andrews works at the University of Wisconsin School of Medicine and Public Health. Both are employed by the Board of Regents, which is the governing body of the University of Wisconsin System. The Board of Regents is named as a defendant, along with University of Wisconsin-Madison Chancellor Rebecca M. Blank, University of Wisconsin System President Raymond W. Cross, and School of Medicine Dean Robert N. Golden (collectively, "Employer Defendants"). All Employer Defendants have some employment relation to the plaintiffs.

As state employees, the parties agree that plaintiffs are eligible for state group health

---

of Medicine and Public Health as a non-suable entity, and (2) dismiss their claim for punitive damages. (Pls.' Opp'n (dkt. #39) 23 n.11.)

[2] In resolving a motion to dismiss under Rule 12(b)(6), the court takes all of the factual allegations in the complaint as true and draws all inferences in plaintiff's favor. *Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007).

insurance.[3]  The Wisconsin Department of Employee Trust Funds ("ETF") administers group health insurance, along with retirement and other employee benefits.  ETF Secretary Robert J. Conlin heads that department.  ETF and the secretary oversee implementation of employee health insurance, but they do not set policy.   Instead, policymaking -- including the contractual terms for group health insurance -- is delegated to the Wisconsin Group Insurance Board ("GIB").  As an "attached board," GIB is located within ETF, but with separate membership and autonomy from ETF.[4]  GIB made the decision to exclude gender transition-related care from group health insurance, and ETF is bound by that decision.

Both plaintiffs receive state group health insurance plans through ETF.  Due to GIB's decision to exclude gender transition treatment, both plaintiffs were denied coverage for sex reassignment surgery.  Both filed complaints and requested right-to-sue letters from the EEOC.  Boyden's efforts to receive treatment are more fully described in this court's earlier order dismissing Dean Health.  (Dkt. #44.)

Due to the lack of coverage, Boyden never received surgery.  Andrews, however, did not wait for the state to lift the restriction.  In 2015, she was medically referred to the Papillon Gender Wellness Center in Pennsylvania, and she received sex reassignment surgery there that same year.  Andrews paid Papillon $14,750 out-of-pocket, and in

---

[3] The court draws facts from the amended complaint, but also takes judicial notice of Wisconsin's statutory scheme to address employee benefits.

[4] The Governor appoints six of the eleven GIB members, and the remaining seats are filled by the Governor, Attorney General, Secretary of the Department of Administration, Director of the Office of State employment Relations, and the Commissioner of Insurance.  The Secretary of ETF is not a member of GIB.

February 2016, she filed a claim with her health insurance administrator, Wisconsin Physicians Service Insurance Corporation ("WPS").[5]  WPS denied the claim because of Wisconsin's transition-related care exclusion.  It also denied a second claim for reimbursement of additional hospital fees and anesthesia.[6]  Andrews appealed her denial, to no avail, and submitted a complaint to ETF.  She has not been reimbursed for the procedure.

OPINION

The parties agree that the School of Medicine and Public Health is not a suable entity and should be dismissed from this case.  They also agree that punitive damages are not available under Title VII, and all claims for punitive damages under Title VII and should be dismissed.  As for the remainder of their motion, defendants are trying to perform a sort of "magic trick."  By arguing that only GIB is responsible for health insurance, but that neither GIB nor ETF is an employer, defendants are essentially arguing that the State of Wisconsin is entirely immunized from Title VII claims.  That is not the case.  In addition to challenges to standing and to the Title VII claims, the court will also address defendants' motion to dismiss the § 1983 claims against the individual defendants and defendants' challenge to the ACA claims.

## I.  Article III Standing

To begin, this court is certainly one of limited authority.  *See Kokkonen v. Guardian*

---

[5] WPS previously was terminated as a defendant by stipulation.  (Dkt. #24.)

[6] In total, Andrews paid $21,000, but the hospital claimed fees of $52,467.95.

*Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction."). Most fundamentally, the United States Constitution restricts the jurisdiction of federal courts to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. To establish a case or controversy, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Defendants do not challenge the first prong of constitutional standing -- that plaintiffs have suffered an injury in fact. They do challenge the second and third prongs for all defendants, except GIB. Defendants argue that GIB is the *sole* defendant responsible for denying coverage of transition-related care and the *sole* defendant empowered to make coverage decisions. Therefore, defendants argue, plaintiffs' injury is neither caused by the conduct of any other defendant, nor redressable by any other defendant, meaning that the claims against all other defendants must be dismissed for lack of standing.

For reasons explained below, defendants are only partially correct. The Employer Defendants do indeed fall outside the court's jurisdiction and must be dismissed. Based upon the information alleged, however, plaintiffs' injuries can be fairly traced to GIB, ETF and ETF's Secretary Conlin. A judgment against these defendants would also provide the plaintiffs redress.

## A. Causation

The causation element of standing demands that the injury be fairly traceable to the challenged action of a defendant, rather than the result of independent action by some

third party not before the court.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Article III causation is a fairly modest bar: proximate causation is not required, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014), nor must the defendant be the only party responsible for the alleged injury*, see Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 500 (7th Cir. 2005).  Generally, the complaint need only allege that "but for" some act or omission of the defendant, the injury would not have occurred.  *See, e.g.*, *id.* at 501 (plaintiff had standing to sue U.S. Secretary of Interior because the regulable third party would not have harmed plaintiff but for Secretary's inaction).

There are some exceptions even to this "but for" bar.  When the injury is caused by an unconstitutional rule of law, the proper defendant is the state official designated to enforce that rule.  *See Am. Civil Liberties Union v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) (*ACLU*) (citing *Diamond v. Charles*, 476 U.S. 54, 64 (1986)).  For example, if preemptively challenging a criminal statute, the plaintiff should sue the Attorney General's office or the local district attorney.  *See Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987); *Doe v. Bolton* 410 U.S. 179 (1973).  Likewise, if a statute creates state-enforced civil penalties, a plaintiff may preemptively sue state officials tasked with enforcing that statute.  *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 794-795 (7th Cir. 2013).  This enforcement exception applies even when the challenged rule of law was not created by a legislature.  For example, in *ACLU*, the plaintiff was found to have standing to challenge the constitutionality of the Florida Code of Judicial Conduct (promulgated by the Supreme Court of Florida) by suing the State Bar and the Judicial

Qualifications Commission (charged with enforcement of the code). *ACLU*, 999 F.2d at 1490; *see also Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224 (7th Cir. 1993) (finding standing for plaintiffs to challenge rules promulgated by the Supreme Court of Illinois, by suing entities charged with enforcing them).

Finally, plaintiffs argue that under *Arizona Governing Committee for Tax Deferred Annuity & Deferred Compensation Plans v. Norris*, 463 U.S. 1073 (1983), the United States Supreme Court recognizes plaintiffs' standing to sue ETF and Conlin. While *Norris* is inapplicable on its face,[7] the court agrees with plaintiffs that the causation element is satisfied when a defendant enforces or administers a challenged policy. In applying this rule, the court separately analyzes the roles of the Employer Defendants and ETF.

### 1. Employer Defendants

For legal purposes, plaintiffs are employed by the State of Wisconsin. Much like the divisions of a large corporation, however, the Wisconsin Legislature has seen fit to divide up the employment responsibilities of the state, delegating them to various government agencies. The Employer Defendants are the persons and entities most immediately connected to plaintiffs' day-to-day employment, but appear to play no role in the administration of state health insurance. Health insurance falls under the domain of ETF and GIB. As a result, while plaintiffs urge the court to apply a "but for" test of causation, they do not and cannot allege any acts or omissions by the Employer Defendants

---

[7] *Norris* involved a Title VII claim against a state employer, but the facts have little applicability in analyzing the standing issues here given that the defendant in *Norris* was an Arizona agency most analogous to GIB, for which defendants already concede standing.

that would satisfy this test, nor do they argue that the Employer Defendants are charged with administering the insurance policy at issue here.

Instead, plaintiffs allege that the Employer Defendants did nothing more than hire the plaintiffs, making them *eligible* for group health insurance through ETF. When employees elected to receive group health insurance, they obtained it through ETF. The Employer Defendants themselves, therefore, played no role in selecting, offering or providing that health insurance.[8] As such, plaintiffs are unable to trace causation back fairly to the Employer Defendants, and those defendants must be dismissed for lack of standing.

### 2. ETF and Secretary Conlin

Although plaintiffs' injury cannot be traced to the Employer Defendants, the court finds that the injury can be fairly traced to ETF. ETF's role as administrator of the group health program makes it and Conlin proper defendants.[9] While the parties disagree about whether GIB should be considered "part" of ETF for standing purposes, there appears no dispute that GIB sets policy, ETF administers it. Moreover, GIB is an "attached board"

---

[8] If plaintiffs wished to argue that the Employer Defendants could have provided additional insurance options outside of ETF, their arguments are both undeveloped and implausible. From the court's review of Wisconsin statutes and administrative code, it is unlikely that the Employer Defendants *could* offer separate, unapproved insurance plans or provide specific coverage extensions for gender reassignment. Nevertheless, if plaintiffs have a good faith belief that the Employer Defendants have the legal authority to offer benefits without ETF's and GIB's approval, then plaintiffs may certainly seek leave to amend their complaint accordingly.

[9] As Secretary of ETF, Conlin is vested with all administrative powers and duties of the department. Wis. Stat. §§ 15.04(1)(a), 40.03(2). In particular, his duties include the administration of group health plans. Wis. Stat. § 40.03(2)(ig). Therefore, any injury fairly traceable to ETF is also fairly traceable to Conlin.

"created in the department of employee trust funds." Wis. Stat. § 15.165(2).

As an attached board, GIB is certainly legally distinct from the rest of ETF, and it is free to exercise its rulemaking powers independent from the Secretary of ETF. Wis. Stat. § 15.03. From this, defendants argue that GIB's independent nature means it is not really "part" of ETF, but the distinction is academic; it does not affect standing. Again, what matters is that while GIB is responsible for contracting with health insurers and setting benefit terms, Wis. Stat. §§ 40.03(6), 40.52(1), 40.52(3), ETF is the entity actually empowered with administering the policies, Wis. Stat. §§ 40.03(2)(a), 40.03(2)(ig). Indeed, even defendants concede that ETF has a "statutory duty to execute GIB's decision" albeit with "no power to do otherwise." (Defs.' Reply (dkt. #43) 7.) Discretion or not, ETF's execution of the policy makes it a proper defendant.

Reaching for contrary authority, defendants argue that two district court decisions suggest that plaintiffs are able to prove causative injury only if ETF were empowered to craft new policy. However, neither of those decisions change the outcome here. In *Parker v. Stranburg*, No. 14-CIV-24010, 2015 WL 3863804 (S.D. Fla. June 22, 2015), a class of motorists challenged as unconstitutional fines issued by local municipalities. Seeking to recover those fines, the motorists sued the Florida Department of Revenue, but their claims were dismissed for lack of standing. *Id.* at *1. Defendants argue that just as the Florida Department of Revenue was statutorily compelled to receive money from municipal fines in *Parker*, so, too, is ETF statutorily compelled to follow GIB policy. Defendants misunderstand the reasoning of *Parker*. The *Parker* plaintiffs lacked standing not because the Department of Revenue was compelled to accept funds by statute, but because the

Department of Revenue's enrichment was a result of the plaintiffs' injury, not a cause.  In *Parker*, municipalities caused plaintiffs' injury, afterwards money passively flowed to the Department of Revenue.  In contrast, ETF's role in administering the group health plan was part of the *cause* of plaintiffs' injury, not a result of it.

Likewise, *Bloch v. Executive Office of the President*, 164 F. Supp. 3d 841 (E.D. Va. 2016), has no bearing on plaintiffs' standing to sue ETF.  Bloch was appointed by President George W. Bush, to serve as a former federal Special Counsel, and later removed from office amidst scandal and criminal proceedings.  Bloch sued for improper termination.  Since only President Bush had the power to remove Bloch, the *Bloch* court ruled that President Bush himself was the only proper defendant to whom causation could be fairly traced.  *Id.* at 848-49 (citing 5 U.S.C. § 1211(b)).  If anything, the *Bloch* decision supports plaintiffs' standing to sue ETF here.  Just as § 1211(b) of Title 5 of the United States Code empowered President Bush to hire and fire the Special Counsel, so, too, Section 40.51(6) of Wisconsin Statutes empowers the ETF to administer the state group health program.

### B. Redressability

In order to have Article III standing, plaintiffs must also show that their injury is likely to be redressed by a favorable decision.  *Spokeo*, 136 S. Ct. at 1547.  Again, this is a modest bar on a motion to dismiss; plaintiffs need only plead that there is a substantial likelihood that the relief requested will redress the injury claimed.  *See Norton*, 422 F.3d at 501 (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n. 20 (1978)).  Neither the merits of plaintiffs' claims, nor the likelihood of success, are not relevant for redressability -- only whether the relief requested would alleviate the harm.  *Id.*

at 502.

Even when the defendant lacks legal authority to prevent or fix the injury, the redressability prong can be met. For example, in *Wolf v. Walker*, 986 F. Supp. 2d 982 (W.D. Wis. 2014), this court allowed same-sex couples to seek redress against their local county clerks for denial of marriage licenses despite the Wisconsin Constitution barring clerks from doing so. *See* Wis. Const. Art. XIII, § 13. Nevertheless, the court found the couples' injury could be redressed by a favorable decision enjoining the clerks from denying marriage licenses. *Wolf v. Walker*, No. 14-cv-64, slip. op. at 12-13 (W.D. Wis. June 13, 2014) (dkt. #134) (permanently enjoining clerks "from denying a marriage license to a couple because both applicants for the license are the same sex").

Similarly, as plaintiffs point out, the Ninth Circuit recognized the standing of a judicial candidate to sue the Arizona Commission on Judicial Conduct to challenge the Arizona Code of Judicial Conduct, even though the commission lacked any authority to change the code. *See Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010). The Ninth Circuit reasoned that a change in the code was not necessary because the commission could be enjoined from enforcing it. *Id.* (citing *Lujan*, 504 U.S. at 561-62) (if defendant's action or inaction causes injury, then ordinarily a judgment preventing or requiring the action will redress it).

Following the same reasons, plaintiffs here satisfy the redressability prong with respect to ETF and its secretary. Indeed, a number of possible rulings directed against these defendants would likely afford plaintiffs redress. For example, plaintiffs specifically request compensatory damages and injunctive relief ordering defendants to provide

transition-related care.  A court order requiring ETF to pay damages for Andrews's surgical costs would provide her redress.  Likewise, an order requiring ETF to pay for Boyden's treatment would provide her redress, as would an order that ETF contract for insurance coverage apart from GIB approval.

Conflating redressability with causation, defendants argue that redressability is absent if the defendants have no power to prevent the plaintiffs' injury.  As explained above, redressability does not require a defendant to have *pre-existing* legal authority that will prevent the injury.  None of the cases cited by defendants hold otherwise.  In *Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007), a Utah county clerk denied a marriage license to three people in a polygamous relationship.  *Id.* at 1103.  The *Bronson* plaintiffs then sued the clerk, asserting constitutional challenges to both Utah's civil *and* criminal prohibitions of polygamy.  *Id.* at 1101.  While the Tenth Circuit held that plaintiffs lacked standing to challenge the constitutionality of the *criminal* statute, this was because the county clerk, and her denial of a marriage license, played no role in plaintiffs' claim to redress from the threat of a future criminal prosecution.[10]  *Id.* at 1109-1110.  Indeed, the threat of criminal prosecution would exist whether or not the court enjoined the clerk to issue a marriage license.  *Id.* at 1112.[11]

---

[10] Utah criminalizes and prosecutes polygamous marriage, whether or not state-sanctioned.  *Bronson*, 500 F.3d at 1102 (citing *State v. Holm*, 137 P.3d 726, 734 (Utah 2006)).

[11] The *Bronson* plaintiffs could likely have satisfied the standing requirements by seeking a marriage license, even though the clerk had no power to change the civil code.  *See e.g. Bostic v. Schaefer*, 760 F.3d 352, 370-72 (4th Cir. 2014).  Even if plaintiffs wished to challenge the criminal code, they could have sued the Utah Attorney General, even though the attorney general lacked any authority to change the code itself.  *Bolton*, 410 U.S. 179.

Defendants also cite to *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001). In that case, plaintiffs sought to enjoin as unconstitutional a Louisiana statute that created a private right of action for recipients of abortions to sue their providers. The plaintiffs, however, filed suit against the governor and attorney general. The Fifth Circuit dismissed the suit, holding that none of the elements of Article III standing were satisfied since the named defendants had no power to enforce the statute and entry of an injunction against them would not stop individual citizens from pursuing claims in courts.

Unlike the cases cited by defendants, a ruling against ETF could wholly resolve the plaintiffs' injury. Defendants acknowledge as much by arguing that plaintiffs' requested relief, while redressing their injury, would have dire consequences. In particular, defendants argue a court order against any non-GIB defendant would be overly intrusive and overturn the state's statutorily-created insurance model. But this puts the cart before the horse since a motion to dismiss is not the time to analyze the merits, or to even address the appropriateness of the requested relief. *Norton*, 422 F.3d at 501. Constitutional standing only requires that the requested relief be *capable* of redressing the injury. Plaintiffs' requested relief accomplishes that much; the merits of their claims are for another day.

## II. Section 1983 Claim

Defendants also seek dismissal of the § 1983 Equal Protection claims asserted against the four individual defendants in both their individual and official capacities. Having dismissed the claims against individual defendants Cross, Blank and Golden for lack of standing, the court need not consider the challenge against them. This leaves

plaintiffs' § 1983 claim against defendant Conlin, the ETF's Secretary.

Defendants contend that plaintiffs fail to allege Conlin's personal involvement with sufficient specificity to proceed against him on an individual capacity claim. In response, plaintiffs contend that they have adequately alleged the "'some causal connection' or 'affirmative link' between the action complained about and the official sued to obtain damages under § 1983." (Pl.'s Opp'n (dkt. #39) 18 (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).) Generally emphasizing the state statutory scheme for providing and administering health insurance for state employees already discussed in this opinion, plaintiffs contend that the allegations in the complaint, coupled with reasonable inferences, satisfy the personal involvement requirement, at least at the pleading stage. More specifically, plaintiffs point out that as its Secretary, Conlin is in charge of the administration of ETF, which includes providing health insurance coverage to state employees and promulgating all rules required for the administration of health insurance plans. (Pls.' Opp'n (dkt. #39) 19.) The court agrees that these allegations are sufficient to satisfy the personal involvement requirement at the pleading stage.

Defendants also seek dismissal of the claims asserted against Conlin in his official capacity based on immunity under the Eleventh Amendment. A state, its agencies and officials are only subject to suit in federal court if one of the following conditions is present: "(1) a state official is sued for prospective equitable relief under *Ex parte Young*, 209 U.S. 123, 159-60 (1908); (2) Congress abrogates the State's immunity pursuant to its powers under section 5 of the Fourteenth Amendment; or (3) the State consents and waives its immunity." *Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009).

14

Here, plaintiffs concede that any claim against Conlin in his official capacity would be for injunctive relief. Still, defendants persist that the *Ex parte Young*, 209 U.S. 123 (1908), exception does not apply because Conlin lacks the authority to grant prospective relief. The requirement, however, is not that exacting. Instead, all that is required is "that the state officer by virtue of his office has some connection with the enforcement of the action." 209 U.S. at 157. While the court agrees with defendants that any ordered prospective relief will almost certainly fall primarily on GIB and ETF to implement, Conlin's position as ETF's Secretary means he has at least "some connection" at the pleading stage to allow the § 1983 claims to go forward against Conlin in his official capacity.

## III.  Title VII Claims

Plaintiffs next assert Title VII discrimination claims against ETF and GIB.[12]  In their motion, defendants argue that Title VII claims against ETF should be dismissed because it did not intentionally discriminate against plaintiffs, and that those same claims against both ETF and GIB must be dismissed because neither is an "employer" under Title VII. Since plaintiffs allege sufficient facts to show that ETF acted in some capacity to discriminate against plaintiffs, and both ETF and GIB are "employers" under Title VII, defendants' motion to dismiss those claims is denied.

---

[12] Plaintiffs also asserted claims against the Board of Regents and the School of Medicine, but since the Board of Regents is dismissed for lack of standing and the parties now agree that the School of Medicine is not a suable entity, the court need only analyze the claims against ETF and GIB.

## A. Intentional Discrimination

To state a viable claim under Title VII, a plaintiff must allege that: (1) an employer discriminates against her with respect to compensation, terms, conditions, or privileges of employment; (2) she is a member of a protected class; and (3) the discriminatory decision was made because the individual is a member of that class. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015). Defendants do not argue that plaintiffs fail to allege that they are members of a protected class; nor do defendants argue that plaintiffs fail to allege employment discrimination. Instead, defendants argue that plaintiffs' allegations fail to satisfy the first element of a Title VII claim: that ETF committed a discriminatory action.

For defendants, the issue once again is *who* plaintiffs allege discriminated against them. In particular, defendants again argue that ETF took no intentionally discriminatory action, but that is not at all clear at this stage. While GIB made the decision to discriminate against transgender persons, plaintiffs still allege that ETF had an active role in administering that decision by (1) discriminating against plaintiffs, (2) who were transgender, (3) because they were transgender. For example, when plaintiff Andrews was unable to receive reimbursement for her surgery, she filed appeals with WPS. When WPS denied her appeals, Andrews took the next step: appealing to ETF. (Am. Compl. (dkt. #27) ¶¶ 78-79.) At this stage, it is not yet clear how much discretionary power ETF has during the appeal process, if any, or whether it could act to rectify a policy that it found illegal under federal law. Since the scope of ETF's role is uncertain, however, the question of ETF's liability is best addressed on a more fulsome record than an initial pleading can

16

afford.

Insofar as defendants argue that plaintiffs must show a specific intention to discriminate, the court also agrees with plaintiffs. When an employment practice involves explicit facial discrimination, as alleged here, the existence of a disparate treatment does *not* depend on the employer's intent. *See Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991). Instead, disparate treatment is demonstrated by the terms of the policy itself.[13] *Id.*; *see also Kentucky Ret. Sys. v. E.E.O.C.*, 554 U.S. 135, 147–48 (2008) (describing in an ADEA context the longstanding rule "that a statute or policy that facially discriminates . . . suffices to show disparate treatment").

## B. Employer Status

Defendants also seek dismissal of plaintiffs' Title VII claims on the basis that ETF and GIB are not the plaintiffs' employer. In a prior opinion and order, the court considered whether Dean Health Plan, Inc. was an employer for purposes of Title VII liability, concluding that it was not. (11/20/17 Op. & Order (dkt. #44).) After reviewing the relevant cases -- which were the same as those cited by the parties in their briefing on the pending motion -- the court concluded that to be an agent under Title VII, "one must be empowered with respect to employment practices, like the right to hire and fire, supervise work, set schedules, pay salary, withhold taxes, *or provide benefits.*" (*Id.* at 6 (emphasis

---

[13] Parties argue about the different types of liability under Title VII, but they do not seem to have a real disagreement. Plaintiffs are not making a disparate impact claim, nor do they claim that facial discrimination is a third form of liability. Rather, plaintiffs correctly assert that facial discrimination is a flavor of disparate treatment -- one in which the burden-shifting framework of *McDonnell Douglas* is inappropriate. *See Reidt v. Cty. of Trempealeau*, 975 F.2d 1336, 1340–41 (7th Cir. 1992) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

added); *see also id.* at 7 ("If anything, an agency relationship exists between plaintiff's employers and ETF/GIB, as the factual allegations suggest that plaintiff's employers delegated to ETF/GIB the responsibility to determine which series should be covered under all of the offered health insurance plans.").) Here, again for the reasons explained above with regard to standing, defendants GIB and ETF are empowered to provide health insurance benefits to state employees, including plaintiffs. As such, the court finds that both are proper suable entities under Title VII, and will deny the motion to dismiss on this basis.

## IV. ACA claims

Finally, plaintiffs assert claims against GIB and ETF for violating Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C § 18116(a), which prohibits discrimination on the basis of sex. Defendants seek dismissal of this claim against GIB based on plaintiffs' failure to allege that GIB is a recipient of federal funds. In addition, defendants seek a stay of this claim pending resolution of another lawsuit challenging this provision of the ACA and related rulemaking proceedings.

### A. Receipt of federal funds

While agreeing that an ACA claim may only be brought against recipients of federal funding, plaintiffs argue that "GIB is part of ETF" and that "ETF receives federal funds." (Pls.' Opp'n (dkt. #39) 35.) The parties dispute the extent of the connection between GIB and ETF, but more importantly for purposes of the pending motion, plaintiffs' reliance on the fact that GIB is a part of ETF does not in and of itself bring it within the scope of a

covered entity under the ACA. Instead, as explained with respect to a similar requirement for federal funding under the Rehabilitation Act claim, "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *Grzan v. Charter Hosp. of Nw. Indiana*, 104 F.3d 116, 120 (7th Cir. 1997), *abrogated on other basis by Amundson v. Wis. Dept. of Health Servs.*, 721 F.3d 871 (7th Cir. 2013) (quoting *United States Dept. of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986)).

The mere allegation that ETF receives federal funding does not, therefore, support a reasonable inference that GIB also received federal funding. *Grzan*, 104 F.3d at 120. ("The coverage of the Rehabilitation Act does not follow federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." (internal citation omitted)). On the other hand, as the Seventh Circuit explained in *Schroeder v. City of Chicago*, 927 F.2d 957 (7th Cir. 1991) -- a case relied on by plaintiffs -- if federal money can be traced to the separate part or division *within* a larger governmental agency then that part or division may be a covered entity under the Rehabilitation Act: "if the office of a mayor received federal financial assistance and distributes it to local departments or agencies, all of the operations of the mayor's office are covered along with the departments or agencies *which actually get the aid*." *Id.* at 962 (emphasis added). Accordingly, the court will grant this portion of defendants' motion to dismiss *without prejudice* so that plaintiffs may file an amended complaint *if* they can allege in good faith that GIB actually received federal funding, either

19

from ETF or otherwise.

**B. Stay of ACA claim**

As for the remaining ACA claim against ETF, defendants seek a stay until the resolution of ongoing litigation in the Northern District of Texas. *See Franciscan Alliance, Inc. v. Price*, No. 7:16-cv-00108-O (N.D. Tex.). The *Franciscan Alliance* lawsuit challenges the legality of certain regulations adopted by HHS that define the sex discrimination prohibition in the ACA to include gender identity discrimination. The district court previously granted a preliminary injunction, staying enforcement of those regulations. *Id.* (dkt. #69) (N.D. Tex. 1/24/17). More recently, that same court stayed the case pending issuance of new regulations. *Id.* (dkt. #105) (N.D. Tex. 7/10/17). As defendants explain, the Trump administration has signaled that it intends either revise or eliminate the challenged regulations.

In considering whether to grant a stay, the court is to consider: "(1) whether the litigation is at an early stage; (2) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (3) whether a stay will simplify the issues in question and streamline the trial; and (4) whether a stay will reduce the burden of litigation on the parties and on the court." *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-WMC, 2010 WL 2079866, at *1 (W.D. Wis. May 19, 2010).

In response, plaintiffs point out that they are relying on the language of the statute itself, rather than regulations under them. According to plaintiffs, their ACA claim does not, therefore, rise and fall with the existence or enforceability of those regulations. Moreover, even if the challenge in *Franciscan Alliance* to the ACA claims is not entirely

mooted by the adoption of new regulations, any resulting decision will not be controlling authority in this case. Accordingly, in light of plaintiffs' focus on the ACA language itself, the uncertainty of whether and when the stay in the *Franciscan Alliance* case will be lifted, and when and if the court will ever issue an opinion, a stay is neither likely to simplify the issues in question nor streamline the trial. Moreover, since plaintiffs' Title VII and Equal Protection claims are proceeding, a stay will not reduce the burden of litigation on the parties or on the court in this case. Accordingly, the court will deny defendants' motion to stay.

## ORDER

IT IS ORDERED that defendants' motion to dismiss and, alternatively to stay (dkt. #28) is GRANTED IN PART AND DENIED IN PART as set forth above.

Entered this 11th day of May, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge