IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALINA BOYDEN and
SHANNON ANDREWS,

        Plaintiffs,                        Case No. 17-cv-264

      v.

STATE OF WISCONSIN DEPARTMENT
OF EMPLOYEE TRUST FUNDS, et al.,

        Defendants.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    Plaintiffs are State Employees Eligible for Health Insurance through Defendants

1.    Plaintiff, Alina Boyden, is and has been employed by the University of Wisconsin as a graduate student employee since August 2013, working as either a teaching assistant or a fellow on at least a one-third full-time basis. (Declaration of Alina Boyden ("Boyden Decl.") at ¶ 3; Declaration of Michael R. Godbe in Support of Motion for Summary Judgment ("Godbe Decl."), Ex. X; May 2, 2018 Stipulation ("May 2, 2018 Stip.") at ¶ 7).

2.    Plaintiff, Shannon Andrews, works at the School of Medicine and Public Health as a researcher in the Carbone Cancer Center. (Declaration of Shannon Andrews ("Andrews Decl.") at ¶ 1).

3.     Proposed Plaintiff, Wren Logan, is employed by the University of Wisconsin Hospital and Clinics Authority as a Psychiatry Resident. (Declaration of Wren W. Logan ("Logan Decl.") at ¶1).[1]

4.     Boyden, Andrews and Logan are state employees eligible for state-provided health insurance. (Godbe Decl., Ex. A (Defs.' Resp. to Pls.' Second Set of Requests for Admission and Interrogatory), Responses to Requests for Admission ¶¶ 1 & 3); Logan Decl. ¶ 1).

5.     Boyden, Andrews, and Logan are women who are transgender. (Boyden Decl. ¶ 2; Andrews Decl. ¶ 2; Logan Decl. ¶ 2).

## A. Plaintiff Alina Boyden

6.     Boyden has received several fellowships and scholarships to support her academic work at UW-Madison, including support from the federal Foreign Language and Areas Students Program and from the University of Wisconsin LGBT Campus Center. She has also served on the Ad-Hoc Committee on Equal Health Care, a faculty shared governance committee. (Boyden Decl. ¶ 4; Declaration of Dr. Stephanie Budge ("Budge Decl."), Ex. 1, p. 24).

7.     Boyden first started to recognize her gender identity around the age of five (5). (Budge Decl., Ex. 1, p. 24).

8.     Boyden has gender dysphoria, or severe distress caused by the incongruence between her gender assigned at birth and her gender identity, and has

---

[1] Plaintiffs include herein facts relevant to proposed Plaintiff, Wren W. Logan, whom Plaintiffs moved to add as a third Plaintiff as part of its Motion for Leave to File Second Amended Complaint (Dkt. # 74, filed May 25, 2018).

been prescribed hormone therapy and gender confirmation surgery ("GCS") to treat her dysphoria. (Budge Decl., Ex. 1, pp. 12, 26-28).

9.    Hormone therapy and GCS are medically necessary treatments for Boyden's gender dysphoria. (Budge Decl., Ex. 1, p. 28; Boyden Decl. ¶¶ 9, 15).

10.    Boyden experiences emotional and physical suffering as a result of not receiving the treatment prescribed for her. (Boyden Decl. ¶ 20).

**B.  Plaintiff Shannon Andrews**

11.    Ms. Andrews first started to recognize her gender identity around the age of five (5). (Andrews Decl. ¶ 4).

12.    Ms. Andrews has a Ph.D. in molecular biology from Princeton University. (Andrews Decl. ¶ 6).

13.    Andrews has gender dysphoria, or severe distress caused by the incongruence between her gender assigned at birth and her gender identity, and has been prescribed hormone therapy and GCS to treat her dysphoria. (Budge Decl., Ex. 1, pp. 12, 32-34).

14.    Hormone therapy and GCS are medically necessary treatments for Andrews' gender dysphoria, and she underwent a vaginoplasty in 2015. (Budge Decl., Ex. 1, p. 34; Andrews Decl. ¶¶ 13, 15, 16).

15.    The surgical procedures and hormone replacement therapy ("HRT") Ms. Andrews has undergone are necessary for her survival. Had she not been able to transition, she would have killed herself. (Andrews Decl. ¶¶ 29, 30).

16.     Andrews has suffered monetary harm as a result of having to pay for GCS, because it was not covered by her state employee health insurance. She has also suffered emotional harm as a result of the denial of benefits because she is transgender. (Andrews Decl. ¶¶ 28-30).

### C. Proposed Plaintiff Wren Logan

17.     Ms. Logan first recognized her gender identity when she was in preschool. (Logan Decl. ¶ 3).

18.     Logan has gender dysphoria, or severe distress caused by the incongruence between her gender assigned at birth and her gender identity, and has been prescribed hormone therapy and GCS to treat her dysphoria. (Logan Decl. ¶¶ 9, 13).

19.     Logan's therapist and psychiatrist agree that GCS is medically necessary treatment for her gender dysphoria. (Logan Decl. ¶ 13).

20.     Logan has suffered emotional and physical harm as a result of her inability to obtain prescribed GCS. (Logan Decl. ¶ 27).

### II.     Gender Identity, Gender Dysphoria, and Treatment

21.     Gender identity is one's internal core sense of one's own sex, such as male or female. (Budge Decl., Ex. 1, p. 8).

22.     All human beings have a gender identity. Gender identity is innate and generally considered to be an immutable characteristic. (Budge Decl., Ex. 1, pp. 8, 19-20).

23.     Treatment aimed at trying to change a person's gender identity and expression to match their sex assigned at birth is recognized by the World Professional Association of Transgender Health ("WPATH") and other major medical associations to be harmful and unethical. (Budge Decl., Ex. 1, pp. 19-20).

24.     "Transgender" means there is an incongruence between a person's gender assigned at birth and the individual's gender identity. (Budge Decl., Ex. 1, p. 9).

25.     Transgender people make up an extremely small percentage of the population, between .38 and .6% of the United States population, and approximately .43% of the population in Wisconsin. (Budge Decl., Ex. 1, p. 10).

26.     Plaintiffs' academic and career accomplishments demonstrate their contributions to society. (Boyden Decl. ¶¶ 1, 3, 4; Andrews Decl. ¶¶ 1, 2; Logan Decl. ¶ 1).

27.     For most transgender individuals, a gender transition or "transitioning" is considered psychologically and medically necessary. Transition can involve social transition and medical transition. (Budge Decl., Ex. 1, pp. 18-19).

28.     A medical transition usually includes any medical procedure to assist a transgender individual with achieving primary or secondary sex characteristics that are closely aligned with their gender identity, including hormone therapy and/or surgeries. Not all transgender persons will want or need medical interventions. (Budge Decl., Ex. 1, p. 9-10).

5

29.     HRT for transgender individuals includes the administration of feminizing or masculinizing hormones to induce changes in physical appearance and is medical necessary treatment for many transgender individuals. (Budge Decl., Ex. 1, p. 10).

30.     GCS includes any surgery to alter or adjust an individual's primary or secondary sex characteristics to align with their gender identity, and is considered medically necessary treatment due to its efficacy in relieving the psychological distress associated with gender dysphoria. (Budge Decl., Ex. 1, p. 10).

31.     Gender dysphoria is the medical and psychiatric term for the psychological distress caused by the incongruence between a transgender person's gender assigned at birth and their gender identity. This psychiatric diagnosis is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"). (Budge Decl., Ex. 1, p. 12).

32.     When individuals diagnosed with gender dysphoria do not obtain competent and necessary treatment, serious and debilitating psychological distress (depression, anxiety, self-harm, suicidal ideation/attempts, etc.) often occurs. (Budge Decl., Ex. 1, p. 13).

33.     To date, every major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people and has called for health insurance coverage for treatment of gender dysphoria. (Budge Decl., Ex. 1, p. 15).

34.    Within the medical and mental health care fields, transition-related medical care, including HRT and GCS, is recognized as medically necessary. (Budge Decl., Ex. 1, p. 18).

35.    A substantial body of research confirms the safety and effectiveness of hormone therapy and surgery to treat gender dysphoria, as well as the serious harm caused by denying care to those who need it. (Budge Decl., Ex. 1, p. 15-18; Expert Witness Report of Dr. Loren S. Schechter ("Schechter Rep."), p. 6-14).

36.    The WPATH Standards of Care ("SOC") for treatment of gender dysphoria outline thirty-seven (37) years of data that focuses on the beneficial psychosocial outcomes of HRT and GCS. (Budge Decl., Ex. 1, p. 16).

37.    The WPATH SOC are widely recognized guidelines for the clinical management of transgender individuals with gender dysphoria. (Schechter Rep. p. 6).

38.    There is no medical basis for blanket exclusions of coverage for all transition-related care. (Budge Decl., Ex. 1, pp. 18, 21-22, 35).

39.    When performing GCS, surgeons use many of the same procedures that they use to treat other medical conditions. (Schechter Rep. p. 11).

40.    For example, surgeons regularly perform mastectomies and chest/breast reconstruction, hysterectomies/salpingo-oophorectomies, and orchiectomies to treat individuals with cancer, or a genetic predisposition to cancer (BRCA 1, 2 genes in the case of prophylactic mastectomy or oophorectomy). (Schechter Rep. p. 11).

41.    Similarly, surgeons perform procedures to reconstruct male or female external genitalia for individuals who have certain medical conditions (e.g., cancer) or who have suffered traumatic injuries to or disabling infections of their genitalia. (Schechter Rep. p. 11).

42.    Insurance coverage is provided to state employees for medically necessary surgeries, including reconstructive surgeries on abnormal structures of the body caused by: (1) congenital defects; (2) trauma; (3) tumors; or (4) disease. (Godbe Decl., Ex. C, Excerpts From 2016 Contract & Uniform Benefits, p. 4-35). In general, medically necessary services are provided "consistent with the symptom(s) or diagnosis and treatment of the Participant's Illness or Injury," based on "standards of acceptable medical practice to treat that Illness or Injury," (Id. p. 4-22; Godbe Decl., Ex. E, 2017 Benefit Year Uniform Benefits, p. 26 (coverage for surgical procedures "when needed to care for an ILLNESS or INJURY"); Dkt. # 93, Deposition of Nancy Thompson ("Thompson Dep.") 24:17-25:12 (surgical procedures are covered if needed to care for an illness or an injury)).

43.    But not all medically necessary surgeries are covered, because Defendants do not cover reconstructive surgeries to treat gender dysphoria though they do cover the same surgeries for other medical conditions and injuries. (Godbe Decl., Ex. C, Excerpts From 2016 Contract & Uniform Benefits, p. 4-44 (exclusion for "procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment"); Godbe Decl., Ex. E, 2017 Benefit Year Uniform Benefits, p. 41; Thompson Dep. 24:23-26:20).

8

44.     When billing insurers for reimbursement, health care providers use Current Procedural Terminology ("CPT") codes, which are developed and maintained by the American Medical Association. The same code or codes may apply to a particular procedure regardless of whether the procedure is performed on a transgender patient or a cisgender patient. (Schechter Rep. p. 11).

45.     For example, a subcutaneous mastectomy may be performed for a cisgender woman to reduce her risk of breast cancer or for a transgender man with gender dysphoria. (Schechter Rep. p. 11).

46.     The same CPT code may be used for both procedures. In general, the charge per CPT code would be the same, whether the procedure were used for treatment of gender dysphoria or treatment of another condition — for example, the charge for a subcutaneous mastectomy (19304). (Schechter Rep. pp. 11-12).

47.     The research, as well as clinical expertise and the WPATH SOC, show that hormone therapy and surgical procedures for gender dysphoria are safe and effective, and that many of these procedures are analogous to surgical procedures used to treat other medical conditions. (Schechter Rep. pp. 6, 12).

48.     The fact that the medical community deems these procedures sufficiently safe to treat conditions other than gender dysphoria is by itself more than sufficient to support the safety of those surgeries to treat gender dysphoria. (Schechter Rep. p. 12).

49.     Studies show overall complication rates for surgical procedures to treat gender dysphoria are similar to the rates for similar surgical procedures for treating other medical conditions. (Schechter Rep. pp. 12-13).

50.     The evidence regarding the efficacy and safety of these treatments is at least as good, if not better, than the evidence supporting other commonly provided medical and surgical treatments. (Schechter Rep. p. 19).

51.     There is no controversy amongst mainstream medical professionals regarding the appropriateness and necessity of medical and surgical care for gender dysphoria. (Budge Decl., Ex. 1, pp. 35-36; Schechter Rep. pp. 19-20).

52.     Transitioning to the sex that matches the individual's identity is also more cost-effective than denying such care, because denial of care is associated with increased disparities in depression and other costly-to-treat conditions. (Budge Decl., Ex. 1, p.22-23).

53.     From an actuarial standpoint, the removal of the exclusion for coverage of transition-related care is immaterial, since it represents less than .1% of the overall costs of medical care. (Declaration of Joan C. Barrett ("Barrett Decl."), Ex. 1, pp. 1, 8; Godbe Decl., Ex. D, July 21, 2016 Emails between Tara Pray and Michael McNally (stating that consultant Segal noted the "cost impact" of removing the exclusion "is typically less than 0.1%," describing this cost as "negligible")).

54.     Recent population-based estimates indicate that approximately .38% to .6% of the United States population identifies as transgender and .43% of the population in Wisconsin is transgender. (Budge Decl. ¶2, Exhibit 1, p. 10).

55.    Boyden cannot afford her prescribed GCS without insurance coverage. (Boyden Decl. ¶ 19).

56.    The health insurance coverage provided to state employees by the State of Wisconsin excludes "Procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment" (hereinafter the "exclusion"). (Godbe Decl., Ex. E, 2017 Benefit Year Uniform Benefits, p. 41).

57.    Boyden was denied coverage for GCS (specifically, a vaginoplasty) because of the exclusion found in the Uniform Benefits plan that prohibits "Procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment." (Boyden Decl. ¶¶ 8, 11; Godbe Decl., Ex. F, Excerpts from Boyden ETF Written Complaint File, p. 1 (reason for denial was exclusion)).

58.    Andrews was denied coverage for GCS (a vaginoplasty) because of the exclusion found in her Health Plan, which prohibits benefits for "HEALTH CARE SERVICES for, or leading to, sex transformation surgery and sex hormones related to such TREATMENT." (Andrews Decl. ¶¶ 16, 20-21; Godbe Decl., Ex. G, Excerpts from Andrews ETF Written Complaint File, p. 8 (reason for denial was exclusion)).

59.    Andrews had to pay for her prescribed GCS out-of-pocket because it was not covered by her insurance. (Andrews Decl. ¶ 28).

60.    After being placed at the University of Wisconsin for her residency, Logan learned that as a state employee, all insurance available to her would exclude transition-related care. Logan was denied coverage for GCS because of the exclusion of transition-related coverage found in the Uniform Benefits plan and was advised

11

that such care was excluded under a provision excluding coverage for "Procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment." (Logan Decl. ¶¶ 12, 22, 21).

61.     After insurer Wisconsin Physicians Service ("WPS") denied the coverage of her 2015 GCS, Andrews filed an appeal of the denial with WPS and submitted a complaint to Employee Trust Funds ("ETF"). (Andrews Decl. ¶¶ 22, 24).

62.     The coverage exclusion is based on gender identity. (Godbe Decl., Ex. H, Jan. 31, 2017 ETF Memo to Health Plans ("the [Group Insurance] Board approved reinstating the exclusion of health benefits and services based on gender identity")); Godbe Decl., Ex. B, "It's Your Choice" Access Health Plan, p. 2 ("There will no longer be an exclusion related to benefits or services based on gender identity"); Godbe Decl., Ex. E, 2017 Benefit Year Uniform Benefits, p. 41 (exclusion for "Procedures, services, and supplies related to surgery and sex hormones associated with gender reassignment"); Dkt. # 53, Deposition of Michael S. Farrell ("Farrell Dep.") at 28:17-25 (describing Texas litigation as a challenge to federal rule forbidding "transgender exclusions" from health plans); Dkt. # 51, Deposition of Herschel Day ("Day Dep.") at 49:17-50:3 (stating his view that the exclusion should be ended because it is "discriminatory and…[he] support[s] the right of transgender individuals to get the healthcare they need," and because "it's not costly to add it to the group plan").

63.     Plaintiffs are denied coverage they need because they are transgender. For most transgender individuals, a gender transition is considered psychologically and medically necessary. (Budge Decl., Ex. 1, p. 9). A medical transition includes any

12

medical procedure to assist a transgender individual with achieving primary or secondary sex characteristics that are closely aligned with their gender identity, such as hormone therapy and/or surgeries. (Id.).

64. Plaintiffs, like non-transgender state employees, qualify for ETF-administered health insurance coverage and have a need for such coverage. (Boyden Decl. ¶ 3; Andrews Decl. ¶ 2; Logan Decl. ¶ 1).

65. The State provides insurance coverage for the reasons stated in Wis. Stat. § 40.01(1), which include "aid[ing] public employees in protecting themselves . . . against the financial hardships of . . . illness, thereby promoting economy and efficiency in public service by facilitating the attraction and retention of competent employees, by enhancing employee morale …. [and] by establishing equitable benefit standards throughout public employment." (Godbe Decl., Ex. A, Defs' Resp. to Interrog. 1).

## III.   The Defendants

66. Defendant, ETF, is an executive branch agency, created by Wis. Stat. § 15.16 and charged with providing and administering retirement, health insurance and other benefit programs to state and local government employees. (*See* Wis. Stat. § 40.01(1); Dkt. # 69, Deposition of Tara S. Pray ("Pray Dep.") at 39:6-17 ("ETF . . . administers the group health insurance program" for state and municipal employees and retirees); Dkt. # 54, Deposition of Robert J. Conlin ("Conlin Dep.") at 25:2-9; 84:1-12; Dkt. # 78, Deposition of Jeffrey E. Bogardus ("Bogardus Dep.") at 15:9-15; 15:20-16:2).

13

67.     ETF directly receives federal financial assistance in the form of Medicare Part D subsidies for the self-insured pharmacy benefits plan offered to state employees. (Godbe Decl., Ex. X, May 2, 2018 Stip. ¶ 2).

68.     Defendant Robert Conlin, Secretary of ETF, is "in charge of the administration of the department and exercise[s], as head of the department, all powers and duties" exercised by other department secretaries. (Wis. Stat. § 40.03(2)(a)).

69.     Conlin and subordinate ETF staff within the Office of Strategic Health Policy ("OSHP") administer health insurance plans for state employees. (Conlin Dep. 35:9-36:3 (Secretary is "ultimately responsible for administering" health insurance programs); 30:18-32:10 (delegates day-to-day administration of health insurance program to OSHP), 89:21-24 & 93:8-19 (ETF administers state employee group health insurance plans)).

70.     As Secretary, Conlin oversaw a reorganization of ETF that created OSHP, and hired Lisa Ellinger, who was the OSHP director during the time when Defendants rescinded and then reinstated the exclusion. (Conlin Dep. 23:4-13; 31:7-19; 55:22-56:2; Dkt. # 68, Deposition of Lisa  M. Ellinger ("Ellinger Dep.") at 11:25-12:3).

71.     OSHP is the "policy office" for state health insurance programs, and "sets the policy with the Group Insurance Board ("GIB") for the group health insurance program." (Pray Dep. 39:22-25).

72.     As Secretary, Conlin is ultimately responsible for ensuring that OSHP staff carry out the GIB's decisions. (Pray Dep. 48:20-23; Conlin Dep. 51:16-23, 52:1-12).

73.     Policy analysts in OSHP, sometimes with assistance from contracted consultants, evaluate the package of employee health insurance benefits (called the "Uniform Benefits") throughout the year and analyze and make recommendations to the GIB about changes to that package, typically in late winter and early spring. (Pray Dep. 45:21-47:3, 48:24-54:25; Conlin Dep. 52:13-53:8 (staff recommend uniform benefits changes and implement uniform benefits approved by GIB); Bogardus Dep. 52:10-16).

74.     As secretary, Conlin took a number of specific actions to review the coverage exclusion at issue in this case, including reviewing the final Health and Human Services ("HHS") rule on nondiscrimination and requesting a legal opinion from ETF as to the applicability of that rule to ETF, reviewing memos by OSHP and ETF relating to the proposed removal of the exclusion, and discussing the coverage exclusion with ETF attorneys on multiple occasions. (Godbe Decl., Ex. W, Defs.' Resp. to Pls.' First Set of Disc. Requests, Interrog. 10).

75.     Defendant, GIB, is one (1) of five (5) boards within ETF. Wis. Stat. § 15.165(2) ("There is created in the department of employee trust funds a group insurance board").

76.     GIB relies on ETF staff when making policy decisions. (Farrell Dep. 36:9-11).

77.     ETF staff have significant control over what new benefits are added to the state employee health plans, because GIB generally does not adopt new benefits that are not recommended by ETF. (Pray Dep. 62:2-5).

78.     GIB votes on the uniform benefit recommendations of ETF staff, typically at its quarterly meeting in May or August, for inclusion in contracts with the private insurance companies that provide coverage to state employees. (Conlin Dep. 78:20-79:22; Day Dep. 32:8-22, 35:10-13).

79.     GIB is "a policymaking board that directs ETF staff on matters related to the group insurance plan for the State of Wisconsin," and directs ETF staff on matters related to the group insurance plans. (Farrell Dep. 32:2-6, 35:17-36:2; Conlin Dep. 34:25-35:1).

80.     GIB considers recommendations from ETF and establishes health insurance benefits for Wisconsin state employees each contract year. (Thompson Dep. 17:24-18:19; Farrell Dep. 35:17-36:5, 39:10-17; Conlin Dep. 34:18-35:1).

81.     ETF implements the decisions of the GIB regarding the uniform benefits package. (Conlin Dep. 51:16-52:11, 89:21-24; Dkt. # 52, Deposition of David H. Nispel ("Nispel Dep.") at 17:11-19; Farrell Dep. 38:13-39:9).

82.     The uniform benefits adopted by GIB govern all state employee plans. (Ellinger Dep. 38:10-19 ("Uniform benefits was instituted to ensure that all those health plans were administering the same benefits package")).

16

83.    ETF's implementation of GIB's benefits decisions includes incorporating the benefits changes into contracts with private health plans who administer employee coverage. (Pray Dep. 66:13-24; Conlin Dep. 82:23-83:3).

84.    GIB contracts with private insurance companies to administer the insurance for state employees pursuant to the Uniform Benefits set by GIB. (Conlin Dep. 82:23-83:3; Nispel Dep. 17:11-23).

85.    Private insurers that contract with GIB may not deviate from the uniform benefits package. (Pray 69:14-19).

86.    ETF negotiates and is the point of contact for contracts with the private health plans. (Nispel Dep. 34:19-20; Conlin Dep. 91:10-92:6; Pray 68:6-23; *see also* Wis. Stat. § 40.02(37) (authorizing GIB to enter "contractual arrangements which may include, but are not limited to, indemnity or service benefits, or prepaid comprehensive health care plans, which will provide full or partial payment of the financial expense incurred by employees and dependents as the result of injury, illness or preventive medical procedures")).

87.    ETF and GIB are both identified as contracting parties for pharmacy benefits. (Godbe Decl., Ex. X, May 2, 2018 Stip. ¶ 8).

88.    ETF enforces contracts with private health plans, which contain the exclusion at issue in this case, through hearing grievances and appeals, conducting audits, and other means. (Conlin Dep. 82:23-83:25 (ETF enforces contracts through appeals and audits); Pray Dep. 85:14-88:12 (describing ways in which ETF OSHP enforces contracts with health plans)).

17

89.     ETF's Office of Legal Services ("OLS") staff provide legal counsel to GIB and ETF. (Nispel Dep. 15:1-3, 18:4-6).

90.     The Board of Regents and the Medical School, along with their chief executive officers (the "Employer Defendants"), offer health insurance plans with the uniform benefits packages set by ETF and GIB. (Godbe Decl., Ex. A, Defs.' Resp. to Reqs. for Admis. ¶¶ 2, 4, 10, 11, 13; Wis. Stat. § 40.52(1) ("all insured employees shall participate" in standard employee health plans devised by GIB and ETF)).

91.     ETF's OLS concluded that ETF is a "covered entity" under the Affordable Care Act ("ACA"). (Nispel Dep. 32:6-17; Godbe Decl., Ex. I, June 22, 2016 GIB Correspondence Memorandum, p. 4).

92.     Navitus Health Solutions is the pharmacy benefit manager that is contracted with the GIB. (Bogardus Dep. 21:3-5).

93.     The OSHP deals primarily with the GIB and the group health plans, including the pharmacy benefit program. (Bogardus Dep. 40:4-11).

94.     Bogardus testified that the cost of hormone drugs, such as estrogen and androgen, is "fairly low compared to other drugs in the market" that the plan does pay for. (Bogardus Dep. 109:17-110:4).

**IV.   History of the Exclusion and Reasons Given for Reinstating the Exclusion**

95.     ETF employee health insurance plans excluded coverage of transition-related care starting in 1994. (Nispel Dep. 25:9-13).

96.     In response to bargaining demands submitted to ETF by the Teaching Assistants Association ("TAA") for the 2005-07 contract, which included a demand

18

that the state "provide coverage for transgender, and transsexual individuals to get surgery and follow-up hormone therapy," ETF stated as follows:

> The Board's actuary estimates that in a population of the size of the state program there would be two procedures annually, each costing about $55,400, including all follow-up therapy. The annual cost could be expected to rise at the rate of general increases in health care costs.

ETF estimated the annual cost of the benefit at $110,800 (Godbe Decl., Ex. J, Attachment to Sept. 8, 2006 emails between Bill Kox and Jeff Bogardus, pp. 19-20).

97.   The TAA's 2009-2011 list of bargaining demands included "coverage for transgender, and transsexual individuals to get surgery and follow-up hormone therapy." (Godbe Decl., Ex. K, Attachment to Oct. 22, 2008 emails between Linda Owens and Jeff Bogardus, pp. 16-17).

98.   ETF noted again that "the Board's actuary estimates that in a population of the size of the state program there would be two procedures annually," and that "data from current extensive studies of employers who cover these procedures show that costs are lower than earlier reported, ranging from approximately $20,000 to $25,000" meaning an estimated annual cost of $40,000 to $50,000. (Id.).

99.   GIB adopted a modification of the exclusion language in 2015 or 2016, but did not remove the exclusion. (Bogardus Dep. 60:10-17).

A.   Removal of the Exclusion

100.   As part of the Group Health Insurance Program Considerations in 2015 for the plan year starting January 1, 2016, ETF noted that it would not recommend

for 2016, but would consider in 2017, "add[ing] coverage for gender reassignment benefits with strict protocols." (Godbe Decl., Ex. L, April 24, 2015 Pray Memorandum, at 5).

101.   The University of Wisconsin specifically requested elimination of the exclusion to enhance hiring, and provided evidence that the costs of such coverage would be minimal. (Pray 104:21-105:9).

102.   In mid-July 2016, ETF staff first recommended to GIB that the exclusion be removed. (Nispel Dep. 27:2-5 ("the department first recommended to the GIB the removal of the exclusion . . . at the July 12, 2016 meeting of the GIB"); Day Dep. 47:1-6).

103.   At the July 12, 2016 GIB meeting, GIB voted unanimously to amend the uniform benefits to permit coverage of transition-related care beginning in January 2017. (Godbe Decl., Ex. M, July 12, 2016 Open Meeting Minutes, pp. 3-4).

104.   GIB member Herschel Day ("Day") was supportive of the removal of the exclusion because he "view[ed] the exclusion as discriminatory and…support[s] the right of transgender individuals to get the healthcare they need," and because "it's not costly to add it to the group plan." (Day Dep. 49:17-50:3).

105.   Wisconsin's actuarial and benefits consultant, Segal, estimated that removing the exclusion would result in a very minor increase in costs. (Thompson Dep. 35:3-8).

106.   The day after GIB voted to remove the exclusion, Day emailed Lisa Ellinger, the director of ETF's OSHP, and asked whether ETF had an actuarial cost

estimate for the removal of the exclusion. (Godbe Decl., Ex. D, July 21, 2016 Emails between Tara Pray and Michael McNally, p. 2).

107.    Segal provided two (2) cost estimates for benefits related to treatment of gender dysphoria. In June of 2016, when ETF was considering removing the exclusion, it obtained Segal's March 3, 2014 estimate provided to the State of Maryland to get a sense of the expected costs for Wisconsin. (Godbe Decl., Ex. N, March 3, 2014 Segal Maryland Coverage Estimate Memorandum, p. 6).

108.    That estimate was between .02% and .03% of total premiums. (Id.).

109.    ETF obtained another estimate from Segal on January 23, 2017, as part of its determination that reinstating the exclusion would not increase costs to the state. (Godbe Decl., Ex. O, January 27, 2017 Segal Transgender Cost Estimate Memorandum, p. 3).

110.    That estimate indicated a range of between .007% and .018% of total premiums. (Id.).

111.    At no time did the Wisconsin Department of Justice ("DOJ") or ETF present evidence of medical research to the GIB members suggesting that gender confirmation surgeries are experimental or have not been demonstrated to be safe and effective for treating gender dysphoria. (Day Dep. 111:5-14; Thompson Dep. 37:4-14).

B. Reinstatement of the Exclusion

112.    However, the DOJ and one (1) GIB board member thereafter began urging that the exclusion be reinstated.  (Day Dep. 64:22-65:3 ("the issue was brought

up for reconsideration by a board member. . . J.P. Wieske"); Pray Dep. 186:16-20 ("the board made a decision to reinstate it based on . . . the concerns brought forth by the DOJ"); Ellinger Dep. 119:24-120:2 ("board member requested that the Wisconsin DOJ be allowed to address the issue")).

113.   J.P. Wieske ("Wieske") brought up the possible reinstatement of the exclusion multiple times. (Day Dep. 65:2-3; Conlin Dep. 151:3-18, 153:23-154:2, 154:10-17).

114.   On August 10, 2016, the DOJ provided a memorandum to GIB via ETF, asking that GIB reconsider its vote to eliminate the exclusion. (Godbe Decl., Ex. P, August 12, 2016 ETF Memo to GIB, Attach. A).

115.   The DOJ memorandum states that the federal HHS rules barring discrimination based on "gender identity" are "unlawful," "intrude on powers reserved to the State of Wisconsin to administer its own health policy," and "do not mandate coverage for any particular procedures." (Id.).

116.   David Nispel and Diana Felsmann, attorneys for ETF, provided a memorandum in response to the DOJ's memorandum on August 11, 2016, noting that the GIB members, as fiduciaries, "must ensure that the Group Health Insurance Program complies with state and federal law." (Godbe Decl., Ex. P, August 12, 2016 ETF Memo to GIB, Attach. B).

117.   The ETF memorandum observed that the HHS non-discrimination rule prevents health insurance issuers from contracting away their nondiscrimination

obligations, and that maintaining the exclusion could therefore "jeopardize ETF's ability to contract with its health insurance issuers." (Id.).

118. Further, the ETF memorandum noted that the cost of removing the exclusion was anticipated to be low, and that services would still be required to be "medically necessary." (Id.).

119. Kevin Potter from the DOJ attended the December 13, 2016 GIB meeting and stated that the DOJ's August 10, 2016 memorandum "was authored by the DOJ at the request of the governor's office for the benefit of the Board." (Godbe Decl., Ex. Q, Dec. 13, 2016 GIB Open Meeting Meetings, p. 9).

120. Potter "stated that the DOJ recommends the Board follow the law as it currently stands," and noted that the State of Wisconsin was part of a federal lawsuit challenging the HHS regulations pertaining to discrimination on the basis of gender identity. (Id.).

121. ETF was directed to proceed with the implementation of the language previously adopted eliminating the exclusion. (Id.).

122. On December 29, 2016, GIB Chair Michael Farrell ("Farrell") instructed Conlin to call a meeting of GIB for the next day. (Conlin Dep. 130:3-13 (describing frustration at the request from a member of the Department of Administration to set up a last-minute board meeting), 132: 8-10 (Farrell calls Conlin the morning of December 29), 136:10-15 ("are we still dealing with this issue? Last day of the year. . . pull off a full board meeting with 24 hours' notice"); Pray Dep. 193:16-18 (the whole thing was pretty unusual)).

123.   Pharmacy Benefits Manager Jeffrey Bogardus ("Bogardus") informed three (3) Navitus employees about the special GIB meeting, which he described via email as "a discussion with Dept of Justice and their recommendation to the GIB to not implement the uniform benefit changes for 2017 surrounding gender identity. This is being pushed by the Governor's office and attorney general. It is based solely on the AG's opinion that the HHS non-discrimination rule is illegal – which I think the courts would have to determine – not the AG." (Godbe Decl., Ex. R, Dec. 29, 2016 email between Jeff Bogardus and Steven Alexander, Shannon Tischer, and Pam Olson).

124.   GIB convened in closed session at the December 30, 2016 meeting to discuss the exclusion. (Godbe Decl., Ex. S, Dec. 30, 2016 Open Meeting Minutes, pp. 2-3).

125.   After deliberating in closed session from 3:13 p.m. to 6:24 p.m., GIB reconvened in open session and voted to reinstate the exclusion once four (4) contingencies were satisfied:

- Subject to a court ruling or an administrative action that enjoins, rescinds or invalidates the HHS Rule;

- Subject to compliance with Wis. Stat. section 40.03 (6)(c);

- Subject to renegotiation of contacts that maintain or reduce premium costs for the state; and finally

- Subject to the opinion of the DOJ that the action taken does not constitute a breach of board members' fiduciary duties.

(Id. p. 3).

24

126.   To change benefits during a plan year was unusual for GIB and ETF. (Conlin Dep. 80:23-81:23 (unusual to change benefits during plan year), 156:22-157:5); Pray Dep. 63:11-23 (can think of no previous examples of eliminating benefits in middle of plan year), 150:4-23 (no prior examples of eliminating benefit after contracts signed), 152:4-9 ("a lot of concern was really about . . . we have to now go back and change all of these things . . . it was quick timing"), 171:15-18 (can think of no similar instance in which a benefit was provided and then rescinded in the same plan year)).

127.   GIB voted to reinstate the exclusion for reasons related to the Texas injunction against HHS to prevent it from enforcing the ACA regulations. (Farrell Dep. 130:11-131:6; Wieske Dep. 95:15-96:6).

128.   According to GIB chair, Michael Farrell, the exclusion was reinstated solely because of the injunction in Texas. (Farrell Dep. 56:8-58:16, 60:4-9, 130:11-131:6).

129.   Farrell referred to the Texas litigation as a challenge to a federal rule requiring removal of "transgender exclusions" from health plans. (Farrell Dep. 28:14-25).

130.   According to Wieske, the exclusion was reinstated solely because "there was not a legal basis to remove the exclusion and we had relied on the legal basis to remove the exclusion." (Wieske Dep. 87:25-88:7).

131.   Wieske testified that, while he was thinking about what he considered to be a lack of medical necessity of GCS in considering the reinstatement of the

exclusion, he had no knowledge of whether surgery was medically necessary or efficacious. (Wieske Dep. 91:13-92:16).

132.   Wieske's only information about the medical necessity of surgery seems to arise from conversations with people at insurance companies who he claims told him that such surgery is not medically necessary. (Wieske Dep. 92:4-9).

133.   According to Nancy Thompson ("Thompson"), the cost of providing the benefits, the safety of the procedures and the effectiveness of the procedures were not reasons for reinstating the exclusion, and were not even discussed by the GIB. (Thompson Dep. 35:3-18, 41:8-9, 44:6-20, 47:14-48:6, 55:11-25, 63:19-64:6, 70:8-71:5, 74:22-75:15).

134.   The only reason Thompson could ascertain for the GIB's reinstatement was that board members were satisfied that they would not be in violation of the law or their fiduciary duties if they did. (Thompson Dep. 85:20-86:16).

135.   Day did not recall DOJ or ETF providing any medical research on the impact of these procedures on patients, nor did he know that cost was one of DOJ's reasons for recommending the reinstatement of the exclusion. (Day Dep. 111:5-14, 113:5-11).

136.   Bogardus did not expect the exclusion to be reinstated prior to the December 30, 2016 meeting, because "the decisions that had already been made we felt were sound." (Bogardus Dep. 94:15-16).

137.  Defendant Conlin was personally involved in the administrative process leading up to the reinstatement of the exclusion. (Conlin Dep. 85:3-12; Godbe Decl., Ex. W, Defs.' Resp. to Interrog. 10).

138.  Conlin determined there was no need to negotiate with the plans over the reinstatement of the exclusion. (Conlin Dep. 85:24-86:19).

139.  Conlin determined that it was unnecessary to bring the issue back to the GIB to determine whether the contingencies had been met. (Conlin Dep. 166:22-167:24).

140.  In January 2017, ETF Secretary Conlin determined that the contingencies had been met and approved a reinstatement of the exclusion, effective February 1, 2017. (Conlin Dep. 89:17-24, 166:14-167:24, 168:10-20; Nispel Dep. 90:17-91:13).

141.  Conlin was involved in preparing the contract amendment reinstating the exclusion that was to be sent to plans, including insisting that the amendment be signed by someone with authority to bind the plans. (Conlin Dep. 85:18-89:8).

142.  The contract amendment went out under Conlin's name, because ETF administers GIB's benefit decisions. (Conlin Dep. 89:17-24).

143.  Numerous witnesses testified that the reversal of recently adopted benefits, the timing of the meeting to reinstate the exclusion, and the adoption of policy based on the occurrence of contingencies were unusual or unprecedented in their memory. (Conlin Dep. 159: 17-22; Pray Dep. 150:19-151:2; Thompson Dep. 67:21-68:5; Farrell Dep. 139:13-16; Nispel Dep. 94:8-16; Bogardus Dep. 51:18-52:3

(could not recall any time when a change to benefits was made in the middle of a benefit year)).

144.   In early February 2017, ETF employees Tara Pray, Joan Steele, Eileen Mallow, and Lisa Ellinger sought legal guidance as to whether reinstating the exclusion would be in violation of either the ACA or a 60-day material modification notice requirement of the Employee Retirement Income Security Act ("ERISA"). (Pray Dep. 164:16-165:22; Godbe Decl., Ex. T, Feb. 6, 2017 emails between Tara Pray and Lisa Ellinger).

145.   At GIB's meeting on February 8, 2017, Day stated that reinstating the exclusion could increase GIB's risk of liability for breach of fiduciary duty if the injunction in the HHS lawsuit was lifted. (Godbe Decl., Ex. U, Feb. 8, 2017 GIB Open Meeting Minutes, p. 5).

146.   At GIB's meeting on May 24, 2017, Day made a motion to again eliminate the exclusion; the motion failed. (Godbe Decl., Ex. V, May 24, 2017 GIB Open Meeting Minutes, pp. 8-9).

147.   Day made this motion because he "felt this could make a positive impact on members' lives," "didn't see it as a high-cost item," and because he "felt that reinstating the benefits meant that doctors and their patients would determine what is medically necessary and not the board." (Day Dep. 100:17-101:3).

148.   When asked to identify the reasons for the exclusion in discovery, the state defendants initially responded "the information requested by this Interrogatory will be addressed by expert testimony and thus it incorporates into this Response any

future relevant expert testimony," and that the exclusion "furthers the state interests contained in Wis. Stat. § 40.01(1). (Godbe Decl. Ex. W, Defs.' Resp. to Interrog. 2.)

149.   After being asked to supplement their responses to Interrogatory No. 2, Defendants added that the exclusion "furthers the state interests in (1) avoiding potential costs associated with the coverage at issue; and (2) declining to provide coverage for treatments that are experimental and have not been demonstrated to be safe and effective for treating gender dysphoria" (Dkt. # 83-1, Defs.' Supp. Resp. to Pls.' First Set of Disc. Requests, Interrog. 2.)

Submitted this 8th day of June, 2018.

**HAWKS QUINDEL, S.C.**
*Counsel for Plaintiffs,*

By: */s/ Nicholas E. Fairweather*
Nicholas E. Fairweather, State Bar No. 1036681
Email: nfairweather@hq-law.com
Michael R. Godbe, State Bar No. 1104823
Email: mgodbe@hq-law.com
Caitlin M. Madden, State Bar No. 1089238
Email: cmadden@hq-law.com
409 East Main Street
Post Office Box 2155
Madison, Wisconsin 53701-2155
Telephone: (608) 257-0040
Facsimile: (608) 256-0236

**AMERICAN CIVIL LIBERTIES UNION OF WISCONSIN FOUNDATION**
*Counsel for Plaintiffs,*


By: */s/ Laurence J. Dupuis*
Laurence J. Dupuis, State Bar No. 1029261
Email: ldupuis@aclu-wi.org
Asma I. Kadri, VA State Bar No. 91290
Email: akadri@aclu.org
ACLU of Wisconsin Foundation
207 East Buffalo Street, Suite 325
Milwaukee, Wisconsin 53202
Telephone: (414) 272-4032

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
*Counsel for Plaintiffs,*


By: */s/ John A. Knight*
John A. Knight
Email: jknight@aclu.org
ACLU Foundation
Lesbian Gay Bisexual Transgender Project
150 North Michigan Avenue, Suite 600
Chicago, Illinois 60601
Telephone: (312) 201-9740