IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALINA BOYDEN and
SHANNON ANDREWS,

       Plaintiffs,                           Case No. 17-cv-264

      v.

STATE OF WISCONSIN DEPARTMENT
OF EMPLOYEE TRUST FUNDS, et al.,

       Defendants.

---

**PLAINTIFFS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT IN RESPONSE TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

### I.    Efficacy of Treatment for Gender Dysphoria

1. The consensus in the medical and psychological community is that a post-pubescent person's gender identity is immutable. (Supplemental Expert Report of Dr. Stephanie Budge ("Budge Supp. Rep.") at 12).

2. The medical profession recognizes gender confirmation surgery as reconstructive, not cosmetic, and the WPATH standards of care emphasize that such treatment is not elective. (Budge Supp. Rep. at 1, Supplemental Expert Report of Dr. Loren Schechter ("Schechter Supp. Rep.") ¶ 4).

3. Depression is not an indication for cosmetic surgery, and cosmetic surgery is not a treatment for depression. (Schechter Supp. Rep. ¶ 1).

4. Cosmetic and elective surgeries performed to enhance self-esteem and self-confidence should not be performed to treat or improve psychological disorders,

and research has not shown this surgery to benefit patients with pre-existing psychological or personality problems. (Budge Supp. Rep. at 3-4).

5. For some patients, hormone therapy and gender confirming surgeries prevent the severe emotional and physical harms associated with gender dysphoria. (Budge Supp. Rep. at 9-10 (research demonstrates relationship between transition-related care and a reduction in suicidal ideation and improved quality of life); Dkt. # 112, Deposition of Dr. Lawrence Mayer ("Mayer Dep."), at 150:1-5 (acknowledging "certainly there are some cases in which it [gender confirming treatment] is called for")).

6. Defendants also cover surgeries such as kidney and heart transplants. (Dkt. # 103-5, 2017 Uniform Benefits, at 31-33).

7. Gender dysphoria, the medical and psychiatric term for psychological distress caused by the incongruence between a transgender person's gender assigned at birth and their gender identity, is distinct from anxiety and mood disorders. (Pls.' PFOF ¶ 30; Budge Supp. Rep. at 4-5).

8. The term "dysphoria" on its own is not a diagnosis, and it is not the same as depression. (Budge Supp. Rep. at 4-5).

9. Surgeons generally consider surgeries performed to treat gender dysphoria as reconstructive, even when the same surgical procedures may be considered "cosmetic" when performed on someone without a gender dysphoria diagnosis. (Budge Supp. Rep. at 2).

10. While anxiety and mood disorders may accompany gender dysphoria, they are not the same thing. (Budge Supp. Rep. at 4).

11. According to the standards of care for transgender patients, surgeries to treat gender dysphoria are only to be undertaken after a qualified mental health professional has assessed the patient and documented that they have met the criteria for such treatment. (Budge Supp. Rep. at 3).

12. Studies using control groups have found that hormone therapy is effective for reducing gender dysphoria. (Budge Supp. Rep. at 7).

13. Studies have also indicated that transgender persons undergoing gender confirmation surgery have reduced suicidal ideation and improved quality of life, compared to those who did not have surgery or hormones. (*Id.* at 9-10).

14. Cosmetic and elective surgeries performed to enhance an individual's self-esteem are not treatments for psychological disorders, and studies indicate that cosmetic surgery does not improve outcomes for patients with depression, anxiety, or body dysmorphic disorder. (Budge Supp. Rep. at 2-4).

15. Cosmetic surgery is not recognized as a treatment for depression, and individuals suffering from depression may not be candidates for cosmetic surgery unless their depression is being treated. (Schechter Supp. Rep. ¶ 1).

16. Schechter is unaware of any studies in which individuals with depression were treated with cosmetic surgery. (*Id.*)

17. Nor is cosmetic surgery considered a treatment for suicidal ideation in cisgender individuals. (Budge Supp. Rep. at 10).

18. Surgeries such as breast reconstruction following mastectomy, a commonly-covered benefit, includes both a reconstructive and a cosmetic component, and is intended to help restore the recipient's sense of femininity and improve self-esteem and well-being. (Schechter Supp. Rep. ¶¶ 2-3).

19. Gender confirmation surgery is similar to reconstructive surgeries provided to non-transgender persons to correct conditions such as congenital absence of the vagina or reconstruction of the vagina/vulva following oncologic resection, traumatic injury, or infection. (Dkt. # 106, Expert Report of Dr. Loren Schechter ("Schechter Rep."), at 11).

20. The exclusion bars chest reconstruction surgery for transgender men and women, while chest reconstruction surgery is covered for cancer and other medical conditions. (Schechter Rep. 7, 11; Dkt. # 103-5, 2017 Uniform Benefits, at 130; see also Schechter Supp. Rep. ¶ 2).

21. The "gender reassignment" exclusion in the Uniform Benefits is entirely separate from the "cosmetic surgery" exclusion. (*Compare* 2017 Uniform Benefits at 41 (gender reassignment exclusion) *with* 47 (exclusion for treatment for "cosmetic or beautifying purposes")).

## II. Defendants' Expert Dr. Lawrence Mayer

22. Mayer is not licensed to practice medicine in the United States, has never practiced medicine or psychiatry, and has no specific training dealing with gender dysphoria. (Mayer Dep. 6:22-7:6).

4

23. Instead, he has reviewed research papers on gender dysphoria, but acknowledges that "reading the papers alone wouldn't make you an expert in anything." (Mayer Dep. 62:12-20).

24. When asked whether hormone therapy is a medically necessary treatment for adults with gender dysphoria, Mayer stated, "I'm not an expert in what is medically necessary," and that a determination of whether something is "medically necessary" must be determined by looking at a specific patient. (Dr. Mayer 64:1-7; *see also* 85:11-16 (if a psychiatrist said reassignment surgery was "absolutely critical" to resolve a certain patient's dysphoria, he would not dispute that conclusion); 86:4-13 (same)).

25. When asked for the basis of the opinions stated in his report, Mayer replied, "Most of the opinions come from first principle. They don't come from research, because there isn't any good research on the treatment of gender dysphoria." (Mayer Dep. 99:19-22).

26. Mayer's expert report cites to his own amicus brief filed in *Gloucester County School Board v. G.G. ex rel Grimm*, No. 16-273 (U.S.) as support for his conclusions on the safety and efficacy of treatments for gender dysphoria, but in that brief, Mayer explicitly stated that he was "leav[ing] aside all questions about how best to treat gender dysphoria in adults." (Mayer Dep. 103:5-14).

27. Mayer contends that gender dysphoria is the same as any other depression, and should be treated the same. (Mayer Dep. 121:17-122:2).

28. Mayer concedes that because he is not a clinician, he cannot offer an opinion as to whether hormone therapy or surgical treatment are appropriate treatments for the Plaintiffs, and that such treatments may be appropriate for them. (Mayer Dep. 157:21-158:10).

29. Mayer testified that he could not design a study to test the effectiveness of treatments for gender dysphoria because he is "not an expert in the field." (Mayer Dep. 128:20-129:2; see also 129:15-18 (he is not an expert in gender dysphoria)).

30. Mayer testified that he did not see studies about what treatments for gender dysphoria are safe and effective. (Mayer Dep. 42:20-43:2; see also Mayer Dep. 36:1-4 (he "searched and searched" but could not find any evidence that surgery is a major treatment for gender dysphoria); 49:20-24 (claiming there is "not a single study that shows the incidence of gender dysphoria goes down as a function of plastic surgery or reassignment surgery")).

31. There are studies that measure gender dysphoria as a specific outcome of transition-related care that have found that gender dysphoria is significantly reduced after the medical interventions, including gender confirmation surgery and hormone therapy. (Budge Supp. Rep. at 6-7).

32. Mayer maintains that a proper study to measure the effect of interventions on gender dysphoria must include an active control. (Mayer Dep. 42:6-13).

33. Many studies have researched the effect of hormone therapy on gender dysphoria using control groups and found these interventions to be effective. (Budge Supp. Rep. at 7).

34. It is not possible to perform a single-blind study in the context of gender reassignment surgery or hormone therapy, because there is no way for the patient to be unaware of whether they are receiving a placebo or the true intervention. (Budge Supp. Rep. at 8).

### III. Defendants' Expert David V. Williams

35. Defendants' expert David V. Williams is not an actuary. (Williams Dep. 24:14-16).

36. Williams is not an expert in the medical necessity, safety, and efficacy of treatments in general nor treatments for gender dysphoria specifically. (Williams Dep. 72:4-11).

37. In calculating the cost of the exclusion, Williams opined that a "risk margin" that would effectively double the total cost estimate was "reasonable," but at deposition he conceded that this risk margin represented a "bad case," if not a "worst case" scenario and admitted that he was aware of no other similar risk margins for comparable benefits. (Williams Dep. 178:18-21; 179:18-23; *see also* 170:20-171:3 ("I'm giving a speculative example of – of – you might call it a worst case scenario")).

38. Williams conceded the 2016 Truven database data he relied upon to make his fifty percent risk factor adjustment could possibly contain "pent-up data"

7

and not be a fully accurate representation of likely future health insurance claims for transgender individuals. (Williams Dep. 180:11-19).

39. Williams does not have enough data to estimate the odds or likelihood that the utilization rate would exceed his point estimate by 50%. (Williams Dep. 203: 11-22).

40. Plaintiffs' expert Joan Barrett, when reviewing Williams' report, recommends an additional risk factor of twenty-five percent compared to Mr. Williams' fifty percent. "Our recommendation would be to use a 25% margin, resulting in a $0.09 PMPM. This would support a scenario where there was one additional reassignment surgery and 16 additional non-surgical patients. The net impact to the State Plan would be $175,000 or 0.02% of total costs." (Barrett Rep. p. 8).

41. Barrett noted that, "Even at Mr. Williams' estimate of $0.15, the removal of the Exclusion rounds to 0.0%, so it is clearly immaterial. It is standard actuarial practice to assume that any benefit that is 0.1% of total costs or less is immaterial for several reasons, but mostly because it is considered a rounding error." (Barrett Rep. p. 7).

42. Williams found no data to support or contradict potential cost savings in removing the exclusion. (Williams Dep. 140:2-11).

### IV. Defendants Conlin and ETF

43. ETF Secretary Robert Conlin, with input from the GIB chair, made the final determination that the contingencies for reinstatement of the exclusion were

met and issued a memo to GIB stating that the exclusion would be reinstated and that "No Board action is required." (Conlin Dep. 32:4-10, 53:2-8, 157:18-21, 167:21-24, 168:17-20 ("Q: You had determined all of the contingencies were met? A: That is what the memo is telling the board, yes"); Dkt. # 83-15, Jan. 30, 2017 Conlin Memo to GIB).

44. Although the elimination of the exclusion was most directly precipitated by the issuance of HHS rules implementing Section 1557 of the ACA, ETF's initial memorandum to the GIB in June 2016 recommending elimination noted that employers "will generally be prohibited from discriminating on the basis of sex, gender identity, or sexual orientation under Title VII and EEOC regulations." (Dkt. # 103-9, Pray Mem. at 3-4).

45. ETF's general counsel rebutted the Wisconsin DOJ's assertion that the section 1557 regulations did not require Defendants to rescind the exclusion in part by noting that the EEOC had taken the position that discrimination based on gender identity constituted sex discrimination. (Dkt. # 103-6, Nispel Mem. at 4-5 (citing U.S. DOJ *Title VII Legal Manual*)).

Dated this 26th day of June, 2018.

        **HAWKS QUINDEL, S.C.**
        *Counsel for Plaintiffs,*

        By: */s/ Nicholas E. Fairweather*
        Nicholas E. Fairweather, State Bar No. 1036681
        Email: nfairweather@hq-law.com
        Caitlin M. Madden, State Bar No. 1089238
        Email: cmadden@hq-law.com
        Michael R. Godbe, State Bar No. 1104823
        Email: mgodbe@hq-law.com
        409 East Main Street
        Post Office Box 2155
        Madison, Wisconsin 53701-2155
        Telephone: (608) 257-0040
        Facsimile: (608) 256-0236

        **AMERICAN CIVIL LIBERTIES UNION OF WISCONSIN FOUNDATION**
        *Counsel for Plaintiffs,*

        By: */s/ Laurence J. Dupuis*
        Laurence J. Dupuis, State Bar No. 1029261
        Email: ldupuis@aclu-wi.org
        Asma I. Kadri, VA State Bar No. 91290
        Email: akadri@aclu-wi.org
        ACLU of Wisconsin Foundation
        207 East Buffalo Street, Suite 325
        Milwaukee, Wisconsin 53202
        Telephone: (414) 272-4032

        **AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
        *Counsel for Plaintiffs,*

        By: */s/ John A. Knight*
        John A. Knight
        Email: jknight@aclu.org
        ACLU Foundation
        Lesbian Gay Bisexual Transgender Project
        150 North Michigan Avenue, Suite 600
        Chicago, Illinois 60601
        Telephone: (312) 201-9740