IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALINA BOYDEN and SHANNON ANDREWS,

                        Plaintiffs,                    OPINION AND ORDER

        v.                                              17-cv-264-wmc

ROBERT J. CONLIN, STATE OF WISCONSIN
DEPARTMENT OF EMPLOYEE TRUST
FUNDS, STATE OF WISCONSIN GROUP
INSURANCE BOARD, MICHAEL S. FARRELL,
STACEY ROLSON, CHARLES GRAPENTINE,
WAYLON HURBURT, THEODORE NIETZKE,
J.P. WIESKE, BOB ZIEGELBAUER, JENNIFER
STEGALL, FRANCIS SULLIVAN, HERSCHEL
DAY, and NANCY THOMPSON,

                        Defendants.

        As transgender women and employees of the State of Wisconsin, plaintiffs challenge

the State's exclusion of "[p]rocedures, services, and supplies related to surgery and sex

hormones associated with gender reassignment" from health insurance coverage provided

to state employees under Title VII, 42 U.S.C. § 2000e *et seq.*, the anti-discrimination

provision of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("ACA"

or "Section 1557"), and the Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution.  Before the court are the parties' cross-motions for summary

judgment.  (Dkt. ##80, 95, 141.)  The court recently considered a similar exclusion for

Wisconsin Medicaid recipients, though on a motion for preliminary injunction.  *See Flack*

*v. Wis. Dep't of Health Servs.*, No. 18-cv-309-wmc, 2018 WL 3574875 (W.D. Wis. July 25,

2018).  Now, with the benefit of a full record, the court concludes here that the challenged

exclusion constitutes sex discrimination in violation of Title VII and the ACA.  As for

plaintiffs' Equal Protection claim, the court concludes that the claim is subject to heightened scrutiny, and defendants have failed to put forth evidence to find that proffered concerns about cost or efficacy were genuine and not *post hoc* inventions in response to litigation. However, relief for violating the Equal Protection Clause is injunctive only, because the named, individual defendants are entitled to qualified immunity.

## PRELIMINARY ISSUE

Before turning to the parties' motions for summary judgment, the court must first address defendants' motions to strike supplemental reports submitted by plaintiffs' experts. (Defs.' Mots. (dkt. ##124, 138).) Plaintiffs timely served expert reports of Stephanie Budge, Ph.D., a licensed psychologist specializing in issues of gender identity and gender transition processes, and Loren S. Schechter, M.D., a board certified plastic surgeon specializing in performing gender confirming surgery. (Budge Original Rept. (dkt. #89); Schechter Original Rept. (dkt. #106).) Plaintiffs later filed an arguably untimely set of "supplemental expert reports" along with their brief in opposition to defendants' motion for summary judgment, and yet another set of so-called "supplemental expert reports" at the time of filing a reply brief in support of their own motion for summary judgment. (Schechter Suppl. Rept. (dkt. #116); Budge Suppl. Rept. (dkt. #119); Schechter 2d Suppl. Rept. (dkt. #137); Budge 2d Suppl. Rept. (dkt. #136).)

Defendants contend that these reports are not proper supplemental reports within the meaning of Federal Rule of Civil Procedure 26(e)(2), and instead are untimely rebuttal reports. As such, defendants seek an order striking them under Federal Rule of Civil Procedure 37 for violating the court's scheduling order.

For the most part, in comparing the topics in the original, timely reports to those covered in the supplemental reports, the *opinions* are not new; rather, plaintiffs' experts simply provide some additional support. Critically, with respect to the topics in the supplemental reports, the *original* reports contain the experts' conclusions, as well as an explanation of how and why they each reached those conclusions. *See Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (describing disclosure requirements under Rule 26(a)(2)(B)).

Starting with Dr. Budge's supplemental reports, the following topics were already covered in her original report:

- Supplemental Report Topic 1 and Second Supplemental Report Topics 4 and 5, all concerning whether treatments for gender dysphoria are similar to cisgender persons seeking cosmetic surgery (*see* Budge Original Rept. (dkt. #101) 16-17, 20 (opining that gender confirming surgery is reconstructive, not cosmetic));

- Supplemental Report Topic 3 and Second Supplemental Report Topic 1, addressing studies showing hormone therapy and surgery are safe and effective (*see id.* at 15-18, 20-21 (reviewing studies showing safety and efficacy of medical transition procedures));

- Supplemental Report Topic 5 and Second Supplemental Report Topic 2, concerning whether there is any dispute over whether a person's status as transgender can be changed (*see id.* at 8, 19-20 (defining "gender identity" as generally immutable, and discussing danger of treatment for transgender individuals seeking to align gender identity with natal sex));

- Second Supplemental Report Topic 2, addressing whether treatments aimed at aligning one's gender identity with the gender assigned at birth may be successful (*see id.* at 19-20 (discussing positions of various medical associations about harm caused by such treatments)); and

- Second Supplemental Report Topic 3, addressing the basis for statement that every major medical association recognizes the medical necessity of treatment for gender dysphoria (*see id.* at 18-19 (summarizing positions)).

At least one of Dr. Schechter's supplemental topics similarly falls within the topics

addressed in his original report: Supplemental Report Topic 2, concerning whether insurance coverage is typically provided for medically necessary breast reduction surgery due to back pain and related problems, as well as breast reconstruction post-mastectomy, falls within the scope of his initial opinions describing billing insurance codes. (*See* Schechter Original Rept. (dkt. #106) 11-12.)

None of these opinions are new. As such, it is questionable whether supplementation was required at all. If plaintiffs had not filed supplemental reports, their experts would likely have been able to offer most, if not all, of this testimony at trial since it falls properly within their timely, original expert disclosures. Plaintiffs presumably supplemented in an effort to cover the specific arguments raised by defendants in their summary judgment briefs, largely relying on defendants' expert's deposition testimony. If anything, by providing defendants with this additional detail, plaintiffs ensured that defendants would not be blind-sided at trial *and* helped avoid otherwise needless dissection by the court as to whether some detail was adequately disclosed in the original expert reports. The court is not going to penalize plaintiffs for either effort. Regardless, as already alluded to, because the court ultimately concludes that defendants failed to put forth evidence in support of a finding that efficacy was a genuine, contemporaneous concern in the Government Insurance Board's decision to reinstate the exclusion, the dispute between the parties as to the efficacy of gender confirming surgery and hormone therapy is not material to the issues before the court on summary judgment.

A few topics, however, appear to extend beyond the opinions in the original reports. For Dr. Budge, Supplemental Report Topic 2 -- concerning the difference between gender

dysphoria and anxiety and mood disorders -- extends beyond her initial report, which was limited to defining gender dysphoria and the fact that it can cause depression and anxiety. Similarly, Supplemental Report Topic 4 -- concerning whether medical interventions can save transgender people's lives -- extends beyond her first report, although her first report did touch on suicide rates for transgender individuals. For Dr. Schechter, his supplemental opinions concerning whether cosmetic surgery is provided to treat depression and whether breast reconstructive surgery has both a reconstructive or functional aspect as well as a cosmetic component (*see* Supplemental Report Topics 1, 3 and 4, and Second Supplemental Report (dkt. ##116, 137)) extend beyond that offered in his original report.

Still, striking these arguably "new" opinions as a sanction under Rule 37(c)(1) would normally only be warranted if plaintiffs' supplemental reports were not "substantially justified" or "harmless." Again, here, these arguably new opinions were obviously offered in response to the expansive deposition testimony of defendants' expert Lawrence Mayer, M.D., M.S., Ph.D. Indeed, Mayer's report is quite thin and presents his opinions in a general manner without much detail. *See Salgado*, 150 F.3d at 742 ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."). For example, in opining on the studies on gender confirming surgery and hormone therapy in his report, Dr. Mayer simply states, "[t]he evidence that these interventions are safe, effective, and optimal is minimal," and cross-references three other sources. (Mayer Rept. (dkt. #90) ¶ 21.)

At his deposition, however, Mayer expanded significantly on this opinion, providing more concrete and specific criticisms of studies that purport to show the efficacy of surgery,

which go well beyond his report or even the review of these studies contained in his 2016 article and 2017 amicus brief -- two of the three sources cited in support of his original opinion. (Mayer Dep. (dkt. #112) 49-60, 62-63, 65-55, 71-72.) Mayer's deposition testimony also touched on topics not addressed in his report, including critiquing Dr. Budge's opinion that all major medical associations have recognized the necessity of transition-related care. (*Id.* at 5-16, 19-20.) Moreover, in responding to plaintiffs' proposed findings and in proposing their own, defendants rely heavily on this testimony. (*See, e.g.*, Defs.' Add'l PFOFs (dkt. #121) ¶¶ 120-33, 137; Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶¶ 9, 32.)[1]

For all of these reasons, the court declines to strike the supplemental reports. To the extent expert testimony is warranted in any remaining trial on damages, plaintiffs' experts may provide testimony consistent with their supplemental reports. To be fair, the court will similarly allow Dr. Mayer's testimony at trial to extend to those opinions and bases for opinions offered at his deposition.

---

[1] In part, defendants fault plaintiffs for not offering some of their expert responses by the rebuttal deadline, arguing that they should have noticed Dr. Mayer's deposition *before* the rebuttal expert report deadline. But this argument presupposes that plaintiffs knew Mayer's testimony was going to be significantly more detailed and extend beyond that offered in his cursory expert report. Moreover, it is *defendants* that are relying heavily on Mayer's deposition testimony in their proposed findings of facts at summary judgment. The court is decidedly disinclined to penalize plaintiffs for choosing to supplement their experts' reports to respond to the expansive deposition of defendants' expert when plaintiffs would instead have been within their rights to seek to strike Mayer's new opinions and bases for opinions outright at summary judgment.

## A. Health Care Coverage for State Employees

As set forth in Wisconsin Statute § 40.01(1), the State provides insurance coverage to "aid public employees in protecting themselves . . . against the financial hardships of . . . illness, thereby promoting economy and efficiency in public service by facilitating the attraction and retention of competent employees, by enhancing employee morale . . . [and] by establishing equitable benefit standards throughout public employment." The Government Insurance Board ("GIB") adopts "Uniform Benefits" that define the coverage terms applicable to all insurance plans offered to state employees through the Group Health Insurance Program and that govern all state employee health insurance plans. GIB then contracts with private insurance companies to administer these insurance plans for state employees consistent with the Uniform Benefits. Insurance carriers that contract to provide health insurance to state employees must offer the coverage terms defined in the Uniform Benefits. Those terms are not subject to negotiation and may not be modified.

Eligible employees may participate in the Wisconsin Group Health Insurance Program through their state employers. Most insurance plans offered through the Group Health Insurance Program are fully-insured. Under these plans, benefit claims are processed and paid by third-party insurance carriers with whom GIB contracts (such as Dean and Quartz). State employees and their employers both pay a share of the insurance premium to the Employee Trust Fund ("ETF"), which transmits those funds to the third-

---

[2] Unless otherwise noted, the court finds the following facts undisputed and material for the purpose of deciding the present motions.

party insurance carriers. The pharmaceutical portion of the Group Health Program is self-insured. For prescription drug benefits, ETF pays these claims directly out of its health coverage reserves, while a third-party administrator assists with claims processing and other administrative tasks.

## B. Defendants

In addition to having the express statutory authority to set "[t]he terms and conditions of the insurance contract or contracts, including the amount of premium," Wis. Stat. § 40.03(6)(d)(5), and contracting with third-party insurance carriers to provide coverage, defendant GIB sets policy and oversees administration of the group health insurance, life insurance and income continuation insurance plans for state employees and retirees, as well as the group health and life insurance plans for local employers who choose to offer them. GIB is made up of 11 appointees and designees of the Governor and heads of various state agencies.

Defendant ETF is an executive branch department created by Wisconsin Statute § 15.16 and charged with providing and administering retirement, health insurance and other benefits to state and local government employees and retirees. Defendant Robert Conlin, the Secretary of ETF, is "in charge of the administration of the department and exercise[s] . . . all powers and duties" exercised by other state department secretaries. Wis. Stat. § 40.03(2)(a). Conlin and subordinate ETF staff with the Office of Strategic Health Policy ("OSHP") administer health insurance plans for state employees, including ensuring that the OSHP staff carry out GIB's decisions. GIB is one of five boards within ETF.

Typically, defendant GIB considers recommendations from ETF and establishes

health insurance benefits for Wisconsin state employees each contract year. ETF then implements the decisions of the GIB to confirm that the benefits offered by each carrier are uniform. ETF's implementation of GIB's benefit decisions includes incorporating the benefit changes into contracts with private health insurance plans who administer employee coverage.

### C. Gender Identity, Gender Dysphoria and Treatment

For purposes of medical diagnosis, as well as increasingly for purposes of common usage, "gender identity" is the internal core sense of one's own sex, such as male or female. All human beings have a gender identity. Plaintiffs contend that gender identity is innate and generally considered to be an immutable characteristic. Defendants dispute this, instead positing that "sex is immutable, whereas gender identity is a developmental process." (Defs.' PFOFs (dkt. #88) ¶ 84.) "Transgender" means there is an incongruence between a person's sex at birth (also referred to as one's "natal sex" in medical texts) or the gender assigned at birth and the individual's gender identity. Transgender people make up a small percentage of the overall population, between 0.38% and 0.6% of the United States population and approximately 0.43% of the population in Wisconsin.

For transgender individuals, transitioning from the gender assigned at birth to the individual's gender identity can be psychologically healthy,[3] although for many this

---

[3] Defendants purport to dispute the concept of transitioning, pointing to Dr. Mayer's testimony that "people are talking out of both sides of their mouth. They say you're born with a gender, but then you need gender transition. If you're born with that gender, why do you need to transition? . . . They need to have a long-term identification, not any particular body configuration." (Mayer Dep. (dkt. #112) 76-77.) Mayer's claimed (or feigned) confusion departs from accepted psychiatric diagnosis. Regardless, the concept of transitioning is not difficult to understand, nor can it really be in dispute since transgender individuals transition from the gender assigned to them at birth --

transition is largely social, rather than medical. A medical transition usually involves any medical procedure to assist a transgender individual with achieving primary or secondary sex characteristics that are closely aligned with their gender identity, ranging from hormone therapy to surgeries. As already noted, not all transgender persons will want or need these medical interventions. Hormone replacement therapy ("HRT") includes the administration of feminizing or masculinizing hormones to induce changes in physical appearance. Gender confirming surgery ("GCS") includes any surgery to alter or adjust an individual's primary or secondary sex characteristics to align with their gender identity. Plaintiffs maintain that GCS and HRT are medically necessary procedures for some transgender individuals to treat gender dysphoria, including themselves.

While defendants dispute both this characterization generally, and the plaintiffs' medical need specifically, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") defines gender dysphoria as "incongruence between one's experienced/expressed gender and assigned gender," as well as "clinically significant distress or impairment in social, school, or other important areas of functioning." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 451-53 (5th ed. 2013). When individuals diagnosed with gender dysphoria do not obtain competent and necessary treatment, serious and debilitating psychological distress often occurs, including depression, anxiety, self-harm, and suicidal ideation/attempts. The American Medical Association ("AMA"), the American Psychiatric

which is the gender that aligns with their natal sex -- to the gender that conforms with their identity.

Association ("APA"), the American Psychological Association, the American Counseling Association, the American Psychoanalytic Association, and the World Professional Association of Transgender Health ("WPATH"), all recognize the medical necessity of transition-related care for transgender people with gender dysphoria.[4]

The parties dispute the efficacy of hormone therapy and surgery. Plaintiffs' experts, Drs. Budge and Schechter, both provide a survey of medical research confirming the safety and effectiveness of these treatments, as well as the harm caused by denying such care to those who need it. Plaintiffs also point to the WPATH Standards of Care ("SOC") for treatment of gender dysphoria, which are widely recognized guidelines for the management of transgender individuals with gender dysphoria and outline 37 years of data that focuses on the beneficial outcomes of HRT and GCS. Defendants dispute that this data "conclusively" demonstrates such beneficial outcomes, again primarily relying on the testimony of their expert, Dr. Mayer. (Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶ 36.) Specifically, Dr. Mayer would call into question this medical research by directing the court to three items in support: (1) an article he co-authored in *The New Atlantis*, a non-peer-reviewed medical journal, in which he appears to rely solely on a handful of studies, all of which Mayer conceded during his deposition have various deficiencies (*see* Mayer Rept., Ex. D (dkt. #90-4) 106-13); (2) an amicus brief he authored -- but did not attach to his report -- in which he describes the lack of medical support for treating gender dysphoric

---

[4] Defendants purport to dispute this proposed fact, although the basis is a cite to defendants' expert, Dr. Mayer, who generally calls into question the value of the AMA's endorsement by pointing out now-discredited past positions of the AMA. (Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶ 33 (citing Mayer Dep. #112) 97-98.)

*children* in accordance with their gender identity (*see* Brief of *Amici Curiae*, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16-273 (U.S. Jan. 10, 2017)); and (3) a 2016 decision of the U.S. Department of Health & Human Services Center for Medicare and Medicaid Service ("CMS"), in which the Department declined to issue a "National Coverage Determination at this time on gender reassignment surgery for Medicare beneficiaries with gender dysphoria because the clinical evidence is inconclusive for the Medicare population" (*see* CMS, Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) (Aug. 30, 2016), *available at* https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282)). (Mayer Rept. (dkt. #90) ¶ 21.) Defendants concede, however, that Mayer testified that "he would not argue with a clinical recommendation that reassignment was 'absolutely critical,'" though they point out that this "reflects his role as an epidemiologist rather than a treating physician." (Defs.' Resp. to Pls.' Suppl. PFOFs (dkt. #127) ¶ 24.)

### D. The Exclusion

As mentioned in the introduction above, this case concerns a specific exclusion to the Uniform Benefits adopted by GIB. Under Section (A)(1)(c) of the exclusions, having the heading of "Surgical Services," the Uniform Benefits exclude from coverage, "[p]rocedures, services, and supplies related to surgery and sex hormones associated with gender reassignment" (the "Exclusion"). (Mallow Decl., Ex. A (dkt. #82-1) 51.) This Exclusion has existed in materially the same form since 1994, although GIB adopted a modification of its language in 2015, changing the language from "sex transformation" to "gender reassignment." In 1994, GIB originally added the Exclusion because "benefits and

services [associated with gender reassignment surgery] were generally accepted by health insurance companies and health care providers to be experimental and not medically necessary." (Roth Decl., Ex. A (dkt. #83-1) 24.)

In application, defendants maintain (and plaintiffs do not appear to dispute, at least as currently applied) that the Exclusion does *not* apply to hormone therapy or mental health counseling when used to treat gender dysphoria *unless* specifically made a course of treatment *leading to or involving gender confirming surgery*, although plaintiffs nevertheless maintain that the actual language of the Exclusion does not contain this express limitation. (Defs.' PFOFs (dkt. #88) ¶ 27; Pls.' Resp. to Defs.' PFOFs (dkt. #113) ¶ 27.) Still, there is no dispute that mental health counseling as a stand-alone treatment for gender dysphoria is covered, whereas hormone therapy involving gender reassignment surgery is not covered; and there is no dispute that the surgery itself is not covered. The Uniform Benefits also exclude from coverage "treatment, services and supplies for cosmetic . . . purposes," explaining that "[p]sychological reasons do not represent a medical/surgical necessity." (Mallow Decl., Ex. A (dkt. #82-1) 58-59.)

For a brief period in 2016, it appeared that GIB's position might change. In 2015, as part of defendant GIB's considerations in defining Uniform Benefits for the Group Health Insurance Program for the plan year starting January 1, 2016, ETF advised that while it would not recommend "add[ing] coverage for gender reassignment benefits with strict protocols" for 2016, it would consider doing so for 2017. (Pls.' PFOFs (dkt. #96) ¶ 100 (quoting Godbe Decl., Ex. L (dkt. #103-12) 8).) In 2015, GIB was also considering a broad redesign of the Group Health Insurance Program, including a possible shift to self-

insurance for all program aspects, with the hope to hold current benefits stable. Moreover, the 2015-2017 state budget required GIB to identify $25 million in savings in the Group Health Insurance Program over those two fiscal years, and as such, ETF's recommendations to GIB were focused on cost reduction strategies, not expanding benefits.

Nevertheless, in a June 22, 2016, memorandum, ETF staff first recommended to GIB that the Exclusion for coverage of gender reassignment surgery be removed. In particular, ETF analyzed the federal Department of Health and Human Services' regulations implementing the Affordable Care Act's anti-discrimination provision, and it concluded that ETF was a "covered entity" for the purpose of the HHS regulations, because of its receipt of federal financial assistance in the form of Medicare Part D subsidies and the fact that it is "principally engaged in administering health insurance coverage." (Roth Decl., Ex. H (dkt. #83-8) 2-3.) Therefore, ETF concluded in its memo that the Exclusion was prohibited. At its July 12, 2016, meeting, GIB agreed, voting unanimously to amend the uniform benefits to remove the Exclusion effective January 1, 2017.

As described in detail below, however, GIB reconsidered that decision. (*See infra* Undisputed Facts § H.) On December 29, 2016, the GIB voted to reinstate the Exclusion once four contingencies were satisfied. In January 2017, ETF Secretary Conlin determined that those four contingencies were satisfied and reinstated the Exclusion, effective February 1, 2017.

### E. Coverage of Same Surgical Procedures for Other Medical Needs

There is no dispute that when performing GCS, surgeons use many of the same

procedures used to treat other medical conditions.[5]  For example, surgeons regularly perform mastectomies and chest/breast reconstruction, hysterectomies, salpingo-oophorectomies (surgical removal of fallopian tubes and ovaries), and orchiectomies (surgical removal of testes) to treat individuals with cancer or a genetic predisposition to cancer, such as the BRCA genes, or as part of treatment for a traumatic injury.

Moreover, Uniform Benefits adopted by GIB for state employees cover "surgical procedures, wherever performed, when needed to care for an illness or injury."  (Godbe Decl., Ex. C (dkt. #103-3) 32.)  The parties have stipulated that this coverage extends to breast reduction surgery, mastectomy, mammoplasty (breast reduction surgery), penectomy (surgical removal of penis), orchiectomy, phalloplasty (surgical creation of a penis), vaginoplasty (surgical creation of a vagina), hysterectomy, and salpingo-oophorectomy, to treat various medical conditions, subject to a medical necessity determination by third-party health plans.  (Pls.' Reply to Pls.' PFOFs (dkt. #133) ¶ 42 (citing Madden Decl., Ex. B (dkt. #131-2)).)

Because of the Exclusion, however, Uniform Benefits do not permit coverage of these procedures for transgender individuals suffering from gender dysphoria.  When billing insurers for reimbursement, health care providers use Current Procedural Terminology ("CPT") codes, which are developed and maintained by the AMA.  The same code or codes apply to a particular procedure regardless of whether the procedure is performed on a transgender person as part of a medical transition or on a cisgender person

---

[5] The fact that these surgical procedures are used to treat other medical conditions would also appear to support a finding that the procedures are safe.  (Pls.' Reply to Pls.' PFOFs (dkt. #133) ¶ 48.)

for some other medical reason. For example, a subcutaneous mastectomy may be performed for a cisgender woman to reduce her risk of breast cancer or for a transgender man with gender dysphoria. The same CPT code (19304) would be used for both procedures and the charge per CTP code would be the same. Studies show overall complication rates for surgical procedures to treat gender dysphoria are similar to the rates for similar surgical procedures for treating other medical conditions.

### F. Cost Implications for Coverage

If the Exclusion were removed from the Uniform Benefits for fully-insured plans in the Group Health Insurance Program, both ETF and all covered members would bear a share of costs associated with procedures, services and supplies related to GCS through their respective contributions to health insurance premiums. If the Exclusion were removed from the Uniform Benefits for the self-insured pharmacy benefit in the Group Health Insurance Program, state employers would directly bear all costs associated with procedures, services and supplies related to GCS through contributions to ETF's health coverage reserves beyond costs covered by members' premiums, co-pays and deductibles.

Based on actual claims data from 2016 and the risk posed by uncertainties in that data, plaintiffs' actuarial expert, Joan Barrett, estimated the cost of removing the Exclusion to be $140,000 per year. Even defendants' expert, David Williams, a health care consultant with an independent actuarial consulting firm, using the same data and methodology, estimated that the State could expect to incur a total of $300,000 in annual costs by removing the Exclusion. Williams estimated that the per member per month

health care cost would be $0.04 to $0.10.[6]

From an actuarial standpoint, the removal of the Exclusion of coverage of transition-related care is immaterial, since it represents less than 0.1% of the overall costs of medical care. Defendant and GIB member Herschel Day, an actuary who reviewed publicly-available information about the pricing impact of removing the Exclusion, determined that the impact would be "negligible" and would not exceed 0.1 to 0.2 percent. (Day Dep. (dkt. #51) 52-53.)[7]

### G. Defendant Conlin's Role in Administering and Reinstating the Exclusion

ETF Secretary Robert J. Conlin and other staff with the OSHP periodically provide recommendations on health insurance benefits coverage to GIB, which it generally accepts. Indeed, ETF staff have significant control over what new benefits are added to the state employee health plans, because the GIB does not usually adopt new benefits that are not recommended by ETF. In particular, policy analysts at OHSP evaluate the Uniform Benefits throughout the year, and they typically make recommendations to the GIB about changes to that package in late winter and early spring. GIB then votes at its quarterly meetings in May or August on the Uniform Benefits recommendations of the ETF staff for possible inclusion in contracts with the private insurance companies that provide coverage

---

[6] Ms. Barrett determined that Williams' estimate presents a "worst case" scenario that effectively doubles the expected costs. (Barrett Rept. (dkt. #105) 9.) At his deposition, Williams conceded that his estimate assumes a "pretty bad" case scenario. (Williams Dep. (dkt. #111) 178.)

[7] These cost estimates appear to be in line with those provided by ETF to the Teaching Assistants Association in response to bargaining demands for such coverage in the mid-2000s. (*See* Pls.' PFOFs (dkt. #96) ¶¶ 96-98.)

to state employees.

As Secretary, Conlin specifically took a number of actions to review the Exclusion at issue in this case, including (1) reviewing the final Health and Human Services rule on nondiscrimination, (2) requesting a legal opinion from ETF as to the applicability of that rule to ETF, (3) reviewing memos by OHSP and ETF relating to the proposed removal of the Exclusion, and (4) discussing the coverage Exclusion with ETF attorneys on multiple occasions. While GIB relies on the ETF secretary and staff when making policy decisions, defendants point out that both Conlin and ETF staff consistently recommended *removing* the Exclusion from the Uniform Benefits, including before GIB voted to reinstate the Exclusion. After GIB's reinstatement of the Exclusion, Secretary Conlin was involved in preparing the contract amendment reinstating the Exclusion that was sent to the health insurance plans under his name, including insisting that the amendment be signed by someone with authority to bind the plans.

## H. Reinstatement of Exclusion

Following its decision to remove the Exclusion, GIB board member J.P. Wieske brought up the issue for reconsideration. ETF staff member Tara Pray and OSHP Director Ellinger also testified at their depositions that the Wisconsin Department of Justice ("DOJ") requested reconsideration. On August 10, 2016, Deputy Attorney General Andy Cook, at the behest of the Governor's office, submitted a memorandum to GIB via ETF, asking the Board to reconsider its vote to eliminate the Exclusion "[t]o the extent the Board believes that the new HHS rules compel it to accept ETF's recommended changes." (Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶ 114 (quoting Godbe Decl., Ex. P (dkt. #103-16) 3-7).)

The memorandum went on to state that the federal HHS rules barring discrimination based on "gender identity" are "unlawful," "intrude on powers reserved to the State of Wisconsin to administer its own health policy," and "do not mandate coverage for any particular procedures." (Godbe Decl., Ex. P (dkt. #103-16) 3.)

In response, David Nispel and Diana Felsmann, attorneys for ETF, provided a memorandum to GIB members, noting as fiduciaries that they "must ensure that the Group Health Insurance Program complies with state and federal law." (Godbe Decl., Ex. P (dkt. #103-16) 8-12.) The ETF memorandum further explained that the HHS non-discrimination rule prevents health insurance issuers from contracting away their nondiscrimination obligations, and that reinstating the Exclusion could "jeopardize ETF's ability to contract with its health insurance issuers." (*Id.* at 8.) The ETF memorandum also noted that the cost of removing the Exclusion was "anticipated to be low" and the requirement that the services be "medically necessary" would remain in place. (*Id.* at 9.)

Attorney Kevin Potter from the DOJ attended the December 13, 2016, GIB meeting and stated that "the DOJ recommends the Board follow the law as it currently stands." (Godbe Decl., Ex. Q (dkt. #103-17) 12.) He further noted that "the State of Wisconsin was part of a federal lawsuit challenging the HHS regulations pertaining to discrimination on the basis of gender identity." (*Id.*) Potter did not elaborate on what he meant by "follow the law as it currently stands," though defendants represent that he counseled the GIB to continue with its July 2016 decision to remove the Exclusion. (Defs.' PFOFs (dkt. #88) ¶ 59.) Potter also explained that Wisconsin had moved for an injunction against enforcement of the HHS regulations, which would be heard by a federal court in Texas on

19

December 20, 2016. GIB took no action at that meeting, noting that it would revisit the issue if and when an injunction was issued.

On December 29, 2016, GIB's Chair, Michael Farrell, instructed Conlin to call a GIB meeting for the next day. GIB convened in closed session at the December 30, 2016, meeting to discuss the Exclusion again. After deliberating in closed session for approximately three hours regarding GIB's legal strategy in light of pending or potential litigation, GIB reconvened in open session and voted to reinstate the Exclusion subject to the following four contingencies being satisfied:

1) "a court ruling or an administrative action that enjoins, rescinds or invalidates the HHS Rule";

2) "compliance with Wis. Stat. section 40.03(6)(c)";[8]

3) "renegotiation of cont[r]acts that maintain or reduce premium costs for the state"; and

4) an "opinion of the DOJ that the action taken does not constitute a breach of board members' fiduciary duties."

(Godbe Decl., Ex. S (dkt. #103-19) 4.)

In January 2017, Conlin determined that the four contingencies described above

_____

[8] That provision provides in pertinent part that ETF:

(c) Shall not enter into any agreement to modify or expand benefits under any group insurance plan, unless the modification or expansion is required by law or would maintain or reduce premium costs for the state or its employees in the current or any future year. A reduction in premium costs in future years includes a reduction in any increase in premium costs that would have otherwise occurred without the modification or expansion. This paragraph shall not be construed to prohibit the group insurance board from encouraging participation in wellness or disease management programs or providing optional coverages if the premium costs for those coverages are paid by the employees.

had been met and approved a reinstatement of the Exclusion, effective February 1, 2017. Conlin, GIB members Thompson and Farrell, and ETF staff members all acknowledge that the reversal of recently adopted benefits, the timing of the meeting to reinstate the Exclusion and the adoption of policy based on the occurrence of contingencies were unusual or unprecedented in their memory. (Pls.' PFOFs (dkt. #133) ¶ 143.)

## I. Proffered Reasons for Exclusion

During their depositions, various GIB members testified that the board's decision to reinstate the Exclusion related to an injunction entered by the district court in Texas, which prevented HHS from enforcing the ACA regulations. GIB Chair Farrell testified that he voted to reinstate the Exclusion solely based on the Texas injunction. GIB member Wieske similarly explained that the Exclusion was reinstated because "there was not a legal basis to remove the exclusion and we had relied on the legal basis to remove the exclusion." (Wieske Dep. (dkt. #79) 87-88.)

Wieske also testified generally that there was a discussion of costs, but he did not remember specifically the contents of that discussion and agrees that there was no quantification of that cost. (*Id.* at 88-89.) Wieske also testified that he was not considering whether surgery was medically necessary or efficacious in voting to reinstate the Exclusion, and that he did not recall any discussion of whether the procedures were medically necessary. (*Id.* at 91-92.)[9] In contrast, GIB member Nancy Thompson, who voted against

---

[9] Wieske also testified that he had a concern that removal of the Exclusion would provide a "false sense" that there would be coverage, because some health insurance providers may not deem it as a medical necessity. (Wieske Dep. (dkt. #79) 90-91.)

reinstatement, testified at her deposition that she could not recall any discussions about the cost of providing coverage or the safety or effectiveness of the procedures, and, if anything, the January 2017 actuarial and benefits consultant report estimated that the cost of removing the Exclusion would be "a very minor potential increase . . ., but it was nothing major." (Thompson Dep. (dkt. #93) 35.)[10]

Finally, GIB member Herschel Day testified at his deposition that he was supportive of the removal of the Exclusion in 2016 because he "view[ed] the exclusion as discriminatory and . . . support[s] the right of transgender individuals to get the healthcare they need," and because "it's not costly to add it to the group plan." (Day Dep. (dkt. #51) 49-50.)

When asked during discovery to identify the reasons for the Exclusion, defendants initially responded that the information would be addressed by expert testimony. After being asked to supplement their response, defendants offered "avoiding potential costs associated with the coverage at issue," adding that the Exclusion "furthers the state interests in . . . declining to provide coverage for treatments that are experimental and have not been demonstrated to be safe and effective for treating gender dysphoria." (Defs.' Suppl. Resp. (dkt. #83-1) Interrog. 2.) At no time, however, did the Wisconsin Department of Justice or ETF present evidence of medical research to the GIB members that suggested GCS was experimental or had not been demonstrated to be safe and

---

[10] A consultant report dated January 23, 2017, estimated the total annual cost to range from $100,000 to $250,000, resulting in a cost estimate per member of $0.05 to $0.13 per month, and representing approximately 0.007% to 0.0018% of total premiums. (Roth Decl., Ex. F (dkt. #83-6) 3.)

effective for the treatment of gender dysphoria. Defendants do not dispute this but contend that "concerns regarding the nature and efficacy of gender reassignment surgery were discussed at one or more GIB meetings." (Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶ 111.) Specifically, defendants point to Conlin's deposition, in which he testified that he recalled hearing GIB member Wieske discuss concerns regarding the nature and efficacy of GCS, although Wieske himself testified that he did not recall raising this issue; instead, he testified, that "this was part of my thinking process." (Pls.' Resp. to Defs.' PFOFs (dkt. #113) ¶ 107.)

## J.  **Plaintiffs**

Plaintiff Alina Boyden has been employed by the University of Wisconsin since April 2013, working as either a teaching assistant or a graduate fellow on at least a "one-third full-time" basis. Plaintiff Shannon Andrews works at the University of Wisconsin School of Medicine and Public Health as a researcher in the Carbone Cancer Center. Both plaintiffs are state employees eligible for state-provided health insurance. Both are also transgender women.

Boyden first started to recognize her gender identity around the age of five. Boyden has been formally diagnosed with gender dysphoria, and she has been prescribed hormone therapy and GCS to treat her dysphoria. Plaintiffs' treating physicians and designated experts have concluded that both hormone therapy and GCS are medically necessary treatments for Boyden's gender dysphoria. Defendants dispute this characterization, largely relying on their own expert Dr. Mayer, who criticizes these opinions largely based on a lack of studies using a proper control group to show that GCS decreases gender

dysphoria. On her part, Boyden avers that: (1) she cannot afford her prescribed GCS without insurance coverage; and (2) she was denied coverage for GCS (specifically, a vaginoplasty), because of the Exclusion. Boyden also avers that she experiences emotional and physical suffering as a result of the denial of this prescribed treatment.

Andrews also reports first starting to recognize her gender identity around the age of five. She, too, suffers from gender dysphoria and has been prescribed hormone therapy and GCS to treat her dysphoria. Andrews actually underwent a vaginoplasty in 2015 at her own expense, which she represents was medically necessary, although defendant challenges this characterization based again on Dr. Mayer's opinions. Andrews further represents that if she had not been able to transition, she would have killed herself. Andrews claims monetary harm as a result of having to pay for her GCS, after coverage was denied by her state employee health insurance.[11] She also claims emotional harm as a result of the denial of benefits because she is transgender.[12]

## OPINION

Plaintiffs pursue claims for sex discrimination under Title VII against ETF and GIB, and under Section 1557 of the ACA against ETF alone. The court will address these claims together, since the anti-discrimination provisions are substantially the same. Plaintiffs also

---

[11] Andrews appealed this original denial of coverage to ETF.

[12] Plaintiffs extensively briefed their respective standing to bring the asserted claims. (Pls.' Opening Br. (dkt. #97) 13-19.) Defendants concede standing in light of the court's opinion and order on defendants' motion to dismiss, while preserving that challenge for any appeal. (Defs.' Opp'n (dkt. #120) 8.) For the reasons provided in its previous opinion and order on standing, the court has no independent basis for questioning the core elements of standing -- namely injury, causation and redressability. *See Boyden v. Conlin*, No. 17-cv-26-wmc, 2018 WL 2191733, at *2-7 (W.D. Wis. May 11, 2018).

pursue a claim under the Equal Protection Clause against the individual defendants pursuant to 42 U.S.C. § 1983, which the court will address separately.

## I.  Title VII and ACA Claims

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2. Employee-sponsored benefits, like health insurance at issue in this case, are part of an employee's wages and benefits for purposes of asserting an anti-discrimination claim. *See Ariz. Governing Comm. for Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1081 (1983) (considering differential treatment on the basis of sex in retirement benefits under Title VII).

Similarly, Section 1557 of the ACA provides in pertinent part, "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq*.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. § 18116. Title IX, in turn, prohibits discrimination on the basis of sex. 20 U.S.C. § 1681.

Defendants challenge plaintiffs' core theory that the Exclusion of coverage of GCS and HRT constitutes sex discrimination, but also argue that: neither GIB and ETF, the defendants named in this claim, are proper defendants under Title VII; there is no private right of action under the ACA; and the State is entitled to immunity under the Eleventh

Amendment from liability under the ACA. The court addresses each of these four challenges in turn below.

## A. Exclusion of Coverage Based on Sex

Defendants argue that Title VII does not apply to the challenged Exclusion because plaintiffs were denied coverage for reasons other than their sex. This court recently considered a very similar argument in some depth in the *Flack* case and ultimately rejected it, at least for purposes of entering a preliminary injunction. Like the Medicaid exclusion at issue in that case, the Exclusion at issue here "denies coverage for medically necessary surgical procedures based on a patient's *natal* sex." *Flack*, 2018 WL 3574875, at *12. For example, as noted in the fact section above, a natal female born without a vagina qualifies for coverage of a vaginoplasty, but not the plaintiffs here because their natal sex is male. (*See supra* Undisputed Facts § E.) As such, this is a "straightforward case of sex discrimination." *Flack*, 2018 WL 3574875, at *12; *see also Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (holding that school policy precluding transgender individual from using the bathroom that conformed with his gender identity constituted sex discrimination because the policy "cannot be stated without referencing sex").

Defendants counter that the Exclusion does not discriminate on the basis of sex because the Uniform Benefits exclude coverage for all cosmetic treatments for psychological conditions. Specifically, defendants analogize GCS with a "hypothetical cisgender female diagnosed with severe depression due to negative body self-image who could not obtain coverage for a breast augmentation or rhinoplasty." (Defs.' Opening Br.

26

(dkt. #81) 21.)   In support of this argument, defendants cite the opinion of their expert,

Dr. Mayer, which is limited to the following:

> If we disregard the principle of optimality, problems of equity
> arise:  If a transgendered woman is entitled to feminization
> procedures to reduce her distress, surely a cis-gendered woman,
> similarly distressed, should be entitled to the same procedure.

(Mayer Rept. (dkt. #90) ¶ 25.)

An opinion as to what is *equitable* would appear to fall outside the scope of Dr.

Mayer's expertise as an epidemiologist, and he cites no other authority in support.

Regardless, his opinion rests on at least two factual premises requiring some support:

(1) that a cisgender woman's depression because of small breast size is medically

comparable to gender dysphoria; and (2) that the appropriate treatment for a cisgender

woman's depression is cosmetic surgery.  Defendants offer none.  Moreover, if GCS were

simply cosmetic surgery, even if required to treat depression, then presumably the Uniform

Benefits' cosmetic surgery exclusion would apply.  If anything, defendants' position renders

the challenged Exclusion duplicative.  Regardless, on this record, the court concludes that

no reasonable factfinder could credit Mayer's unsupported analogy.

Relatedly, defendants argue that the Exclusion simply prohibits coverage for gender

reassignment, meaning plaintiffs were denied coverage for an excluded *procedure*, not

because they are transgender.  Certainly, the Exclusion does not impact *all* transgender

individuals.  Indeed, as discussed above, not all transgender individuals suffer from gender

dysphoria; even those who do, do not necessarily need nor are recommended for GCS;

some transgender state employees have already medically transitioned; and still others

choose not to proceed for individual reasons.  However, the Exclusion need not injure *all*

members of a protected class for it to constitute sex discrimination.

As the Seventh Circuit explained in *Whitaker*, "there is no requirement that every girl or every boy, be subjected to the same sex stereotyping. It is enough that [plaintiff] has experienced this form of sex discrimination." 858 F.3d at 1051; *see also Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 588 (7th Cir. 2011) (an employer cannot rebut plaintiff's prima facie showing of discrimination by pointing to an employee of the same protected class as plaintiff who was not discriminated against). Moreover, as explained in the *Flack* opinion, even if defendants were correct in arguing that this is not a straight-forward case of sex discrimination in light of the Seventh Circuit's 1984 decision in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), "the scope of what qualifies as prohibited sex discrimination has changed over time." 2018 WL 3574875, at *13. Recently, the Seventh Circuit recognized this expansion in holding that: (1) Title VII's prohibition extends to discrimination based on sexual orientation, *Hively v. Ivy Tech Cmty. Coll. Of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc); and (2) even more pertinent to this case, differential treatment based on sex-based stereotypes as applied to transgender individuals implicates Title IX, *Whitaker*, 858 F.3d at 1048. For this reason, *Ulane* has been at least "drastically undercut," if not entirely called into question. *Flack*, 2018 WL 3474875, at *13 (discussing *Hively*, 853 F.3d at 341, and *Whitaker*, 858 F.3d at 1047).[13]

---

[13] Other district courts in this circuit similarly have recognized the Seventh Circuit's implicit rejection of *Ulane*. *See Students v. U.S. Dep't of Educ.*, No. 16-CV-4945, 2016 WL 6134121, at *19 (N.D. Ill. Oct. 18, 2016), *R. & R. adopted sub nom. Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16-CV-4945, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) (detailing the Seventh Circuit's apparent movement away from the narrow definition of "sex" in *Ulane*); *U.S. Equal Emp't Opportunity Comm'n v. Rent-A-Ctr. E., Inc.*, 264 F. Supp. 3d 952, 955 (C.D. Ill. 2017) (similarly calling into question the validity of the holding in *Ulane* in light of more recent Seventh Circuit opinions).

Finally, defendants argue that the Exclusion does not compel plaintiffs to adopt certain cultural stereotypes or risk punishment. To the contrary, defendants creatively argue that to *require* coverage would "insert the State directly into the business of encouraging surgeries meant to conform peoples' appearances to their own perceived sex stereotypes." (Defs.' Opening Br. (dkt. #81) 29-30.) However, defendants' position appears unhinged from reality. As an initial matter, removing the Exclusion does *not* compel surgery, nor any other treatment for gender dysphoria. Again, as explained above and in *Flack*, a portion of transgender individuals do not suffer from gender dysphoria; and for some portion of those individuals who do, GSC and/or hormone therapy will not be a recommended course of treatment.

Viewed more generally, all individuals, whether transgender or cisgender, have their own understanding of what it means to be a woman or a man, and the degree to which one's physical, sexual characteristics need to align with their identity. For example, a cisgender woman who has a mastectomy for treatment of breast cancer may opt not to have reconstructive surgery. That choice, however, may be untenable to another cisgender woman placed in the same position. Similarly, a transgender woman may require breast augmentation to address her gender dysphoria, whereas another transgender woman may not. *Nothing* about offering coverage without regard to one's natal sex *forces* individuals to have surgery to conform their physical traits to their identified gender.

Instead, the Exclusion implicates sex stereotyping by limiting the availability of medical transitioning, if not rendering it economically infeasible, thus requiring transgender individuals to maintain the physical characteristics of their natal sex. In other

words, the Exclusion entrenches the belief that transgender individuals must preserve the genitalia and other physical attributes of their natal sex over not just personal preference, but specific medical and psychological recommendations to the contrary. In this way, defendants' assertion that the Exclusion does not restrict transgender individuals from living their gender identity is entirely disingenuous, at least for some portion of that population who will suffer from profound and debilitating gender dysphoria without the necessary medical transition.

Whether because of differential treatment based on natal sex, or because of a form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics, the Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII and the ACA's anti-discrimination provision.

### B. GIB and ETF as Proper Defendants of Title VII Claim

Defendants also challenge plaintiffs' Title VII claim on the basis that neither ETF nor GIB is a proper defendant. With respect to ETF, defendants argue that plaintiffs have failed to put forth any evidence that (a) the Board of Regents delegated authority to ETF to determine covered services under the Uniform Benefits, or (b) ETF had the freedom to select the plans, rather than simply offer plans for GIB's approval. With respect to GIB, defendants argue that it does not have the required 15 employees to be an "employer" as required by Title VII. *See* 42 U.S.C.A. § 2000e(b).

In its earlier opinion and order on defendants' motion to dismiss for lack of standing, the court criticized defendants for "arguing that only GIB is responsible for health

insurance, but that neither GIB nor ETF is an employer," effectively allowing the only responsible entities for setting health insurance for state employees to skirt the reach of Title VII. *Boyden v. Conlin*, No. 17-cv-26-wmc, 2018 WL 2191733, at *2 (W.D. Wis. May 11, 2018). Acknowledging the court's concern, defendants now explain they are "not arguing . . . the State of Wisconsin or state agencies can **never** be liable under Title VII— that argument obviously would be wrong. Rather, state defendants argue that Title VII simply does not apply to GIB and ETF under the circumstances presented here." (Defs.' Opp'n (dkt. #120) 11.) Notwithstanding this attempted explanation, however, since ETF and GIB have been charged with determining benefits offered to state employees, defendants' position is effectively still that state employees cannot bring a claim for discrimination under Title VII based on the State's administration of healthcare benefits. This position remains untenable.

Defendants' position also lacks merit. As the court previously explained in its opinion and order on defendants' motion to dismiss, ETF's role in administrating the Group Health Insurance Program makes it a proper defendant on plaintiffs' Title VII claim. *See Boyden*, 2018 WL 2191733, at *4-5. Indeed, the facts presented at summary judgment suggest, at minimum, that ETF's role extends well beyond the simple administration of health care benefits, as it recommends inclusions and Exclusions to GIB. Moreover, having been actually empowered by the State to administer the policies, *see* Wis. Stat. § 40.03(2)(a), (ig), this forms a sufficient basis to hold ETF, as an agent of the State and the ultimate employer, liable for sex discrimination under Title VII.

Defendants similarly argue that GIB is not an employer because it does not meet

the statutory definition of employer under Title VII, having less than 15 employees. This is a non-sequitur. Like ETF, GIB is not liable under Title VII as an employer of plaintiffs; rather, it is on the hook as an agent of plaintiffs' state employers or the State as the ultimate employer, as GIB is tasked with setting benefits terms and contracting with health insurers for all state employers. *See* Wis. Stat. §§ 40.03(6), 40.52(1), 40.52(3). There is no dispute that plaintiffs' employers have more than 15 employees, much less the State.

## C. Availability of Private Rights of Action under ACA

Next, defendants challenge the right of plaintiffs as private citizens to bring a claim under the ACA against defendant ETF.[14] The ACA expressly provides that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 504, or such Age Discrimination Act shall apply for purposes of this subsection." 42 U.S.C. § 18116. As noted in *Flack*, this language indicates Congress intended to provide a private right of action to enforce the anti-discrimination provision of the ACA. 2018 WL 3574875, at *11 (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). As such, this court continues to join other district courts in finding a private right of action under the ACA. *See, e.g.*, *Edmo v. Idaho Dep't of Corr.*, No. 1:17-CV-00151-BLW, 2018 WL 2745898, at *8 (D. Idaho June 7, 2018); *Audia v. Briar Place, Ltd.*, No. 17 CV 6618, 2018 WL 1920082, at *3 (N.D. Ill. Apr. 24, 2018) (citing additional cases).

---

[14] Defendants concede that ETF is a "covered entity" under the ACA with respect to the health insurance plans it offers to state employees because it receives Medicare Part D subsidies. (Defs.' Opp'n (dkt. #120) 42.)

### D. Eleventh Amendment Immunity for ACA Claim

Finally, defendants argue that the GIB and ETF are entitled to immunity from suit under the Eleventh Amendment to the United States Constitution. The court agrees that no provision of the ACA purports to abrogate state sovereign immunity, nor has the State expressly declined to waive its immunity. *See generally Pennhurst State Sch. & Hosp. v. Halderman*, 469 U.S. 89, 99 (1984). As plaintiffs point out, however, the State's acceptance of federal funds acts as a waiver of immunity:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, *or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance*.

42 U.S.C. § 2000d-7(1) (emphasis added). Section 1557 of the ACA is such a federal statute prohibiting discrimination against an entity receiving federal financial assistance. 42 U.S.C. § 18116(a).

Acknowledging as much, defendants still argue that "Congress lacked power under the Spending Clause to abrogate immunity in cases like this one," because "States would not have known that Title IX or Section 1557 reached [transgender status] claims when originally deciding to accept federal funding." (Defs.' Opening Br. (dkt. #81) 62.) Defendants cite *no* support for this novel argument. Regardless, the Seventh Circuit has already held to the contrary. *See, e.g.*, *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 555 (7th Cir. 2001) (upholding waiver provided under 42 U.S.C. § 2000d-7). Moreover, defendants' argument that a state's implied waiver under § 2000d-7 turns on

some kind of informed consent extending the reach of federal antidiscrimination law only so far as anticipated at the time a state accepted federal funds would be wholly unworkable in practice, to say nothing about absurd on the facts here, which would require the court to find that the State of Wisconsin would have turned down tens, if not hundreds, of millions of dollars in federal funding each year to avoid funding GCS at a cost of one to three hundred thousand dollars per year if Section 1557 prohibits the Exclusion of coverage at issue. Accordingly, the court rejects defendants' claim of immunity from suit under the ACA.

## II. Equal Protection Claim

In addition to the Title VII and ACA claims, plaintiffs assert an Equal Protection claim under 42 U.S.C. § 1983 against ETF Secretary Robert Conlin and GIB members Michael S. Farrell, Stacey Rolston, Charles Grapentine, Waylon Hurburt, Theodore Nietzke, J.P. Wieske and Bob Ziegelbauer, all in their individual and official capacities. Plaintiffs assert a similar claim against defendants GIB members Jennifer Stegall, Francis Sullivan, Herschel Day and Nancy Thompson, but only in their official capacities.

### A. Standard of Review

In *Flack*, this court considered whether something more than rational basis was required to uphold a state's singling out gender confirming surgery from insurance coverage, concluding that "heightened scrutiny may be appropriate either on the basis of sex discrimination or through the recognition of transgender as a suspect or quasi-suspect class." 2018 WL 3574875, at *15 (citing *Whitaker*, 858 F.3d at 1051, among other cases).

In defending against the equal protection claim, defendants characterize the Exclusion as merely denying "cosmetic surgery to treat psychological conditions," and as such, argue that the court should only apply rational basis review. (Defs.' Opening Br. (dkt. #81) 20.) In support, defendants direct the court to *Gedulig v. Aiello*, 417 U.S. 484 (1974) -- a decision predating the Pregnancy Discrimination Act, *see* 42 U.S.C. § 2000e(k) -- in which the Supreme Court applied rational basis review in holding that the denial of coverage for pregnancy-related disabilities under California's insurance plan did not run afoul of the Equal Protection Clause. 417 U.S. at 497. Defendants' reliance on *Gedulig*, however, rests on a finding that the Exclusion does not treat individuals differently based on sex.[15] For the reasons explained above, the court has rejected this argument. As such, the court finds that some form of heightened scrutiny applies.

In *United States v. Virginia*, 518 U.S. 515 (1996), the Supreme Court set forth the standard of review to be applied in evaluating sex-based classifications, like that at issue here. *See also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (applying same standard of review in recent decision holding that statute governing acquisition of United States citizenship by child born abroad, which distinguished based on the sex of the parent, violated the Equal Protection Clause); *Whitaker*, 858 F.3d at 1050 (citing same standard in case concerning differential treatment of transgender students). Under this standard,

---

[15] In partial support of their argument, defendants point out that the Uniform Benefits exclude other procedures a health care provider may deem medically necessary for his or her patient -- namely, bariatric or weight-loss surgery and coverage for infertility services. However, these procedures do *not* touch on any protected status, and as such, they are not entitled to a heightened standard of review. The fact that not all medically necessary procedures are covered, therefore, *does not* relieve defendants of their duty to ensure that the insurance coverage offered to state employees does not discriminate on the basis of sex or some other protected status.

the proffered justification must be "exceedingly persuasive." *Virginia*, 518 U.S. at 533.

Moreover, the burden coming forward with such a reason "rests entirely on the State." *Id.*

As such, "[t]he State must show at least that the [challenged] classification serves

important governmental objectives and that the discriminatory means employed are

substantially related to the achievement of those objectives." *Id.* (internal citations and

quotation marks omitted). Finally, and importantly here, in proffering a justification, the

State must proffer reasons that are "genuine, not hypothesized or invented *post hoc* in

response to litigation." *Id.*[16]

## B. Purported Reasons for Exclusion

Defendants specifically contend that the Exclusion was reinstated for two reasons:

(1) the cost of providing coverage; and (2) the safety and efficacy of GCS and hormone

therapy. From an actuarial perspective, there appears to be no dispute that the cost of

---

[16] Plaintiffs also assert that their status as transgender individuals affords them heightened scrutiny review. In determining whether heightened scrutiny should apply based on being a member of a suspect or quasi-suspect class, the court consider the following factors:

> (1) whether the class has been subjected to a history of discrimination; (2) whether individuals in the class are able to contribute to society to the same extent as others; (3) whether the characteristic defining the class is immutable; and (4) whether the class is politically powerless.

*Wolf v. Walker*, 986 F. Supp. 2d 982, 1012 (W.D. Wis. 2014), *aff'd sub nom. Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) (internal citation and quotation marks omitted). Based largely on the expert opinion of Dr. Mayer, defendants challenge whether the third and fourth elements are satisfied here, arguing that "transgender status is not 'immutable'" and that the "the robust legislative, social, and political movement in favor of transgender rights" undercuts a finding that they are politically powerless. (Defs.' Opp'n (dkt. #120) 22-23.) Because heightened scrutiny is warranted based on the Exclusion implicating sex-based classifications, however, the court need not decide whether there is a legitimate legal or factual dispute that transgender individuals qualify as a suspect or quasi-suspect class.

coverage is immaterial at 0.1% to 0.2% of the total cost of providing health insurance to state employees, even adopting defendants' cost estimation. Based on the testimony of their own expert David Williams, however, defendants argue that "the actuarial concept of 'materiality' does not govern the actions of a policy-making body (like GIB) with the fiduciary responsibility to prudently manage assets under its control." (Defs.' Resp. to Pls.' PFOFs (dkt. #122) ¶ 144.) In contrast, plaintiffs' expert Joan Barrett states that in her experience, "no employer has made a benefits decision based on cost for a benefit that costs less than 0.1%." (Barrett Rept. (dkt. #105) 10.)

More critically, defendants' evidence that the GIB *actually* considered cost of coverage in reinstating the Exclusion is contradicted by the record. Indeed, on this record, the court is hard-pressed to find that a reasonable factfinder could conclude that the cost justification was an "exceedingly persuasive" reason or that this miniscule cost savings would further "important governmental objectives." *Virginia*, 518 U.S. at 533. In support, defendants only offer the deposition testimony of a single GIB member that there was a discussion of costs, but even he did not remember the specific content of that discussion, and he acknowledged that there was no quantification of that cost. (Wieske Dep. (dkt. #79) 88-89.) Moreover, no other GIB member is able to corroborate his vague memory, nor are there any contemporaneous documents supporting a claim that cost was a reason in *either* removing *or* reinstating the Exclusion. Moreover, testimony from board members who voted against reinstating the Exclusion establish that the *lack* of a cost concern was the reason for their vote.

Defendants maintain that there was a second reason for GIB's decision to reinstate

the Exclusion -- efficacy and safety. Here, too, the evidence that those concerns were genuine is limited. Defendants point to ETF Secretary Conlin's deposition testimony that he recalled hearing GIB member Wieske discuss concerns regarding the nature and efficacy of GCS, though Wieske himself testified that he did not recall raising this issue. Instead, Wieske testified, that "this was part of my thinking process." (Pls.' Resp. to Defs.' PFOFs (dkt. #113) ¶ 107.) Defendants also rely on the DOJ's August 10, 2017, memo, stating that ETF could "point to . . . medical research suggesting that such procedure . . . may in fact harm patients." (Defs.' Reply to Defs.' PFOFs (dkt. #128) ¶ 109.) However, the memo provides no support for this statement.

Still, GIB originally added the Exclusion in 1994 because "benefits and services [associated with gender reassignment surgery] were generally accepted by health insurance companies and health care providers to be experimental and not medically necessary." (Roth Decl., Ex. A (dkt. #83-1) 24.) While this evidence provides a basis for a reasonable trier of fact to conclude that concerns about efficacy were part of the justification for adoption of the *original* Exclusion, it is also *not* evidence permitting a reasonable finding that a concern about efficacy was the reason for voting *either* to exclude *or* to reinstate the Exclusion.

In defending against a sex-discrimination Equal Protection claim under heightened scrutiny, a defendant's failure to put forth evidence of a "genuine, not hypothesized or invented *post hoc* in response to litigation" reason forms a sufficient basis to find in favor of the plaintiff. *Virginia*, 518 U.S. at 533; *see also Whitaker*, 858 F.3d at 1052 ("What the record demonstrates here is that the School District's privacy argument is based upon sheer

conjecture and abstraction."); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, No. 3:18-CV-37-WTL-MPB, 2018 WL 3708049, at *5 (S.D. Ind. Aug. 3, 2018) (granting summary judgment in favor of plaintiff on Equal Protection claim because defendants "presented no evidence to support this justification beyond [their expert] Dr. Smith's testimony"); *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011) ("[Defendant] presented insufficient evidence to show that he was actually motivated by concern over litigation regarding Glenn's restroom use."). In other words, without any evidence to support a finding that defendants were *actually* concerned about efficacy in reinstating the Exclusion, the court need not consider whether defendants have raised a genuine issue of material fact -- largely via their expert's testimony -- as to the efficacy of GSC and hormone therapy for the treatment of gender dysphoria. Such an inquiry would only be relevant if rational basis review were appropriate. *See Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992) (explaining that under rational basis review, a government's classification "will not be set aside if any facts reasonably may be conceived to justify it" (citing *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961)).

Not only is the record devoid of any evidence to show that GIB members voted as they did for cost or efficacy reasons, the evidence is overwhelming that the actual or genuine reason for the reinstatement had to do with the DOJ's guidance -- specifically, the belief that the Texas court's entry of an injunction absolved defendants of any legal obligation to provide coverage. In opposing plaintiffs' motion to compel privileged information, namely a DOJ memo concerning reinstatement of the Exclusion and the substance of GIB members' conversations with DOJ attorneys, however, defendants

expressly disavowed this as a justification for GIB's action in reinstating the Exclusion:

> Although this case will turn partly on GIB's reasons for reinstating the Exclusion, GIB has never asserted "advice of counsel" as a defense or otherwise relied (at least in this litigation) on the confidential legal advice that Plaintiffs seek to discover. Instead, GIB has identified two state interests that justify the Exclusion, neither of which has anything to do with the attorney-client communications at issue here: (1) the potential cost of covering gender reassignment surgery, and (2) concerns about the medical efficacy of those procedures.

(Defs.' Opp'n to Pls.' Mot. to Compel (dkt. #63) 2.)

For all these reasons, defendants have failed to create a genuine issue of material fact as to whether a genuine, and not *post hoc*, reason for the reinstatement of the Exclusion was either cost or efficacy. *See Nichols v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) ("[S]ummary judgment is 'not a dress rehearsal or practice run,' but the 'put up or shut up moment' in which a proponent of facts must show what evidence it has to convince a trier of fact to accept its version of events." (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).[17] Accordingly, the court

---

[17] The court would be remiss not to note its serious concerns with the reliability of Dr. Mayer's opinion that no credible studies demonstrate that gender confirming surgery and hormone therapy are effective treatments for gender dysphoria. As detailed above, there are serious flaws with each of the three sources Mayer cites in support of this opinion. (*See* supra Facts § E; Mayer Rept. (dkt. #90) ¶ 21.) To begin, *The New Atlantis* is not a peer-reviewed medical journal, but rather a quarterly publication from the Ethics and Public Policy Center, a socially conservative advocacy group. (Schechter Original Rept. (dkt. #106) 17.) And the studies cited by Mayer are outdated and suffer from various flaws, which even he conceded at his deposition. (*Id.*; Mayer Dep. (dkt. #112) 142-43 ("absolutely" agreeing that the Meyer/Reter article has "important limitations," that neither the Dhejne article nor the Kuhn study address effectiveness of GCS, and recognizing, albeit downplaying, the conclusion of the Murad article that gender reassignment with the use of hormone therapy *was* "associated with improvements in gender dysphoria").) Next, the opinion expressed in Mayer's amicus brief only concerns gender dysphoria among children, and it was discredited by major medical associations. (Schechter Original Rept. (dkt. #106) 18 (citing Br. of Amici Curiae American Academy of Pediatrics, *et al.* at 21-24, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, No. 16-273 (U.S. Mar. 2, 2017)).) Finally, as for the CMS 2016 decision, the Department of Health and Human Services declined to issue national standards regarding how to determine medical

concludes that the Exclusion does not survive heightened scrutiny.

## C. Personal Involvement

In their original motion, defendants also seek summary judgment as to plaintiffs' Equal Protection claim asserted against defendant Conlin on the basis that he was not personally involved in the alleged discriminatory act. Specifically, defendants argue that "[t]he fact that ETF, under Conlin's direction administers GIB's decision does not suffice, since Conlin had no control over those decisions." (Defs.' Opening Br. (dkt. #81) 41.) *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.").[18]

On this record, however, a reasonable jury could find that Conlin was personally involved: (1) in his capacity as Secretary of ETF administering health care coverage to state employees; (2) in the reinstatement of the Exclusion by personally determining that the four contingencies set by GIB at the December 2017 meeting were satisfied; and (3) in drafting contract amendments to health plans. The cases cited by defendants are

---

necessity among the Medicare population, finding a lack of studies specific to that group. (*Id.* at 15.) In contrast, the Department had already concluded in 2014 that there was "a consensus among researchers and mainstream medical organizations that transsexual surgery is an effective, safe and medically necessary treatment for [gender dysphoria]." (*Id.* (citing (Schechter Original Rept., Ex. B (dkt. #106-2) 20).) Not only has Medicare since 2014 provided coverage based on a patient's individual needs, Mayer fails to address more recent studies cited by plaintiffs' experts, which appear to address his core criticism of a lack of credible studies measuring the reduction of gender dysphoria after medical inventions. (*See, e.g.*, Budge Original Rept. (dkt. #89) 15-18; Budge Suppl. Rept. (dkt. #119) 6.)

[18] Defendants also point to ETF's stance in support of removing the Exclusion to undermine a finding of personal involvement on the part of Conlin. State of mind, however, is not relevant since plaintiffs are challenging the Exclusion as an "overtly discriminatory classification." (Pls.' Opp'n (dkt. #115) 28 (citing *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985)).)

distinguishable from these facts primarily because liability is asserted against Conlin based on *his* actions, and not on those of a subordinate or other entity. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (reiterating long-standing rule in § 1983 cases that a superior cannot be liable under a *respondeat superior* theory, but instead must have participated in or at least know about the actions of his or her subordinate); *Alicea v. Luzerne Cnty. Housing Auth.*, No. 3:15-CV-01387, 2017 WL 489686, at *3 (M.D. Pa. Jan. 3, 2017) (rejecting *respondeat superior* theory of liability against the City based on actions of housing authority); *Nolan v. Cuomo*, No. 11 CV 5827 DRH AKT, 2013 WL 168674, at *10 (E.D.N.Y. Jan. 16, 2013) (holding that defendant who had a role in maintaining sex offender registry was not personally involved in denial of plaintiff's request to be declassified where defendant was not authorized to make "any determinations or recommendations").[19]

In their supplemental motion, defendants also seek summary judgment in favor of defendant Nietzke, a GIB member, on plaintiffs' claim asserted against him in his individual capacity, because he did not vote to reinstate the Exclusion. (Dkt. #141.) As such, defendants maintain that he should only be sued in his official capacity like the other GIB members who did not vote for the Exclusion. Plaintiffs oppose this on the theory that Nietzke "may have supported the Exclusion in discussions that led to reinstating the Exclusion in the closed session meeting that took place on December 30, 2016 or elsewhere" and also pointing to Nietzke's vote to not remove the Exclusion in May 2017.

---

[19] Indeed, *Alicea* supports a finding that the facts at issue here are sufficient to implicate Conlin, with that court holding that the housing authority's role in *administering* the City's public housing program under Pennsylvania law was sufficient to find that it was personally involved in the discriminatory conduct. 2017 WL 489686, at *3.

(Pls.' Opp'n to Suppl. Mot. (dkt. #148) 4.)  In light of plaintiffs' earlier line-drawing -- that GIB members who did not vote to reinstate the Exclusion would only be sued in their official capacity -- the court would be inclined to dismiss the individual capacity claim against Nietzke.  As addressed below, however, the court need not reach this issue in light of its decision to grant qualified immunity to all individual defendants.

### D. Qualified Immunity

Finally, defendants argue that the individual defendants are entitled to qualified immunity on any claim for damages based on a violation of the Equal Protection Clause.[20] The court agrees.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether a qualified immunity defense is available involves a two-part test to determine: (1) whether the facts alleged show defendants violated a constitutional right when viewed in the light most favorable to the party asserting the injury; and (2) whether those rights were clearly established at the time of the alleged violation. *Board v. Farnham*, 394 F.3d

---

[20] In their original motion, defendants sought summary judgment on this basis as to ETF Secretary Conlin.  In response to the court granting plaintiffs leave to add certain GIB members as defendants in their individual capacities, the court allowed defendants an opportunity to file a supplemental motion for summary judgment asserting the qualified immunity defense as to these newly-added, individual defendants.  (Dkt. #141.)  More recently, plaintiffs filed a motion for leave to file a supplemental motion for summary judgment, seeking a finding of liability against the newly-added, individual GIB members.  (Dkt. #157.)  In light of the court's decision to grant defendants' motion for summary judgment on the individual defendants' qualified immunity defense, plaintiffs' motion has been rendered moot.

469, 477 (7th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, defendants' qualified immunity defense turns on the question of whether the denial of insurance coverage for GCS and hormone therapy for the treatment of gender dysphoria violated a clearly established right under the Equal Protection clause -- either because (1) such an Exclusion constitutes clear sex discrimination or (2) transgender individuals are clearly a suspect or quasi-suspect class entitled to heightened scrutiny. As to the latter theory, there are no Supreme Court or Seventh Circuit cases finding that as a class, transgender individuals are entitled to heightened scrutiny. Indeed, the Seventh Circuit declined most recently in *Whitaker* to reach this question. *See Whitaker*, 858 F.3d at 1051 ("But this case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny."). Neither has the Supreme Court or the Seventh Circuit definitively decided that a denial of insurance coverage for GCS and hormone therapy for transgender individuals only constitutes *sex* discrimination under the Fourteenth Amendment's Equal Protection Clause.[21]

In finding no clearly established precedent for purposes of qualified immunity to date, the court is cognizant of the risk that it may be defining the liability question here too narrowly by considering differential treatment specific to *a denial of insurance coverage*. As the Seventh Circuit recently cautioned in *Mitchell*, "this particularity requirement does not go so far as to mandate a mirror-image precedent from the Supreme Court or this court." *Mitchell v. Kallas*, 895 F.3d 499 (7th Cir. 2018). Perhaps the correct question is

---

[21] Even so, having considered whether a denial of such care implicates the Eighth Amendment, *see Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018), the Seventh Circuit has at least signaled what its decision *might* be.

whether any differential treatment of transgender individuals is clearly subject to heightened protection under the Equal Protection clause. If so, in the context of upholding the grant of a preliminary injunction, the Seventh Circuit already held in *Whitaker* that the bathroom policy at issue, which targeted transgender students, constituted sex discrimination subject to heightened scrutiny under the Equal Protection Clause. 858 F.3d at 1051-52.[22]

In fairness, however, *Whitaker* was issued on May 30, 2017, approximately five months after GIB decided to reinstate the Exclusion if four conditions were satisfied *and* approximately four months after the Exclusion was reinstated. Moreover, as previously discussed, GIB's reversal appears to have been motivated, at least in part, by a Texas district court decision going the opposite way. Given that plaintiffs' Equal Protection claim turns on those actions, the court finds that the law was not clearly established at the time the individual defendants were taking steps to reinstate the Exclusion. This line drawing may still seem too narrow by plaintiffs, but given the rapid development of the law in this area, the court declines to find that the "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016).

---

[22] The concept that differential treatment based on sex-stereotyping constitutes sex discrimination is not a new concept, dating back to the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). However, the sex stereotyping involved in that case -- that the plaintiff should "walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry," *id.* at 235 -- is arguably sufficiently distinct from the kind of stereotyping here -- that transgender individuals' physical sex characteristics should conform with their natal sex -- to preclude a finding that the rights at issue in plaintiffs' Equal Protection claim were clearly established by that decision or its progeny.

## III. Trial Plan

So, where does this leave us?  Having found liability in favor of plaintiffs on their Title VII and ACA claims, plaintiffs have a right to pursue: (1) equitable relief, *see* 42 U.S.C. § 2000e-5(g) (Title IX remedies provision); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979) (holding private right of action under Title IX for injunctive or equitable relief existed);[23] (2) compensatory and punitive damages, *see* 42 U.S.C. § 1981a(a)(1) (Civil Rights Act of 1991, applied to Title VII claims); *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992) (holding that compensatory damages are available under Title IX);[24] and (3) an award of attorneys' fees and cost, *see* 42 U.S.C. § 2000e-5(k) (Title VII remedy); 42 U.S.C. § 1988(b) (providing for fees for Title IX claims).  Moreover, the court's finding of liability on the Equal Protection claim also entitles plaintiffs to equitable relief and attorney's fees.  *See* 42 U.S.C. §§ 1983, 1988(b).  While the court will determine any equitable relief at trial, as well as award of attorneys' fees and costs, defendants have demanded a jury trial as to plaintiffs' claims for compensatory and/or punitive damages, which is their right.  And so a jury there shall be.[25]

---

[23] The court looks to Title IX in understanding the remedies available for a violation of Section 1557 of the ACA.  *See also* 42 U.S.C. § 18116.

[24] The punitive damages provision of § 1981a only applies to Title VII claims, and there is no similar provision under Title IX for an award of punitive damages.

[25] Of course, the court would be open to crafting an equitable remedy for reimbursement of plaintiff Andrews' outlay of funds to cover her GCS, assuming that plaintiffs can direct the court to some authority that such an award falls under "any other equitable relief as the court deems appropriate" under 42 U.S.C.A. § 2000e-5(g)(1).  A court mediator is available to facilitate these discussions, but failing that, the court will plan to address the scope and manner of trial at next week's Final Pretrial Conference.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #80) and supplemental motion for summary judgment (dkt. #141) are GRANTED IN PART AND DENIED IN PART. The motions are granted as to defendants' argument that the individual defendants are entitled to qualified immunity against plaintiffs' Equal Protection claim asserted against those defendants in their individual capacity. In all other respects, the motions are denied.

2) Plaintiffs' motion for partial summary judgment (dkt. #95) is GRANTED.

3) Defendants' motions to strike plaintiffs' supplemental expert reports (dkt. #124) and second supplemental expert reports (dkt. #138) are DENIED.

4) Plaintiffs' motion for leave to file supplemental motion for summary judgment (dkt. #157) is DENIED AS MOOT.

Entered this 18th day of September, 2018.

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge